**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| LAURA ROSE,<br><br>Plaintiff,<br><br>v.<br><br>FORD MOTOR COMPANY, LLC,<br><br>Defendants. | Case No.:<br><br>Hon. |


| | |
|---|---|
| Jacquelyn Kmetz (P83575)<br>Elizabeth K. Abdnour (P78209)<br>Ashley A. Dylenski (P88208)<br>ABDNOUR WEIKER, LLP<br>325 E. Grand River Ave., Suite 250<br>East Lansing, MI 48823<br>(517) 994-1776<br>jacquelyn@education-rights.com<br>liz@education-rights.com<br>ashley@education-rights.com<br><br>*Attorneys for Plaintiff* | |


# COMPLAINT

Plaintiff, LAURA ROSE, by and through her attorneys, ABDNOUR WEIKER LLP, hereby files the following complaint for disability, age, and race discrimination and retaliation and violations of her statutory rights in violation of the Titles I and V of the Americans with Disabilities Act, Title VII of the Civil Rights

Act, the Age Discrimination in Employment Act, the Persons with Disabilities Civil Rights Act and the Elliott-Larsen Civil Rights Act against Defendant as captioned above.

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction over Plaintiff's federal claims under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., Title V of the Americans with Disabilities Act, 42 U.S.C. § 12201 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.
2. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress for providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.
3. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a), which gives district courts "supplemental jurisdiction over all other claims that

are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

4. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Eastern District of Michigan as the Defendant is located and operates in the Eastern District of Michigan and the events and omissions giving rise to this action occurred within the Eastern District.

## PARTIES

5. Plaintiff Laura Rose is a 52-years-old Caucasian individual with a disability, pursuant to MCL 37.1103(h) and is a resident of the State of Michigan and Wayne County. At all relevant times, Ms. Rose was an employee of Ford Motor Company, LLC, located in the County of Wayne, Michigan and City of Dearborn, Michigan.

6. Ford Motor Company, LLC was at all relevant times and continues to be organized and existing under the laws of the state of Michigan, and has its principal place of business, located in the County of Wayne, at 1 American Rd., Dearborn, MI 48126, where the events that give rise to this Complaint occurred.

## FACTUAL ALLEGATIONS

7. Ford Motor Company, LLC (Ford) is a place of business operating within Wayne County, Michigan.

8. Laura Rose was an employee of Ford who has been diagnosed with attention deficit hyperactivity disorder (ADHD) and generalized anxiety disorder (GAD).
9. Ms. Rose's ADHD and GAD limit multiple major life activities, including interacting with others and working.
10. Ms. Rose has managed her ADHD and GAD through therapy and lifestyle changes, which together have allowed her to manage her symptoms and excel in her career.
11. In June 2011, Ford hired Ms. Rose as a full-time employee, serving as a Project Manager, Design Studio at the GSR7 Level, equivalent to a higher non-management entry-level analyst role.
12. On February 1, 2013, Ms. Rose was promoted to GSR8, the highest non-management analyst position.
13. On July 1, 2015, Ms. Rose was promoted to management, serving as the Body Interior Engineering Integration Supervisor at the LL6 level.
14. In August 2017, Ms. Rose transferred interdepartmentally, staying at the LL6 level, but moving to Vehicle Programs to serve as a Program Management Supervisor.
15. At this time, Ms. Rose was also initially placed on the "Key Talent" track.
16. In 2022, Jeff Seaman, Ms. Rose's former manager, recruited Ms. Rose for a promotion to the LL5 EV Utilities Platform Program Manager position.

17. Mr. Seaman then became Ms. Rose's Chief Program Engineer (CPE), operating as her direct supervisor.

18. In accepting the position, at Ms. Rose's request, Asmat Kamal, a neurotypical male, became her JobShare partner.

19. Ms. Rose requested Mr. Kamal JobShare the position to handle the administrative tasks made difficult by her disabilities, leaving Ms. Rose open to focus on the more demanding strategic work.

20. As a JobShare partner, Mr. Kamal was to perform more administrative duties, while Ms. Rose focused on strategic business and cross-functional responsibilities.

21. Ms. Rose also expressed to Mr. Seaman that Mr. Kamal could provide necessary accommodations for her executive functioning deficits, in an informal manner via the JobShare partnership, such as memory recall prompting.

22. Although Mr. Seaman expressed some concerns with Mr. Kamal's performance, including that he was not "LL5 material," Mr. Seaman ultimately approved Ms. Rose's JobShare proposal.

23. In approving the agreement, Mr. Seaman confirmed with Ms. Rose that the JobShare arrangement would serve as an informal accommodation for her executive functioning needs.

24. Upon receiving her LL5 promotion and joining the team, Mr. Seaman immediately directed Ms. Rose to assume a significant portion of the CPE responsibilities.

25. From approximately October 2022 through the end of April 2023, Ms. Rose regularly operated in a stand-in CPE capacity, meaning that in addition to supporting the work as program manager, Ms. Rose was also tasked with decision-making and program-leadership duties for the work she and her team were completing.

26. Under Ms. Rose's leadership, the cross-functional team Mr. Seaman assigned her to successfully met all key performance milestones for an entirely new, "whitespace" product, which was timed to be Ford's lead electric vehicle launch.

27. Ms. Rose's accomplishments were recognized in her positive year-end performance review.

28. During their 2022 performance review, Ms. Rose and Mr. Kamal received constructive feedback that Mr. Kamal was perceived as contributing substantially less to the successful product delivery and was less capable than Ms. Rose.

29. Although Ms. Rose received significantly more positive feedback than Mr. Kamal regarding her specific work performance, consistent with general practice, both Ms. Rose and Mr. Kamal received the same performance rating.

30. That year, Ms. Rose received a larger stock award than Mr. Kamal, reflecting her more substantial contributions, capabilities, and performance.

31. In November 2022, Ms. Rose began receiving professional treatment for her ADHD and GAD.

32. On April 1, 2023, Mr. Dana Katinas replaced Mr. Seaman as Ms. Rose's CPE.

33. That same month, when meeting with Mr. Katinas, Ms. Rose disclosed her ADHD diagnosis, along with the accommodation arrangement via the JobShare partnership with Mr. Kamal.

34. Thereafter, Mr. Katinas began discriminating against and harassing Ms. Rose.

35. For example, Ms. Rose repeatedly raised concerns about the team approaching burn-out following months-long 60-hour weeks, despite being compensated for less, and in response, Mr. Katinas aggressively advised Ms. Rose to "be careful."

36. As another example, when Ms. Rose expressed concern or attempted to dissuade Mr. Katinas from inadvertently violating corporate procedures due to his unfamiliarity with the department, Mr. Katinas responded in a hostile manner.

37. As yet another example, Mr. Katinas repeatedly rejected Ms. Rose's documented, corporate-dictated obligations as both a People Leader and Personal Development Committee Representative with increasing hostility, in direct contravention to well-established corporate practice and policies.

38. Notably, Mr. Kamal received no such aggressive or hostile treatment in response to similar feedback and comments to Mr. Katinas.

39. Despite this hostile and discriminatory treatment by Mr. Katinas, Ms. Rose continued to meet and exceed all performance objectives.

40. Ms. Rose successfully delivered platform program objectives with minimal intervention or guidance while simultaneously seeking and delivering workstreams on behalf of her "tophat" program team.

41. Ms. Rose's 2023 mid-year performance review noted she exceeded expectations for delivery objectives and met expectations for leadership behaviors.

42. Again, consistent with general practice, Mr. Kamal received the same ratings, despite being less capable and contributing less than Ms. Rose.

43. In December 2023, Ms. Rose received a corporate award, with Mr. Kamal as her JobShare partner, from Mr. Katinas and Linda Zhang for being the only team to deliver their milestones on time.

44. At the end of 2023 and into the first half of 2024, Ford included Ms. Rose in selection pools for multiple promotional interviews, including a JobShare Hardware Integration Manager, JobShare Integrated Services PMO Director, and individual Platform Architecture and Prototyping.

45. For several of these interview pools, upon information and belief, the postings were closed early due to the number of applicants.

46. Upon information and belief, only 4-5 candidates were interviewed for each role, demonstrating how impressed Ford was with Ms. Rose to include her in the selection pools for the roles, despite being less than 18 months into her pay grade.

47. During this same time frame, Ms. Rose was also having conversations with several Chiefs and Directors who indicated they were hoping for opportunities to to promote Ms. Rose.

48. In approximately December 2023, Ms. Rose informed Mr. Katinas that a change in her ADHD medication was causing her to experience some cognitive deficits, specifically around emotional regulation, and a considerable increase in memory and attention deficits.

49. Ms. Rose also confirmed with Mr. Katinas that Mr. Kamal was aware of these changes, was supportive, and that collectively they would ensure they continued to deliver their workstream responsibilities but would likely need to shift some of their JobShare responsibilities to accommodate Ms. Rose's current needs.

50. Mr. Katinas told Ms. Rose this would not be a problem.

51. Shortly thereafter, in February 2024, Ms. Rose and Mr. Kamal received an unfavorable 2023 year-end performance review, despite the documented accomplishments and positive work performance described above and despite receiving "exceeds expectations" on their mid-year review in August 2023.

52. The "exceeds expectations" rating for delivery objectives was inexplicably reduced to "below expectations."

53. Mr. Katinas' verbal feedback failed to explain the significant decrease in performance rating.

54. Instead, Mr. Katinas' feedback was aggressive, confusing, and contradictory to Ms. Rose and Mr. Kamal's established organizational roles, responsibilities, and required processes.

55. When Ms. Rose and Mr. Kamal met with Mr. Katinas and attempted to express their concerns with the performance review, Mr. Katinas became defensive and refused to respond to their questions.

56. Mr. Katinas also failed to provide any evidence to support his sudden decision to rate them as "below expectations."

57. During the meeting, Mr. Katinas repeatedly shouted at Ms. Rose when she attempted to calmly exit the room, as she was feeling suddenly ill and Mr. Katinas had far surpassed the allotted 30-minute meeting time frame and was simply continuing to berate Ms. Rose and Mr. Kamal.

58. Ms. Rose's Chief Program Manager, Kathy Ralston, who also attended the performance review meeting, later expressed concern to Ms. Rose about Mr. Katinas' conduct during the meeting.

59. Ms. Ralston encouraged Ms. Rose to submit a rebuttal to the performance review.

60. Ms. Rose submitted a rebuttal on May 23, 2024.

61. The performance review, including Mr. Katinas' hostile behavior during the meeting, quickly and significantly exacerbated Ms. Rose's GAD.

62. Ms. Rose's medical team recommended she limit her interactions with both Mr. Katinas and Ms. Zhang, Ms. Rose's Director and the person ultimately responsible for signing the performance reviews, until they were able to stabilize Ms. Rose emotionally and psychologically.

63. During this time, Mr. Kamal began modifying their internal JobShare responsibilities so that he became the sole direct contact with Mr. Katinas.

64. Ms. Rose objected to this modification, as completely removing all interactions with Mr. Katinas directly interfered with her ability to receive necessary updates and information on her workstreams.

65. However, over Ms. Rose's objection, Mr. Kamal would purposely schedule meetings with Mr. Katinas at times Ms. Rose had direct conflicts.

66. During this same timeframe, Mr. Katinas and Ms. Zhang also both actively excluded Ms. Rose and Mr. Kamal from working on their program's primary objective, a reconfiguration of their vehicle platform, which accounted for at least 75% of Ms. Rose's planned annual workload and comprised the core function of her position.

67. Meetings for this workstream were set, or later updated, to "private" in the calendaring system, explicitly excluding Ms. Rose.

68. Mr. Katinas resisted Ms. Rose's repeated attempts to engage in the workstream and its meetings.

69. Instead, Mr. Katinas stated in team meetings with Ms. Rose and Mr. Kamal that they would not be permitted to be involved in the workstream until he and Ms. Zhang made a decision to "cascade" the status of the progress on the workstream.

70. Mr. Katinas refused to give Ms. Rose any other information regarding this workstream, including on what pre-conditions were necessary for him and Ms. Zhang to make such a decision, despite this workstream being a primary responsibility of Ms. Rose's job role.

71. Mr. Kamal advised Ms. Rose that Mr. Katinas maintained this stance in their individual discussions as well.

72. Mr. Katinas rebuffed all efforts by Ms. Rose to engage in discussions regarding this workstream or her other workstreams.

73. On April 24, 2024, Mr. Kamal emailed Ms. Rose requesting to end their JobShare arrangement.

74. However, despite Mr. Kamal's desire to end the arrangement, he was not formally able to do so until either he or Ms. Rose found another role, which Ms.

Rose later did on July 1, 2024, when she moved to the Ford Customer Service Division (FCSD) Task Force.

75. Mr. Kamal told Ms. Rose he had been advised his employment would likely be terminated if he remained Ms. Rose's partner.

76. Mr. Kamal declined to share who told him this.

77. That same day, Mr. Katinas scheduled an out-of-process performance review with Ms. Rose, which Ms. Zhang claimed was a "new process" for all employees.

78. Notably, however, Mr. Kamal was not given an out-of-process performance review.

79. Mr. Kamal was also prohibited from attending Ms. Rose's out-of-process performance review, despite their JobShare arrangement and despite the two attending all performance reviews together in the past.

80. Mr. Katinas continued to prohibit Mr. Kamal from attending the performance review even after Ms. Rose reminded him that Mr. Kamal served as an accommodation for her ADHD, keeping track of their performance achievements and operating as a memory prompt for Ms. Rose to effectively recall and recount their performance. B

81. Ms. Rose reported her concerns about the out-of-process performance review to Erin Pantano, Human Resources (HR) Disability Specialist, and requested

permission to record the performance review meeting to facilitate recall as a reasonable accommodation in lieu of Mr. Kamal's attendance.

82. Ford denied Ms. Rose's request to record the meeting.

83. Instead, Ms. Pantano advised Ford's HR representative, Taleen Newlin, would attend the performance review meeting.

84. As a result of the sudden out-of-process performance review invitation, the abrupt ending of her JobShare arrangement, and Ford's refusal to provide her with agreed-upon disability accommodations, Ms. Rose's mental health deteriorated even more significantly, leading to a new diagnosis of severe anxiety and requiring additional psychiatric care.

85. On April 30, 2024, Ms. Rose met with Mr. Katinas and Ms. Ralston for the out-of-process performance review.

86. Ms. Newlin did not attend the meeting, nor did Ford provide any explanation for her absence or any other individual to serve in her role at the meeting.

87. During this meeting, Ms. Rose cited her exclusion from key workstreams, presented documentation of well-received cross-functional alternative initiatives and contributions, and requested detailed clarification on Mr. Katinas' negative feedback, which was never previously provided and only shared verbally during the meeting.

88. Mr. Katinas refused to answer Ms. Rose's questions, repeatedly claiming that Ms. Rose should just "be comfortable with ambiguity."

89. Mr. Katinas also advised Ms. Rose she was trending toward a "below expectations" rating in all categories for her mid-year performance review.

90. No explanation was provided as to why Ms. Rose was trending toward a "below expectations" rating in all categories.

91. In response to this out-of-process performance review, Ms. Rose scheduled touchpoint meetings with Mr. Katinas for both the end of May and end of June, to discuss her work performance and progress, and to attempt to raise her performance rating to where Ford expected it to be.

92. At both meetings, Ms. Rose led the discussion and provided detailed documentation demonstrating the quality of her work and directly addressing each aspect of Mr. Katinas' feedback.

93. During both meetings, Mr. Katinas said Ms. Rose she was meeting expectations without exception, specifically stated Ms. Rose was "trending up," and provided no areas for improvement.

94. In fact, in each meeting, Mr. Katinas stated Ms. Rose was doing excellent work that was exactly what he hoped for and responded with "no" when Ms. Rose asked if there was anything else she should do differently moving forward.

95. During these meetings, Mr. Katinas also acknowledged that he had deliberately prohibited Ms. Rose and her team from completing their principal responsibilities for several months.

96. At the beginning of June 2024, Ms. Ralston retired and Ms. Rose's direct-line reporting transitioned to Ms. Ralston's Director, Mr. Craig Kelly.

97. Ms. Rose regularly shared her documentation and the feedback she received with both Mr. Kelley and her HR representative, Ms. Newlin, via email.

98. Neither Mr. Kelley nor Mr. Newlin ever responded to these emails.

99. Although Ford policy required Mr. Kamal and Ms. Rose to continue their JobShare agreement until one of them was moved to a new role, following his April 24, 2024 email, Mr. Kamal avoided most interactions with Ms. Rose and limited his direct contributions to the team's work through the end of June 2024.

100. Mr. Kamal frequently redirected program-related requests to one of Ms. Rose's subordinates or someone on the broader work team.

101. Mr. Kamal also sought to circumvent Ms. Rose's direct involvement in various workstreams by repeatedly avoiding interactions with her and attempting to delegate Ms. Rose's work, that she was actively working on and delivering, to other members of her team.

102. Mr. Kamal also became argumentative and actively tried to dissuade Ms. Rose from working on those responsibilities, despite Mr. Katinas' feedback in the

April performance review meeting that Ms. Rose wasn't "visible" enough on the team.

103. Thus, despite Mr. Kamal's interference, Ms. Rose still actively pursued and delivered as much of the work herself as possible in accordance with her defined job responsibilities, including, but not limited to, providing detailed CPE briefings on key program content investigations, interrogating and mitigating program timing disconnects, serving as program lead for computer-aided engineering design feasibility, and identifying and driving $600,000 total and $10 per part cost avoidance.

104. Notably, despite Mr. Kamal's efforts to circumvent Ms. Rose, in approximately late May or early June 2024, Mr. Katinas commented to one of Ms. Rose's subordinates that Mr. Kamal had accomplished no significant work on the team and was instead devoting his time to pursuing a new role.

105. Despite the repeated positive feedback Ms. Rose received during her touchpoint meetings with Mr. Katinas, Ms. Rose received a below expectations rating in both categories for her 2024 mid-year performance review.

106. During her performance review meeting with Mr. Katinas and Mr. Kelley, they provided Ms. Rose with specific subcategory rankings that made it mathematically impossible to have received an overall score of 1.

107. For example, in two out of the four subcategories comprising the project deliverables ranking, Ms. Rose received a 3 and a 2, respectively.

108. Therefore, even if Ms. Rose had received a 1 in the remaining two subcategories, her overall score for project deliverables would have been a 1.75.

109. Due Ford's policy that scores 0.67 or higher should be rounded up, Ms. Rose should have received at least a 2, for "meets expectations," in the project deliverables category.

110. The supporting text in Ms. Rose's performance review was almost exclusively positive, making the low scores clearly inaccurate.

111. The only negative text in Ms. Rose's performance review was that she allegedly did not know "how and where to contribute consistently" during time frame when Mr. Katinas had admitted that he was actively excluding Ms. Rose from her primary workstreams, as described *infra*.

112. Further, despite Ms. Rose and Mr. Kamal still being bound by their JobShare agreement, their history of receiving the same performance ratings regardless of individual contributions, and Mr. Katinas' previous remarks regarding Mr. Kamal's failure to accomplish significant work, Mr. Kamal received individual performance scores that were higher than Ms. Rose's.

113. In early July 2024, Ms. Rose accepted a temporary Program Manager position with a high-visibility corporate task force, to seek relief from the ongoing hostility and discrimination from Mr. Kamal and Mr. Katinas.

114. Before Ms. Rose joined the corporate task force team, it had a reputation for failing to make sufficient headway in its goals and objectives.

115. From the beginning, Ms. Rose communicated openly with her new management and team members about her disabilities and her accommodation needs.

116. Ms. Rose received overwhelmingly positive feedback for her performance in the Program Manager role from both her Interim Chief, Yvonne Kinnie, and her Interim Director, Ken Ely, as well as from her cross-functional teams.

117. As a result of the change in leadership and team, resulting in a work environment free from discrimination and harassment, Ms. Rose's disability symptoms improved.

118. Because she was no longer being harassed and discriminated, and her disability symptoms improved so significantly, Ms. Rose was able to deliver a challenging effort launched a significant warranty-cost avoidance dealer support hotline within weeks of joining the corporate task force.

119. Ford's Chief Executive Officer, Jim Farley, publicly praised Ms. Rose's efforts on the corporate task force.

120. Mr. Ely also gave Ms. Rose a Director's Award for pulling a key module support launch ahead on the task force.

121. While on this temporary assignment, Ms. Rose pursued permanent roles at Ford that both better aligned with her career goal to transition into Technical Program Management and allowed her to maintain the improvement to her disabilities and mental health.

122. Ms. Rose also built a strong rapport with Mr. Ely, who regularly sought her input on reorganizing his nearly 1,000-person organization, repeatedly communicated his intent to promote Ms. Rose to LL4 within his organization, and regularly engaged her in other work, treating Ms. Rose as a trusted collaborator.

123. In November 2024, Ms. Rose participated in a series of interviews for a role in another department, Integrated Services, to establish a Program Management/Business Office.

124. Ms. Rose ultimately received a formal offer for this position.

125. After Mr. Ely learned of the offer to Ms. Rose, he countered with his own lateral positional move, keeping Ms. Rose at an LL5 level, instead of giving her the promotion he had previously discussed with her.

126. In making this lateral position offer, Mr. Ely advised Ms. Rose that her disabilities would likely hinder future promotional opportunities.

127. Mr. Ely also told Ms. Rose that other department leaders, such as the one in Integrated Services where she had been offered new position, would not be as tolerant of her disability limitations as he had been.

128. Mr. Ely prefaced his comments by saying, "HR is not in the conversation."

129. Mr. Ely's statements negatively triggered Ms. Rose's severe anxiety symptoms.

130. Terrified by these statements and fearing that a role in Integrated Services would go poorly for her because of her disabilities, Ms. Rose declined the offer from Integrated Services and accepted Mr. Ely's offer.

131. However, Ms. Rose made her acceptance of Mr. Ely's offer contingent on her leading a specified, comprehensive software-focused workstream and receiving the title of Technical Program Manager, Software.

132. Mr. Ely accepted Ms. Rose's conditions and promised she would continue to lead three critical, defined workstreams in which she was already actively engaged.

133. Mr. Ely also acknowledged his understanding that Ms. Rose's desire to transition away from traditional program management was a key factor in her decision to accept his offer under her stated conditions.

134. Following this conversation with Mr. Ely, Ms. Rose confirmed the details of the agreement with her new manager, Ms. Stacy Balzer.

135. Ms. Balzer confirmed receipt of the details, expressing appreciation for Ms. Rose's clarity and quickly facilitating Ms. Rose's internal transfer.

136. However, only a few weeks after reaching this agreement, Mr. Ely announced a new reorganization that assigned Ms. Rose a new direct-line manager, who had not yet been identified and was not slated for ownership of any of Ms. Rose's current workstreams.

137. Even more concerning, Mr. Ely significantly changed Ms. Rose's agreed-upon responsibilities and title, placing her in a traditional program management office which she had specifically rejected in accepting the position.

138. When Ms. Rose brought her concerns to Mr. Ely's attention and reminded him of their agreement as related to Ms. Rose's job responsibilities and title, Mr. Ely initially claimed to have forgotten their prior agreement.

139. However, Mr. Ely then readily offered to reinstate Ms. Rose's originally agreed upon title and job description and updated the reorganization chart accordingly.

140. However, in doing so, Mr. Ely kept the change in reporting, advising Ms. Rose she would still report to a new manager, Mr. Kleber Fernandes, effective January 1, 2025.

141. As before, immediately following this conversation with Mr. Ely, Ms. Rose confirmed these updates with Ms. Balzer, her now soon-to-be former manager.

142. In December 2024, Mr. Fernandes initiated a conversation with Ms. Rose, expressing confusion about her role and responsibilities.

143. Ms. Rose provided Mr. Fernandes detailed information regarding the prior agreements with both Mr. Ely and Ms. Balzer.

144. During this conversation, Ms. Rose also told Mr. Fernandes about a previous conversation with Mr. Ely, in which he expressed concern with Ms. Rose's ability to maintain program management duties for an entire department given the work volume and her disabilities.

145. Ms. Rose also told Mr. Fernandes about her disabilities and needed accommodations.

146. Mr. Fernandes thanked Ms. Rose for the information and did not express any concerns, aside from Ms. Rose's 70-hour work weeks, which were required to maintain the quality of Ms. Rose's deliverables.

147. Ms. Rose ended 2024 with continued positive feedback and no documented areas for improvement.

148. Despite their positive reviews of Ms. Rose and no stated concerns aside from her 70-hour work weeks, in a meeting on or about January 14, 2025, both Ms. Balzer and Mr. Fernandes told Ms. Rose they had concerns about her performance.

149. When Ms. Rose asked for specific information and cited the consistent positive feedback to date, Ms. Balzer and Mr. Fernandes referred to Ms. Rose's December 2024 conversation with Mr. Fernandes and her 2024 mid-year review.

150. Ms. Balzer and Mr. Ferandes claimed these two incidents demonstrated a pattern of "pushback," despite Mr. Fernandes not raising any such concerns during or following the December 2024 conversation and despite no such concerns listed in Ms. Rose's 2024 mid-year performance review.

151. Neither Ms. Balzer nor Mr. Fernandes identified any specific concerns with Ms. Rose's performance or any failure to meet her defined roles and responsibilities.

152. Instead, they continued to repeat that the problem was that Ms. Rose's general "behavior" constituted "pushback."

153. When Ms. Rose asked for specific examples how her behavior constituted pushback, neither Ms. Balzer nor Mr. Fernandes provided any.

154. When Ms. Rose attempted to prompt Ms. Balzer's recollection of previous conversations between them regarding the agreed-upon fundamentals of Ms. Rose's position, Ms. Balzer denied those previous, documented communications.

155. Instead, Ms. Balzer baselessly claimed Ms. Rose had agreed to be the organization's Program Manager.

156. Due to the increasing hostility and combativeness by both Ms. Balzer and Mr. Fernandes in this meeting, Ms. Rose began rapidly experiencing severe GAD symptoms, including overwhelming confusion and shock, rapid heart rate, and panic.

157. With great effort, Ms. Rose pushed through her increasing symptoms to reiterate the scope of her existing responsibilities, as previously agreed upon between herself and Mr. Ely, and as communicated to and agreed upon by both Ms. Balzer and Mr. Fernandes.

158. In response, Ms. Balzer and Mr. Fernandes ended the meeting and told Ms. Rose to provide a detailed weekly breakdown of her duties, to which they said they would then provide follow-up.

159. Ms. Rose promptly provided the requested breakdown, but to date, neither Mr. Fernandes nor Ms. Balzer provided any response or follow-up.

160. Following this discussion, Mr. Ely began missing most of the standing meetings that Ms. Rose led, despite previously attending most of them.

161. Mr. Ely also stopped responding to Ms. Rose's instant messages, which they had previously used to communicate frequently.

162. In noticeable contrast, Mr. Fernandes began attending meetings for workstreams that Ms. Rose supported but had previously required no oversight by Mr. Fernandes and were owned by Mr. Fernandes' peers.

163. This abrupt increase in oversight, directly following a hostile meeting, further exacerbated Ms. Rose's physical GAD symptoms, which included frequent debilitating migraine headaches and vertigo that became resistant to treatment.

164. Ms. Rose began experiencing longer and longer stretches of insomnia, struggled to bathe and eat consistently, and rapidly lost 35 pounds in about six weeks.

165. In private meetings with Ms. Rose via videoconference, Mr. Fernandes became increasingly aggressive in his language, tone, volume, and body language, becoming red-faced and shouting at her on multiple occasions.

166. As one example, in January 2025, when Ms. Rose had had to take medical leave due to anxiety-related migraines, Mr. Fernades told her that a decision had been made to cancel a critical meeting to report progress on one of her workstreams.

167. Mr. Fernandes claimed the cancellation was a decision made by himself, Mr. Ely, and Mr. Josh Halliburton, Executive Director of Quality, to avoid wasting the directors' time due to Ms. Rose's poor performance and "surprising" lack of progress.

168. In response, Ms. Rose expressed confusion and concern, noting that the meeting's presentation outlining the team's progress had been directly reviewed and approved by Mr. Ely prior to its submission.

169. Ms. Rose also noted that Mr. Ken Dorony, another manager and the owner of the specific workstream at issue, had also reviewed the presentation and neither he nor Mr. Ely had expressed any concerns.

170. In fact, after reviewing the presentation, Mr. Dorony requested and received Mr. Ely's nominal input and approval to submit the presentation for Mr. Halliburton's director-level forum.

171. Inexplicably, Mr. Fernandes reprimanded Ms. Rose for allowing another manager to review the presentation with Mr. Ely prior to submission.

172. Following this exchange with Ms. Rose, upon information and belief, Mr. Fernandes met with Mr. Dorony to disparage Ms. Rose.

173. Mr. Dorony later shared with Ms. Rose that Mr. Fernandes stated he personally canceled the meeting because he assumed Ms. Rose was going to be unable to present on the team's progress.

174. Mr. Dorony then clarified with Mr. Fernandes that, as the workstream's owner, the team's progress and presentation of that progress was his responsibility, not Mr. Fernandes' nor Ms. Rose's.

175. Shortly thereafter, in February 2025, Ms. Balzer and Mr. Fernandes accused Ms. Rose of making an inappropriate statement to a vendor.

176. Specifically, they accused Ms. Rose of stating, "No one in SEO FCSD likes me," thus making the vendor feel "very uncomfortable" and "compelled" to report it.

177. According to Ms. Balzer and Mr. Fernandes, this statement made the vendor deeply uncomfortable, and she had personally escalated the issue to them.

178. Ms. Rose told Ms. Balzer and Mr. Fernandes she had no recollection of any such exchange.

179. Ms. Rose had worked with the vendor in question for years, greatly respected her, and had no desire to demean herself in front of her. Therefore, she did not believe she would ever have said such a thing.

180. Ms. Balzer and Mr. Fernandes concluded the discussion by reprimanding Ms. Rose and advising her to maintain professionalism with all vendors.

181. After this false attack on her character, Ms. Rose's severe GAD and its associated physical and psychological symptoms became debilitating and caused a new symptom—memory loss.

182. Ms. Rose consulted with her medical team, who advised Ms. Rose to take an immediate leave of absence due to her rapidly deteriorating mental and physical health.

183. Ms. Rose began her medical leave, taken under the Family Medical Leave Act (FMLA), on February 13, 2025.

184. Shortly after going on leave, the referenced vendor reached out to Ms. Rose, unsolicited, to ask why everyone in the department was no longer responding to her, despite the vendor helping to define position capabilities prior to a request for multiple quotes.

185. At the time, the vendor was unaware Ms. Rose was on medical leave.

186. During the exchange, Ms. Rose apologized for the previous inappropriate statement.

187. The vendor vehemently denied initiating a complaint about Ms. Rose with either Ms. Balzer or Mr. Fernandes or having communicated anything to anyone that could be interpreted as a complaint.

188. The vendor further denied ever discussing Ms. Rose with anyone, personally or professionally.

189. On March 25, 2025, Ms. Rose contacted PeopleFirst, Ford's third-party Human Resources Department, and Sedgwick, Ford's short-term disability provider, regarding her impending return to work after her FMLA leave ended, in accordance with Ford policy.

190. PeopleFirst and Sedgwick gave Ms. Rose conflicting information, with Sedgwick advising Ms. Rose to return to work and negotiate her concerns face-to-face with Mr. Fernandes and PeopleFirst advising it may be unwise to do so given Mr. Fernandes' hostile conduct.

191. Sedgwick approved short-term disability coverage for Ms. Rose's first month of full-time leave.

192. However, Sedgwick denied Ms. Rose's second month of coverage, claiming the documentation Ms. Rose's provider submitted was insufficient.

193. After numerous attempts to connect with Sedgwick, Ms. Rose's psychiatric-mental health nurse practitioner (PMHNP), was finally able to provide further supporting documentation on April 8, 2025.

194. Ms. Rose's PMHNP also provided documentation regarding Ms. Rose's return-to-work assessment and need for additional accommodations.

195. Ms. Rose anticipated being able to return to work on Monday, April 14, 2025, following guidance from Sedgwick on Friday, April 11, that she should return to work regardless of whether her accommodations were approved.

196. However, later that same day, PeopleFirst advised Ms. Rose to await further contact from them before returning to work, after Ms. Rose explained Mr. Fernandes' hostility towards her and his direct role in exacerbating her disability symptoms which prompted her medical leave.

197. Ms. Rose was also advised that Mr. Fernandes had not approved her accommodations and did not understand how she could safely return to work if he was refusing to accommodate her or engage in the interactive process, so she took PeopleFirst's advice and waited.

198. On April 13, 2025, Ms. Rose submitted a copy of her requested reasonable accommodations, along with a detailed statement of the hostile and discriminatory treatment she had faced prior to going on medical leave, to Parth Thoria and Rebecca Lightfoot with Ford HR.

199. In her statement, Ms. Rose detailed the negative impact her managers' hostile and discriminatory treatment had on her mental and physical health.

200. Ms. Rose also emphasized that the purpose of her statement was not to initiate a complaint, but rather to document the treatment and concerns she experienced after initially disclosing her disability to Mr. Katinas in January 2024 in an effort to avoid continued hostility and instead transition back to her role with the necessary reasonable accommodations in place.

201. The reasonable accommodations Ms. Rose was requesting, at the recommendation of her medical providers, included:

a. Continued remote work;

b. Modified schedule with extended breaks and associated reasonable workload; and

c. A change in management style/communication to include:

i. Refraining from exhibiting aggression;

ii. Using written communication rather than verbal as much as possible;

iii. Limiting non-essential interactions; and

iv. Recording meetings.

202. The accommodations were requested only temporarily, for a period of two months, to accommodate Ms. Rose's disabilities as she transitioned back to full-time work after her medical leave.

203. Ms. Rose and her medical providers would then reassess her disability symptoms and related needs to identify what, if any, ongoing reasonable accommodations were necessary to accommodate her.

204. Ms. Rose copied Donna B. from Sedgwick and PeopleFirst on the email containing her statement to HR and her requested reasonable accommodations.

205. In the body of her email, Ms. Rose noted that, as she had not heard anything from further from PeopleFirst about returning to work, she was awaiting further communication before returning.

206. On April 14, 2025, Rhoda Jones from HR confirmed receipt of Ms. Rose's email, statement, and requested accommodations, noting Ms. Thoria had forwarded it to her.

207. Ms. Jones advised Ms. Rose that the first step in the accommodation request process was for Sedgwick to review the requested accommodations and then follow up with Ford regarding next steps.

208. Ms. Rose confirmed with Ms. Jones that Sedgwick had received the requested return to work accommodations the previous week and that she had spoken with both Sedgwick and PeopleFirst that day, April 14.

209. Per those conversations, PeopleFirst advised they were awaiting documentation from Sedgwick, but Sedgwick indicated they did not provide such documentation to Ford.

210. To facilitate the sharing of documents and information, Ms. Rose continued to copy both Sedgwick and PeopleFirst on her communications, noting she hoped they could work together approve her accommodations so she could return to work.

211. On April 15, 2025, having received no response from Ms. Jones, Sedgwick, or PeopleFirst, Ms. Rose sent a follow-up email requesting an update on the status of her return-to-work accommodations request.

212. On April 16, 2025, Donna B. from Sedgwick, called Ms. Rose and advised her that Sedgwick had sent modified paperwork to Ford's PeopleFirst team regarding her accommodation request.

213. Donna B. noted that, as Ms. Rose's requested accommodations included both restrictions, including the limited hours and change in management style, and accommodations, including the remote work, they separated the paperwork into two distinct requests before sending them to PeopleFirst.

214. Ms. Rose then called Mariana Tamez Vazquez, PeopleFirst representative, to confirm receipt of the paperwork.

215. Ms. Vazquez confirmed receipt of the paperwork and noted they were in the process of discussing the request and seeking approval from Mr. Fernandes.

216. Ms. Vazquez also recommended that Ms. Rose speak directly with her local HR representative, Ms. Jones, about the requested accommodations and her HR statement.

217. In reviewing Ms. Jones' calendar to request a meeting accordingly, Ms. Rose observed that Ms. Jones met with Mr. Fernandes that same morning, April 16.

218. Ms. Rose requested a meeting with Ms. Jones for Thursday, April 17, at 9:00am.

219. Also on April 16, 2025, Ms. Rose spoke with Mr. Dorony, who advised her that within the first month of her medical leave, Mr. Fernandes had stated Ms. Rose was not returning.

220. While Mr. Dorony acknowledged he could sometimes have communication or language issues with Mr. Fernandes, and thus either he or Mr. Fernandes could have misunderstood the question, Mr. Dorony took Mr. Fernandes' response to mean that Ms. Rose had "had enough and just quit."

221. Ms. Jones declined to meet with Ms. Rose on April 17 to discuss her accommodations and statement to HR, as Ms. Rose had requested.

222. In the morning on April 22, 2025, Donna B., Sedgwick examiner, called Ms. Rose to tell her that Ford had placed her on extended leave.

223. Donna B. read to Ms. Rose from an email she had received from PeopleFirst the day before, April 21, 2025.

224. Per that email, Ford was placing Ms. Rose on "No Work Available" Status through June 13, 2025, or until she no longer needed disability accommodations or restrictions.

225. Donna B. could not tell Ms. Rose if "No Work Available" meant in all of Ford or just in Ms. Rose's specific workstreams or department.

226. Notably, the accommodations were the exact same accommodations Donna B. had discussed with Ms. Rose during their April 16 phone call.

227. Compared to the originally requested accommodations, these modified accommodations included only remote work and 4-hour workdays for a two-month period.

228. The modified accommodations made no reference to any changes or modifications to communication, recording meetings, or how Ms. Rose's managers interacted with her.

229. Ms. Rose inquired about engaging in the interactive process under the ADA, but Donna B. said she had no information or knowledge about the process.

230. When Ms. Rose asked if anyone else had engaged in the interactive process with Ford before, Donna B. advised she was "pretty new," but had only seen requested accommodations approved or rejected without any negotiation or discussion.

231. Donna B. also advised Ms. Rose that, due to her placement on extended leave, she would be placed on long-term disability which would drop her pay to her pay to 60% for of her salary beginning on May 28, 2025.

232. Shortly after the call with Donna B., Luba from PeopleFirst called Ms. Rose and told her to reach out to Mr. Fernandes directly to try to negotiate her accommodations.

233. Ms. Rose reiterated her concerns about trying to negotiate her accommodations with Mr. Fernandes.

234. Luba did not provide Ms. Rose with any alternative options or any information about engaging in the interactive process.

235. Ms. Rose asked Luba for a copy of Ford's interactive process policy, but Luba said she did not know of any such policy and advised Ms. Rose to request it form her local HR representative.

236. Shortly after this call, Ms. Rose also submitted requests to both Sedgwick and People First for all documentation and records related to her current disability leave.

237. That same day, April 22, Ms. Rose also spoke with Mr. Dorony again about her efforts to return to work.

238. Although organizationally Ms. Rose did not report directly to Mr. Dorony and instead reported to Mr. Fernandes, Mr. Dorony was the manager who owned the majority of the workstreams that Ms. Rose supported.

239. During their conversation, Mr. Dorony confirmed he wanted Ms. Rose to return to work as soon as possible, because she was a valuable member of the team as an experienced performance manager.

240. Mr. Dorony said the current people covering her workstreams were either overloaded or lacked the request capabilities to fully deliver on Ms. Rose's work.

241. Mr. Dorony also said any number of work hours would be helpful from Ms. Rose, even part-time.

242. Ms. Rose asked if Mr. Dorony would support her reporting directly to him moving forward rather than Mr. Fernandes, and he agreed he would.

243. Mr. Dorony agreed that, if she returned, Ms. Rose could go into his building for on-site attendance, rather than Mr. Fernades' building.

244. On April 24, 2025, Ms. Rose sent a meeting request to Ms. Jones for Monday, April 28, 2025, along with a request for a copy of Ford's interactive policy, copying Ms. Jones' manager, Heather Kostka, as Ms. Jones was out of the office.

245. Ms. Rose's email also asked Ms. Jone to provide the reasons her accommodation requests had been rejected to assist her in preparing alternative reasonable accommodations requests that would not cause Ford undue hardship.

246. Ms. Kostka responded that she would assist in providing Ms. Rose the requested documentation.

247. Ms. Jones responded that she was unable to meet at the requested time.

248. Ms. Rose responded asking what time worked best for Ms. Jones to reschedule the meeting and noting that Ms. Kostka had not yet provided her with the requested documentation.

249. Ms. Jones dismissed Ms. Rose's request to reschedule the meeting, indicating there was no need to meet as her work restrictions could not be accommodated and she had been placed back on leave.

250. In response, Ms. Rose reiterated her request to engage in the interactive process.

251. Ms. Rose also noted that it had been almost a month since she had initially contacted Ford, her local HR, PeopleFirst, and Sedgwick, regarding her intent to return to work and engage in the interactive process.

252. Ms. Rose noted that, despite having initiated communication almost daily with at least one of these respective representatives, Ford had failed to engage in the interactive process.

253. Ms. Rose also advised that Ford's failure to engage in the interactive process was exacerbating her disability symptoms, interfering with the recovery she had made while on leave.

254. Ms. Rose advised that she wished to return to work with reasonable accommodations.

255. Lastly, Ms. Rose advised that PeopleFirst had told her to reach out to her local HR to initiate the interactive process.

256. Ms. Jones ignored Ms. Rose's repeated requests to engage in the interactive process, responding that she would reach out to PeopleFirst to "learn more," and asking if Ms. Rose had received the letter regarding her placement on "No Work Available" status.

257. Ms. Rose confirmed receipt, once again reiterating her request to engage in the interactive process regarding reasonable accommodations as the letter referenced only the specifically requested accommodations and did not reference a return-to-work date.

258. Ms. Rose asked that Ms. Jones confirm that Ford was declining to engage in the interactive process or otherwise provide a time to meet.

259. Ms. Jones responded that Ms. Rose's accommodations had been rejected because she had not been released to work full-time, which is what Ford required for accommodations to be approved.

260. Ms. Jones confirmed that Ms. Rose was being placed on extended leave.

261. Ms. Jones did not provide Ms. Rose with a copy of Ford's interactive process policy.

262. Ms. Jones did not provide a date and time to meet to engage in the interactive process.

263. Ms. Rose responded to both Ms. Jones and Ms. Kostka seeking confirmation that neither of her local HR representatives were willing to speak with her or provide her a copy of Ford's interactive process policy.

264. Ms. Jones again failed to respond to Ms. Rose's request, instead sending her a link to Ford's general disability policy.

265. The linked policy gave general information regarding the disability accommodations policy, but despite referencing the importance of the interactive process, failed to provide any specific information regarding how Ford conducted or how employees could access the interactive process.

266. Ms. Rose responded, again requesting that Ford engage in the interactive process.

267. Ms. Rose also requested that, per the disability accommodations policy, Ms. Jones provide Ford's rationale that the requested accommodations created an undue hardship.

268. Later than afternoon, Ms. Kostka responded to Ms. Rose's earlier email noting that she and Ms. Jones were working with Ford's People Matters team and Sedgwick, but that as HR business partners, their role was limited to supporting leaves and accommodations.

269. Ms. Rose responded to Ms. Kostka the following day, April 29, again requesting a meeting to discuss her accommodations, and seeking the contact information for the People Matters representative tasked with reviewing her statement to HR.

270. Ms. Jones responded to Ms. Rose's email but failed to provide any availability for a meeting to engage in the interactive process or any contact information for a People Matters representative.

271. Instead, Ms. Jones noted that Ms. Rose's request for a partial workday interfered with the essential functions of her job but failed to provide any information about which essential job function was affected or how.

272. Ms. Jones also advised that "No Work Available" was an internal designation for an employee whose accommodations request could not be met.

273. Ms. Jones advised that they would work with Ms. Rose further on any accommodations only after her doctor released her to work full duty.

274. Lastly, Ms. Jones stated that People Matters would follow up with Ms. Rose regarding her HR statement only after she returned to work full duty.

275. Ms. Rose requested a copy of the essential functions of her job that Ms. Jones had referenced.

276. Ms. Jones failed to respond, and Ms. Kostka instead responded on her behalf, stating they had provided Ms. Rose all the information they were able to and had been directed to advise Ms. Rose to work with Sedgwick for all matters related to her medical leave.

277. Ms. Kostka did not say who advised them to no longer engage with Ms. Rose regarding her requested accommodations and return to work.

278. Ms. Rose then reached out to Sedgwick with the same request for a copy of the essential job functions referenced in Ms. Jones' email.

279. Around this time, Sedgwick notified Ms. Rose that her pay would be reduced.

280. On April 30, 2025, Ms. Rose spoke with Mr. Mike Kan, another Ford manager overseeing some of the workstreams to which Ms. Rose had been assigned.

281. Mr. Kan advised Ms. Rose they had hired another employee on the LL5 level to handle Ms. Rose's work while she was out on leave.

282. Mr. Kan indicated it had been planned for some time to take this work away from Ms. Rose, prior to her going on leave.

283. Notably, this was the same work that Mr. Ely had previously used to induce Ms. Rose to decline the outside offer and remain within his organization, yet only weeks later it was already in the process of being taken away from her.

284. Replacing Ms. Rose on these workstreams reduced her essential job functions to less than a full-time role.

285. Ms. Rose began receiving documents responsive to her records requests from Sedgwick in late April.

286. Per those responsive documents, Mr. Fernandes explicitly rejected Ms. Rose's requested accommodations, stating "our aligned recommendation is that she should only return to work in her current role when she is fully able to perform the function full time."

287. Mr. Fernandes' email failed to identify who else was involved in making that recommendation.

288. Mr. Fernandes' email was also silent as to why the recommendation that Ms. Rose be denied the opportunity to work until she could do so full time was being made, why Ms. Rose's requested temporary accommodations could not be accommodated, and why the requested accommodations created an undue hardship for Ford.

289. In a continued effort to return to work, Ms. Rose requested to meet with Mr. Eric Hinrichsen, a Diversity Equity Inclusion (DEI) manager who had assisted Ms. Rose in documenting potential accommodations for her disabilities the previous year.

290. Mr. Hinrichsen worked under the supervision of Mr. Ernest Adams, Chief DEI Officer.

291. Mr. Adams and his team had taken a very proactive approach in building relationships with Ford's employee resource groups, including Ford Employees with Diverse Abilities, of which Ms. Rose was a member.

292. Ms. Rose had initially met with Mr. Hinrichsen on October 24, 2024 to share her concerns about the hostile treatment she had experienced up to that time.

293. Mr. Hinrichsen declined to get directly involved but expressed empathy to Ms. Rose and encouraged her to make a formal report.

294. Ms. Rose met with Mr. Hinrichsen on Thursday, May 2, 2025.

295. During this meeting, Mr. Hinrichsen provided inputs and updates on Ms. Rose's JobShare proposal and was verbally supportive as Ms. Rose talked with him about her attempts to get Ford to participate in the interactive process.

296. Following that meeting, Ms. Rose emailed Ms. Jones, Ms. Kostka, and Mr. Fernandes, again reiterating her request that Ford engage in the interactive process with her regarding her requested accommodations and return to work.

297. In her email, to address Ford's stated concern that Ms. Rose must return to work full-time, she proposed another JobShare arrangement, which would allow her to work part-time while ensuring her alleged essential job functions had full-time coverage.

298. Ms. Rose attached a completed copy of Ford's Reasonable Accommodation Request form, outlining the specific proposed JobShare arrangement.

299. Ms. Rose noted she was scheduling an interactive process discussion with them the following Monday, May 5, to further discuss her proposal and any feedback or suggestions Ford may have as part of the interactive process.

300. On Sunday, May 4, Ms. Rose learned that one of her colleagues, Ms. Eniso Ngwenya, had been recruited to join Mr. Fernandes' team, effective immediately.

301. Ms. Ngwenya told Ms. Rose her responsibilities would include work that Ms. Rose had been performing immediately prior to her medical leave.

302. Further, Ms. Ngwenya indicated she was beginning the role on a part-time basis, directly contradicting Ford's claims to Ms. Rose that her essential job functions required that she return to work full-time.

303. Ms. Ngwenya is not disabled, younger than Ms. Rose, and African American.

304. Ms. Jones responded to Ms. Rose's email and meeting request on Monday, May 5, proposing an alternative meeting time for that Friday, May 9, and noting Ms. Kostka and Mr. Fernandes would not be attending.

305. After Ms. Rose requested an earlier date and time to meet, given that her FMLA leave was close to being exhausted and she had been actively attempting to engage in the interactive process for over a month, Ms. Jones agreed to meet that Wednesday, May 7.

306. Ms. Rose met with Ms. Jones and Erin Pantano, People Matters' disability representative, on May 7, 2025.

307. Ms. Pantano started the meeting claiming that Ford's response to Ms. Rose's requests, including taking over a month to schedule an interactive process meeting, was common practice in terms of how it treated individuals transitioning from full to partial disability.

308. Ms. Pantano also claimed, without details, that there had been some sort of "mix-up" related to what was initially sent to Mr. Fernandes that may have caused some delay.

309. Regarding her reasonable accommodations request, Ms. Rose noted that she was working with her medical team as required to address her disability and identify appropriate accommodations, but that return-to-work accommodations of some sort would be necessary.

310. Ms. Rose emphasized this was why she had only requested the accommodations for two months—she and her medical team would then reassess and modify the accommodations request as needed as she transitioned back to full-time work.

311. Ms. Rose reiterated her request for a copy of her essential job functions.

312. Neither Ms. Pantano nor Ms. Jones provided Ms. Rose with her essential job functions, instead just generally speaking about the concept of essential job functions.

313. Regarding her proposed JobShare arrangement, Ms. Rose confirmed she already had a partner identified and able to begin working at 90% capacity.

314. Ms. Jones and Ms. Pantano advised they would follow up with Mr. Fernandes to confirm that the JobShare proposal could be implemented.

315. Ms. Rose confirmed she was open discussing any additional details necessary to facilitate the proposed arrangement.

316. Regarding her accommodation request for continued remote work, Ms. Rose said she was willing to ask her medical provider to modify his recommendation to comply with Ford's expectation of one in-office day per week.

317. A follow-up meeting was scheduled for Monday, May 12, to provide Ms. Pantano and Ms. Jones an opportunity to follow-up with Mr. Fernandes regarding the proposed JobShare arrangement.

318. On Monday, May 12, Ms. Jones emailed Ms. Rose rescheduling the follow-up meeting to that Friday, May 16, as she and Ms. Pantano were unable to meet with department leadership until that Thursday, May 15.

319. Based on her colleague's calendars, it was becoming increasingly apparent to Ms. Rose that Ms. Ngwenya was beginning to take over many Ms. Rose's

previous work responsibilities, many of which Mr. Ely had explicitly promised her as part of the negotiation for the position.

320. The calendars indicated that had been directly assigned to two of Ms. Rose's three specific workstreams.

321. Upon information and belief, Ms. Ngwenya was still performing Ms. Rose's previous job functions in only a part-time capacity.

322. Based on Ms. Rose's overall job functions, this primarily left only her warranty work unfulfilled.

323. Ms. Rose was also maintaining communication with her team members and workstream owners, who repeatedly advised her that her return to work would be welcome in any capacity as there were multiple key elements not being addressed in her absence.

324. In responding to Ms. Jones' request to reschedule the meeting to May 16, Ms. Rose expressed her concerns with the ongoing delays and requested that the meeting be rescheduled for sooner if possible, noting that Ms. Pantano's calendar indicated she would be out of the office on May 16.

325. Ms. Jones declined to meet earlier, stating she would meet with Ms. Rose on Friday, May 16, without Ms. Pantano.

326. On Friday, May 16, Ms. Jones again emailed Ms. Rose to cancel and reschedule the follow-up meeting.

327. Ms. Jones proposed meeting on May 21, 2025, almost a full week later, which would be almost two months since Ms. Rose had initially contacted Ford about returning to work.

328. In her email, Ms. Jones claimed Mr. Fernandes needed time to identify work assignments that aligned with Ms. Rose's work restrictions.

329. Following receipt of this email, Ms. Rose again spoke with Mr. Dorony.

330. Mr. Dorony confirmed that Ms. Ngwenya had taken over many of Ms. Rose's job functions within the past few weeks, despite attempts by Ford to characterize Ms. Ngwenya's work as a "new" workstream.

331. Ms. Rose responded to Ms. Jones' email on Monday, May 19, expressing confusion as to what new work assignments Mr. Fernandes would need to identify, given the limited, temporary nature of her requested accommodations and the proposed JobShare arrangement that would ensure her prior responsibilities were completely fulfilled with capacity for additional work.

332. Ms. Rose also noted her concerns with Ford's recruitment of Ms. Ngwenya as her replacement after she began attempting to return to work, and that Ms. Ngwenya had been recruited in an initial part-time capacity despite Ford's repeated insistence to Ms. Rose that the essential job functions for the work Ms. Ngwenya was performing required full-time capacity.

333. Ms. Rose requested a response on her JobShare proposal, noting that she and her partner were ready to implement that proposal immediately or, alternatively, she was prepared to return to work immediately on a temporary part-time basis with a rapid transition to full-time, as she had previously offered.

334. On May 21, 2025, Ms. Jones emailed Ms. Rose again canceling and rescheduling the meeting, proposing a new date of Friday, May 23.

335. Ms. Rose agreed, noting that it would require her to move a medical appointment, which she was willing to do, and her concern over Ford's repeated cancellations within just a few hours of the scheduled meetings.

336. In response, Ms. Jones revoked the May 23 date and time, advising Ms. Rose to keep her medical appointment and stating she would work with Ms. Rose's availability.

337. Because Ford failed to grant her reasonable accommodations or otherwise timely engage in the interactive process, as well as her related concerns of hostile and discriminatory treatment by Ford employees, Ms. Rose submitted a complaint with the Michigan Department of Civil Rights on May 22, 2025, alleging failure to accommodate, disability discrimination, and retaliation.

338. Ms. Rose emailed Ms. Jones that same day, advising that she had submitted the MDCR complaint, but confirming her ongoing interest in working with Ford to resolve her concerns collaboratively and return to work.

339. On or about May 23, 2025, Ms. Rose was made aware that Ford hard prepared termination paperwork shortly after she notified Ford of her MDCR complaint.

340. According to that paperwork, Mr. Fernandes, Ms. Kostka, Mr. Ely, and Ms. Melissa White, People Matters Manager, had all signed their approval of Ms. Rose's termination on May 22, 2025.

341. Bindu Blatchley, People Matters Director, was the final required signature, which was completed on May 23, 2025.

342. According to the termination form, Ms. Rose being terminated for inconsistent performance and behavior at both her 2024 mid-year and year-end reviews, including not meeting performance expectations for her level and role and "becoming defensive" when provided direction or asked about the status of work assignments.

343. The termination form also accused Ms. Rose of blaming leadership and others for performance shortcomings.

344. As detailed *infra*, Ms. Rose received almost exclusively positive reviews and no substantive feedback regarding areas of improvement.

345. Further, as noted *infra*, when Ms. Balzer and Mr. Fernandes first confronted Ms. Rose about alleged character concerns on January 14, 2025, they were unable to provide any specific examples.

346. On May 30, 2025, Ms. Rose received confirmation from Sedgwick that her salary had decreased to 60%.

347. Also on May 30, 2025, Ms. Rose received notice from Sedgwick that she was now considered on "unpaid leave," which in addition to eliminating her salary, also caused additional losses to her insurance coverage and benefits.

348. As Ms. Rose had received no further communication from Ford regarding the interactive process or her termination, Ms. Rose submitted updated paperwork to Sedgwick on June 3, 2025, requesting an extension of her leave until an agreement was reached on reasonable return-to-work accommodations.

349. Ms. Rose also provided paperwork to her medical provider supporting the continued need for return-to-work accommodations.

350. Ms. Rose's provider returned the completed forms that same day, indicating the same accommodations were still necessary for Ms. Rose's return to work.

351. Ms. Rose immediately submitted the updated paperwork to Sedgwick.

352. On June 5, 2025, Ms. Rose filed a complaint with the Equal Employment Opportunity Commission on June 5, 2025, alleging disability discrimination and retaliation after she filed the MDCR complaint, age discrimination, and race discrimination.

353. On June 12, 2025, Ms. Rose emailed Ms. Jones, Ms. Pantano, and Sedgwick an updated accommodation request based on Sedgwick's advice.

354. In her email, Ms. Rose noted her medical leave was set to expire that weekend and asked how she should proceed if an agreement regarding her accommodations was still not reached as of Friday, June 13.

355. Ms. Jones responded to Ms. Rose on June 13, 2025, noting Mr. Fernandes had responded to Sedgwick's inquiries, continuing to claim he could not accommodate Ms. Rose's restrictions, and instructing her to continue to communicate with Sedgwick.

356. Ms. Rose responded again requesting that Ford engage in the interactive process.

357. By this point, it was clear that Ford and Sedgwick were doing nothing but forcing Ms. Rose to run endlessly on a bureaucratic Möbius strip:

a. Ford HR repeatedly directed Ms. Rose to direct her communications to Sedgwick;

b. Sedgwick would only confirm Ms. Rose's disability leave status and direct her to contact her local HR regarding her accommodation requests; and

c. Ms. Rose's local HR would advise her that Mr. Fernandes had denied her accommodations requests and redirect her back to Sedgwick.

358. On June 19, 2025, Ms. Rose received written notice from Ford that she continued to be placed on "No Work Available" status through July 14.

359. On June 24, 2024, Ms. Rose contacted Ms. Jones and Ms. Pantano, following up on her request to engage in the interactive process.

360. Ms. Rose noted that regardless of the date of her return to work, given the nature of her disabilities, she would require accommodations to do so, and Ford's insistence on her being fully healed prior to returning would prevent her from ever being able to work.

361. In other words, Ford's failure to engage in the interactive process was itself creating a situation in which Ms. Rose—a person who could and wanted to return to work—would be permanently and fully disabled.

362. Ms. Rose also noted that, given the temporary nature of her requested accommodations, had Ford approved them or otherwise timely engaged in the interactive process following her initial request in April 2025, she would already have been back to work full-time.

363. On June 30, 2025, Ms. Jones finally responded to Ms. Rose's request to engage in the interactive process, copying Ms. Pantano on the email and noting she would send a meeting notice for Wednesday, July 2.

364. When Ms. Rose arrived at the meeting on July 2, 2025, Ms. Pantano was not present—only Ms. Jones.

365. Ms. Jones said Mr. Fernandes would be joining to discuss Ms. Rose's role, leading Ms. Rose to believe she would finally be able to return to work.

366. When Mr. Fernandes joined, he told Ms. Rose she was being terminated for poor performance and then immediately left the meeting.

367. Rather than engaging in the interactive process, as Ms. Rose had repeatedly requested, Ms. Jones continued the meeting only a few more minutes to advise Ms. Rose her termination was effective immediately.

368. Ms. Rose exhausted her administrative remedies and timely filed this action within 90 days of receipt of her right to sue letter.

**COUNT I**
**Disability Discrimination, Hostile Environment,**
**Failure to Accommodate, and Retaliation**
**Americans with Disabilities Act**
**42 U.S.C. § 12101 *et seq*.**

369. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

370. Title I of the Americans with Disabilities Act (ADA) prohibits employers from discriminating against employees on the basis of disability. 42 U.S.C. § 12112(a).

371. Title V of the ADA prohibits employers from retaliating against an individual who has alleged a violation of the ADA. 42 U.S.C. § 12203(a).

372. Ford is a covered entity and an employer within the meaning of the ADA.

373. Plaintiff is a qualified individual with a disability within the meaning of the ADA because she actually and currently has, has a record of, or is regarded as

having a physical or mental impairment that substantially limits one or more major life activities.

374. Plaintiff's condition does not prevent her from performing the duties of her job.

375. Plaintiff met, and many times exceeded, her employer's legitimate job performance expectations.

376. Mr. Katinas discriminated against Plaintiff and created a hostile environment for her by suggesting that she could not perform her job because she was disabled, giving her baseless unfavorable performance reviews, excluding her from her primary workstreams, yelling at her, and communicating with her in a hostile and aggressive manner.

377. Mr. Ely discriminated against Plaintiff and created a hostile environment for her by offering, then rescinding an offer, of a promotion; telling her that her disabilities would likely hinder her future promotional opportunities; and failing to fulfill his promises to her in her role after she accepted his job offer.

378. Mr. Fernandes discriminated against Plaintiff and created a hostile environment by repeatedly denying her disability accommodations requests while refusing to engage in the interactive process and by terminating her.

379. The unwelcome conduct was so severe and pervasive that, in the totality of the circumstances, it had the purpose or effect of substantially interfering with

Plaintiff's employment and created an intimidating, hostile, or offensive work environment.

380. A reasonable person in Plaintiff's position would have perceived the work environment as hostile or offensive.

381. Defendant discriminated against Plaintiff by failing to approve the accommodations she needed to do her job, failing to engage in the interactive process, and terminating her after she repeatedly requested disability accommodations.

382. Defendant retaliated against Plaintiff by failing to approve the accommodations she needed to do her job, failing to engage in the interactive process, and terminating her after she repeatedly exercised her right to request and obtain accommodations for her disability and after she notified Ford that she had filed a complaint of disability discrimination with the Michigan Department of Civil Rights.

383. As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered damages as detailed in the Damages section of this Complaint.

**COUNT II**
**Race Discrimination and Retaliation**
**Title VII of the Civil Rights Act**
**42 U.S.C. § 2000e-2 *et seq*.**

384. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

385. Defendant is an employer within the meaning of the Title VII of the Civil Rights Act (Title VII).

386. Plaintiff is an employee within the meaning of Title VII.

387. Title VII prohibits discrimination on the basis of race. 42 U.S. Code § 2000e-2(a).

388. Title VII also prohibits retaliation against an employee who has alleged a violation of Title VII. 42 U.S.C. Code § 2000e-3(a).

389. Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) regarding the race discrimination and retaliation she had suffered at Ford.

390. Defendant discriminated and retaliated against Plaintiff based on her race in violation of the Title VII by treating her less favorably than and ultimately terminating her employment to replace her with a person of color after she notified Defendant that she had filed a race discrimination complaint with the EEOC.

391. As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered damages as detailed in the Damages section of this Complaint.

## COUNT III
**Age Discrimination and Retaliation**
**Age Discrimination in Employment Act**
**29 U.S.C. § 621 *et seq*.**

392. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

393. Defendant is an employer within the meaning of the Age Discrimination in Employment Act (ADEA).

394. Plaintiff is an employee within the meaning of the ADEA.

395. ADEA prohibits discrimination on the basis of age. 29 U.S. Code § 623(a).

396. The ADEA also prohibits retaliation against an employee who has alleged a violation of the ADEA. 29 U.S.C. Code § 623(d).

397. Plaintiff filed a charge with the EEOC regarding the age discrimination and retaliation she had suffered at Ford.

398. Defendant discriminated and retaliated against Plaintiff based on her age in violation of the ADEA by treating her less favorably than and ultimately terminating her employment to replace her with a younger person of color after notified Defendant that she had filed an age discrimination complaint with the EEOC.

399. As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered damages as detailed in the Damages section of this Complaint.

## COUNT IV

**Disability Discrimination, Hostile Environment, and Retaliation**
**Michigan's Persons with Disabilities Civil Rights Act**
**MCL 37.1101 *et seq*.**

400. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

401. Defendant is an employer within the meaning of the Persons with Disabilities Civil Rights Act (PDCRA).

402. Plaintiff is an employee within the meaning of the PDCRA.

403. The PDCRA prohibits an employer from discriminating against an employee on the basis of disability.

404. The PDCRA also prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing." MCL 37.1602(a).

405. Plaintiff is a person with a disability, and/or was regarding as having a disability by Defendant and thus is covered by the PDCRA.

406. Plaintiff's condition substantially interferes with one or more major life activities.

407. Defendant discriminated against Plaintiff and created a hostile environment by failing to approve the accommodations she needed to do her job, failing to address the known hostile environment she was experiencing, and terminating her after she repeatedly requested disability accommodations.

408. Defendant retaliated against Plaintiff by placing additional requirements for requesting an accommodation above and beyond those placed on others seeking disability accommodations and terminating her after she repeatedly exercised her right to request and obtain accommodations for her disability and after she provided notice that she had filed a complaint with the Michigan Department of Civil Rights.

409. As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered damages as detailed in the Damages section of this Complaint.

**COUNT V**
**Age and Race Discrimination and Retaliation**
**Michigan's Elliott-Larsen Civil Rights Act**
**MCL 37.2202 *et seq*.**

410. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

411. Defendant is an employer within the meaning of the Elliott-Larsen Civil Rights Act (ELCRA).

412. Plaintiff is an employee within the meaning of ELCRA.

413. ELCRA prohibits employers from discriminating against an employee on the basis of race or age. MCL 37.2202(1).

414. ELCRA also prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has

made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing." MCL 37.2701(a).

415. Plaintiff met, and many times exceeded, her employer's legitimate job performance expectations.

416. Defendant discriminated and retaliated against Plaintiff based on her age and race in violation of the ELCRA by terminating her employment to replace her with a younger person of color after notified Defendant that she had filed an age discrimination complaint with the EEOC.

417. As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered damages as detailed in the Damages section of this Complaint.

**DAMAGES**

418. Plaintiff realleges and incorporates by reference previously pled paragraphs as if fully pled herein.

419. As a direct and proximate result of the above-described conduct, Plaintiff suffered general, special, incidental, and consequential injury and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a. Pain, suffering, and emotional distress;

b. Physical manifestations of emotional distress including migraines, memory loss, embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;
c. Loss of employment opportunities;
d. Damage to her professional reputation;
e. Anxiety;
f. Depression;
g. Hypervigilance;
h. Economic loss;
i. Medical and medical-related expenses;
j. Pharmaceutical expenses;
k. Prevention from performing daily activities and obtaining the full enjoyment of life;
l. Psychological treatment, therapy, and counseling and related expenses;
m. Loss of the ordinary pleasures of everyday life;
n. Loss of relationships
o. Travel and travel-related expenses; and
p. All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff prays for judgment against Defendant as follows:

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C. For any appropriate statutory damages;

D. For costs of this suit;

E. For punitive damages, according to proof, as appropriate to the individual cause of action;

F. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G. For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Now comes Plaintiff, by and through her attorneys, ABDNOUR WEIKER LLP, and hereby demands a trial by jury.

DATED: September 13, 2026

Respectfully Submitted,
ABDNOUR WEIKER, LLP

*s/Jacquelyn Kmetz*
Jacquelyn Kmetz (P83575)
Elizabeth K. Abdnour (P78209)
Ashley A. Dylenski (P88208)
325 E. Grand River Ave., Suite 250
East Lansing, MI 48823
(517) 994-1776
jacquelyn@education-rights.com
liz@education-rights.com
ashley@education-rights.com

*Attorneys for Plaintiff*