**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| LAURA ROSE,<br><br>Plaintiff,<br><br>v.<br><br>FORD MOTOR COMPANY, LLC; DANA KATINAS; KEN ELY; KLEBER FERNANDES; STACY BALZER; and SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.;<br><br>Defendants. | Case No.: 2:26-cv-13470<br><br>Hon. Mark A. Goldsmith |


| | |
|---|---|
| Jacquelyn Kmetz (P83575)<br>Elizabeth K. Abdnour (P78209)<br>Ashley A. Dylenski (P88208)<br>ABDNOUR WEIKER, LLP<br>325 E. Grand River Ave., Suite 250<br>East Lansing, MI 48823<br>(517) 994-1776<br>jacquelyn@education-rights.com<br>liz@education-rights.com<br>ashley@education-rights.com<br><br>*Attorneys for Plaintiff* | |


**AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff LAURA ROSE, by and through her attorneys, ABDNOUR WEIKER LLP, hereby files the following Amended Complaint alleging violations of Titles I and V of the Americans with Disabilities Act; Title VII of the Civil Rights Act; the

Age Discrimination in Employment Act; the Persons with Disabilities Civil Rights Act; the Elliott-Larsen Civil Rights Act; the Family and Medical Leave Act; breach of contract; negligent performance of a voluntary undertaking; negligent misrepresentation; and intentional infliction of emotional distress against Defendants as captioned above.

## INTRODUCTION

1. Laura Rose was an extremely talented, high-performing twenty-four-year employee of Ford Motor Company.

2. For over two decades, Ford praised and promoted Ms. Rose; identified her as "Key Talent;" honored her with numerous awards and accolades; and increased her responsibility, including giving her supervisory level responsibilities before she had a supervisory role

3. Ms. Rose worked significant overtime on a regular basis, turned around failing Ford projects, dependably delivered high-quality work on time or early, and received consistent positive feedback from her colleagues and supervisors.

4. Despite performing well above expectations as a full-time employee for over a decade, after giving Ford notice that she had a disability and needed accommodations, Ford employees began discriminating and retaliating against Ms. Rose.

5. Even as the discrimination and abuse took an increasing toll on Ms. Rose's physical and mental health, her work did not suffer, and she continued to outperform her colleagues.

6. Eventually, however, the escalating hostility and abuse became so damaging to Ms. Rose's health that she was forced to take medical leave.

7. When Ms. Rose sought reasonable accommodations so she could return to work a few weeks later, Ford and its external human resources provider, Sedgwick, denied her accommodations without engaging in the legally required interactive process with her.

8. Ford then replaced Ms. Rose with a younger, nondisabled employee, and fired her.

9. Now, Ms. Rose, who was once a shining star considered "Key Talent," at Ford, has been left emotionally devastated and struggling to find another position where she can use her extensive technical and management skills and be properly compensated.

## <u>JURISDICTION AND VENUE</u>

10. This Court has original jurisdiction over Plaintiff's federal claims under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.; Title V of the Americans with Disabilities Act, 42 U.S.C. § 12201 *et seq*.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*.

11. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress for providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

12. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a), which gives district courts "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

13. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Eastern District of Michigan as the Defendant is located and operates in the Eastern District of Michigan and the events and omissions giving rise to this action occurred within the Eastern District.

**PARTIES**

14. Plaintiff Laura Rose is a 54-year-old woman with disabilities and is a resident of the State of Michigan and Wayne County.

15. At all relevant times, Ms. Rose was an employee of Ford Motor Company, LLC.

16. At all relevant times, Defendant Ford Motor Company, LLC (Ford) was and continues to be a foreign profit corporation organized and existing under the laws of the State of Michigan, with its principal place of business located at 1 American Road, Dearborn, Wayne County, Michigan 48126, where the events that give rise to this Complaint occurred.

17. At all relevant times, Defendant Dana Katinas worked within the County of Wayne, State of Michigan; was an agent and/or employee of Ford, acting or failing to act within the scope, course, and authority of his employment and employer; and served as Ford's GE2 Platform Chief Program Engineer (CPE).

18. At all relevant times, Defendant Ken Ely worked within the County of Wayne, State of Michigan; was an agent and/or employee of Ford, acting or failing to act within the scope, course, and authority of his employment and employer; and served as Ford's Global Director, Service Engineering Operations.

19. At all relevant times, Defendant Kleber Fernandes worked within the County of Wayne, State of Michigan; was an agent and/or employee of Ford, acting or failing to act within the scope, course, and authority of his employment and employer; and served as Ford's Global Service Excellence Director, Service Engineering Operations.

20. At all relevant times, Defendant Stacy Balzer worked within the County of Wayne, State of Michigan; was an agent and/or employee of Ford, acting or

failing to act within the scope, course, and authority of her employment and employer; and served as Ford's Director, Technical Support Operations, Service Engineering Operations (SEO).

21. At all relevant times, Defendant Sedgwick Claims Management Services, Inc. (Sedgwick) was and continues to be a foreign profit corporation organized and existing under the laws of the State of Michigan, with its principal place of business located at 3250 West Big Beaver Road, Troy, Oakland County, Michigan 48084.

## FACTUAL ALLEGATIONS

### *Ford Immediately Identifies Ms. Rose as a Talented, Promising Leader*

22. Ms. Rose began working at Ford as a contracted agency employee in 2002.

23. From 2002 to June 2011, Ms. Rose worked for Ford as an agency employee, serving as Project Management Analyst (PMA) when Ford recruited Ms. Rose as a full-time employee.

24. During that nine-year period, Ms. Rose repeatedly performed tasks demonstrating her ability to work beyond her salary grade.

25. For example, an LL2[1] Vehicle Program Director created a "bagman" position for Ms. Rose to manage his business functions.

---

[1] Ford classifies salaried employees using two principal career structures: General Salary Roll (GSR) levels for primarily non-management employees and Leadership Levels (LL) for management employees. GSR levels generally increase with seniority, from GSR 1 through GSR 8, while the LL scale runs in the opposite direction, with lower numbers reflecting greater management seniority. Thus, an employee's transition from GSR to LL reflects advancement from the individual-contributor track into Ford's management ranks; within the LL structure, LL6 is the initial management level, followed by LL5, LL4, and progressively more senior leadership levels.

26. A "bagman" served the functional purpose of a Business Manager, handling tasks such as budget, headcount, and special projects, and serving as a collaborative partner with the executive, but without the title and equivalent compensation.

27. Historically, even though bagman roles were considered less technically demanding and more administrative in nature, they were seen as stepping-stones for promotions, because they required the ability to negotiate above their salary grade, cross-functional visibility, and consistent proximity to executives.

28. Further, bagman roles provided access to and management of information that is typically held at the executive level.

29. As such, they were typically held by promotion-ready employees within the management ranks, not agency employees.

30. In 2009, an LL3 CPE recruited Ms. Rose to join his team, ultimately leading to Ms. Rose directing her own cross-functional team to deliver a model year program,[2] which is typically a minimum LL6 role.

31. After Ford significantly reduced staff following the 2008 recession, Ms. Rose was one of only fifteen remaining PMAs, out of the original 125 that had started in 2002.

---

[2] Each vehicle has multiple model years that are developed simultaneously.

32. In bringing Ms. Rose on full time in June 2011, Ford hired her directly into the GSR7 level as a Project Manager in the Design Studio within Ford's Product Development department, bypassing the lower GSR levels through which employees ordinarily progressed.

33. Although Ms. Rose would not be diagnosed with ADHD and GAD for another eleven years, the neurological differences associated with those conditions had been present throughout her life. They affected how she processed information, sustained attention, communicated, and interacted with others.

34. Those same differences were also intertwined with some of Ms. Rose's greatest professional strengths. Ms. Rose could focus intensely on data, meticulously manage complex projects, identify solutions to difficult problems, and effectively lead teams through high-stakes deadlines.

35. Ford continued to recognize Ms. Rose's abilities.

36. In 2012, within six months of joining Ford, Ms. Rose was entrusted with responsibilities previously performed by an LL3 executive, including leadership of Ford's senior executive design review process.

37. While in the role of Design Project Manager, Ms. Rose transformed the executive vehicle design review process to increase meaningful participation from Ford's senior executives and ensure their feedback informed product decisions.

38. Ms. Rose became particularly skilled at navigating competing personalities and preventing interpersonal conflicts from derailing the process, earning her the nickname the "design whisperer."

39. As a part of this process, Ms. Rose's work also brought her to the attention of Ford's CEO, who provided unsolicited positive feedback on Ms. Rose's work.

40. The amount of unsolicited positive feedback Ms. Rose received from all levels of employees, from the CEO down to working team members, was such that Design Studio management actively deterred other organizations from recruiting her because her capabilities were considered a critical skillset.

41. On February 1, 2013, Ms. Rose was promoted to GSR8, the highest non-management analyst position available at Ford.

42. As a GSR8, Ms. Rose remained a Project Manager in the Design Studio, and Ford provided her a raise and increased responsibilities.

43. On July 1, 2015, Ms. Rose was promoted to management, serving as the Body Interior Engineering Integration Supervisor at the LL6 level.

44. In June 2017, Mr. Jeff Seaman began recruiting Ms. Rose to join his Bronco team in Vehicle Programs and Ms. Rose accepted.

45. In August 2017, Ms. Rose then transferred to Vehicle Programs to serve as the LL6 Bronco Program Management Supervisor under Mr. Seaman.

46. That fall, Ms. Rose was also initially placed on the "Key Talent" track.

47. Ford's Key Talent track identified approximately the top five to ten percent of employees unanimously selected by a Personnel Development Committee (PDC) comprised of LL3 and LL4 leaders based on two factors: (1) what the employee delivers, and (2) how the employee works with and leads others to achieve those results.

48. PDC selection reflected Ford upper management's determination that an employee possessed exceptional leadership potential warranting further development and that management expected that they would advance through multiple levels of Ford's leadership structure.

49. Upon information and belief, for an LL6 employee, placement on the Key Talent track meant that Ford expected that they would, at some point, advance at least two salary grades.

50. For an LL5 employee to be placed on the Key Talent list, which is significantly more competitive, Ford expected that they would advance at least two salary grades within five years.

51. Once an employee is placed on the Key Talent track, they remain on it unless Ford removes them.

52. Following Ms. Rose's placement on the Key Talent track, Ms. Rose and Mr. Seaman began having conversations about the company's goals for Ms. Rose's advancement and leadership contribution, including a promotion to an LL5 position.

53. Ms. Rose told Mr. Seaman that she was concerned that, as her responsibilities increased, the strategies she had developed over the years to manage her executive functioning symptoms were becoming less effective, particularly with respect to routine administrative tasks.

54. Mr. Seaman was not worried. He told Ms. Rose he viewed her neurological differences as a strength and valued the exceptional work they helped her produce.

55. When an administrative detail occasionally fell through the cracks, Mr. Seaman responded with good-natured comments such as, “Oh, Laura,” rather than criticism, reinforcing Ms. Rose’s sense that her neurological differences were understood and appreciated.

56. Although Ms. Rose felt accepted and valued for the way her mind worked, those around her did not yet understand how exhausting it had become for her to continually compensate for her neurological differences.

57. During this time, the Bronco team lacked a CPE, leaving Ms. Rose responsible for directing her peers, as Mr. Seaman had to manage the responsibilities that would otherwise have been handled by a CPE.

58. Ms. Rose excelled at the substantive demands of directing her peers, including delegating assignments and managing escalations, but struggled with clerical tasks, such as managing her email and scheduling her calendar.

59. Ms. Rose's colleagues on the Bronco team understood her executive functioning differences and adapted informally—for example, they knew to call Ms. Rose when they needed to reach her rather than rely on email.

60. What Ms. Rose did well, she did exceptionally well, and these differences did not detract from her effectiveness or the value Ford placed on her work.

61. However, Ms. Rose was concerned about her executive functioning challenges interfering with her ability to succeed in increasingly higher roles and began brainstorming ways to meet her executive functioning needs while still performing the high-level substantive work that had become her hallmark.

***Ms. Rose Finds Creative Ways to Overcome Her Disability-Related Challenges***

62. In early 2018, Ms. Rose confided in Mr. Asmat Kamal, a long-time colleague and close friend, about her placement on the Key Talent track.

63. Ms. Rose told Mr. Kamal told him that, although she was excited about the advancement opportunities associated with the Key Talent track, she worried that she might struggle with compensating for some of her executive functioning challenges as she advanced into increasingly demanding leadership positions.

64. Over the next few months, Ms. Rose and Mr. Kamal discussed ideas to mitigate Ms. Rose's executive functioning challenges, including a potential JobShare[3] arrangement.

65. In early 2018, when Mr. Kamal began to consider a transition from his team, Ms. Rose lobbied Mr. Seaman to consider recruiting Mr. Kamal to join the Bronco Program Management team as a lateral LL6 Supervisor.

66. Mr. Seaman agreed to pursue Mr. Kamal's transfer to the Bronco Program Management team to manage the launch responsibilities.

67. Launch support required long hours in loud, overstimulating, and demanding conditions.

68. Although Mr. Seaman and Ms. Rose both believed Ms. Rose could successfully handle launch responsibilities, as she had done during the 2010 Mustang launch, the environmental conditions had caused her difficulty maintaining healthy sleep and eating habits, difficulty maintaining emotional regulation, and agitation. Thus, they were concerned that placing Ms. Rose into the same environmental conditions would create the same health concerns.

69. Accordingly, based on Ms. Rose's recommendation, Mr. Seaman agreed to bring Mr. Kamal onto the team to handle those responsibilities.

---

[3] Ford's JobShare program is a flexible work arrangement through which two salaried employees jointly perform the responsibilities of a single full-time position. JobShare percentages can range from forty to ninety percent each, in any combination, across the two partners.

70. Mr. Kamal joined the Bronco Program Management team as an LL6 Supervisor in October 2018.

71. Ms. Rose and Mr. Kamal had not yet agreed to pursue a JobShare arrangement, but the longer they worked together on the Bronco program through 2018 and 2019, the more frequently they discussed the possibility.

72. Although they did not expressly discuss it, both understood that Mr. Kamal's opportunities for promotion and continued advancement were limited because he had not been identified for the Key Talent track and, upon information and belief, had not been identified by management as next up for a promotion, while Ms. Rose was likely to continue advancing within Ford.

73. A JobShare arrangement therefore offered Mr. Kamal an opportunity to advance alongside Ms. Rose because, so long as they occupied a shared role, Ms. Rose's continued advancement would require Ford to consider their advancement together.

74. In late 2019, Ms. Rose and Mr. Kamal formally proposed a LL5 JobShare position to Mr. Seaman.[4]

75. Their proposed division of responsibilities was designed as follows: Ms. Rose would assume the strategic and high-impact responsibilities at which she

---

[4] Ms. Rose and Mr. Kamal elected to develop a 90% JobShare proposal, in which each JobShare partner was expected to work approximately thirty-six hours per week and receive 90% of the compensation associated with the position. In such an arrangement, the partners collectively assumed responsibility for the role, coordinated their schedules and responsibilities to maintain continuity, and were expected to be managed, evaluated, and reviewed together as a single working unit. Ford upper management referred to such a division as "two heads for the price of one," due to Ford's unwritten "casual overtime" policy of requiring up to 25% additional hours per employee.

excelled, while Mr. Kamal would assume responsibility for clerical functions that were particularly difficult for Ms. Rose because of her executive-functioning challenges.

76. The JobShare proposal allowed for Mr. Kamal to serve as a "switchboard operator" for Ms. Rose's clerical functions, while Ms. Rose handled the substantive work.

77. Mr. Kamal's clerical functions included:

   a. Reviewing all communications (e.g., emails, instant messages, and texts);

   b. Escalating strategic and intractable issues to Ms. Rose and advising her to check the applicable communication;

   c. Responding to all other non-escalating communications;

   d. Managing agendas for Ms. Rose and himself;

   e. Delegating non-escalating incoming tasks and projects to subordinates; and

   f. Maintaining a record of their team's achievements, completed work product, and the status of their work objectives.

78. Mr. Seaman initially resisted the proposed JobShare arrangement because Ms. Rose had been designated Key Talent and promotion-ready, while Mr. Kamal had not.

79. From late 2019 through spring 2021, Mr. Seaman repeatedly discouraged Ms. Rose from pursuing the JobShare arrangement, explaining that Mr. Kamal was not viewed as "LL5 material" and that the proposed pairing had been poorly received during PDC discussions.

80. Mr. Seaman initially believed Ms. Rose would remain at the top of her peers, and would continue advancing simply by leveraging the acumen, intellect, and ingenuity that had placed her on the Key Talent track, even without a JobShare partner.

81. However, based on her own understanding of her executive functioning needs, Ms. Rose believed her career trajectory was too important to leave to neurological chance.

82. Ms. Rose believed a JobShare partner was necessary for her to continue advancing alongside her peers.

83. Ms. Rose explained to Mr. Seaman how Mr. Kamal could also provide necessary support to accommodate her executive functioning deficits, such as memory recall prompting.

84. By spring 2021, Mr. Seaman realized he had not fully comprehended the tremendous mental strain required of Ms. Rose to operate at increasing levels of responsibility. He came to understand that a JobShare partner was necessary to accommodate her executive functioning needs.

85. Thus, in the spring of 2021, Mr. Seaman agreed to support the JobShare agreement of Ms. Rose and Mr. Kamal.

86. In approving the agreement, Mr. Seaman asked Ms. Rose if the JobShare arrangement was a necessary accommodation for her executive functioning needs.

87. Ms. Rose confirmed that it was.

88. Ms. Rose and Mr. Kamal then began seeking the endorsement of other necessary upper management, mentors, and advocates to get the JobShare proposal approved.

89. At the end of June 2022, Ms. Rose and Mr. Kamal interviewed together with Mr. Seaman and two other CPEs for the EV Platform Utilities Program Manager position with the intention of assuming the role as JobShare partners.

90. In August 2022, Ms. Rose and Mr. Kamal were both promoted to the LL5 EV Utilities Platform Program Manager position, pursuant to their JobShare agreement.

91. Mr. Seaman became Ms. Rose's CPE, operating as her direct supervisor.

92. Pursuant to Ms. Rose and Mr. Kamal's previous discussions regarding a JobShare arrangement, Mr. Kamal's role as Ms. Rose's JobShare partner was to handle clerical tasks, leaving Ms. Rose open to focus on the more demanding strategic work, including strategic business and cross-functional responsibilities.

93. Per the JobShare arrangement, Ms. Rose and Mr. Kamal would occupy the same role, with the same expectations of delivering on the same responsibilities.

***<u>Ms. Rose and Mr. Kamal Successfully Execute Their JobShare Arrangement</u>***

94. On Ms. Rose's first day with the team, Mr. Seaman immediately assigned her a significant portion of his CPE responsibilities.

95. Upon information and belief, he did so to give Ms. Rose visibility across the broader organization and an opportunity to demonstrate that she was capable not only of the LL5 work for which she had been selected, but also of performing at the more senior CPE level.

96. This was the second time Mr. Seaman had entrusted Ms. Rose with responsibilities above her formal level.

97. Thus, from approximately August to September 2022, with Mr. Seaman's oversight, Ms. Rose regularly operated in a stand-in CPE capacity, meaning that in addition to performing her role as EV Utilities Platform Program Manager, she was also tasked with many of Mr. Seaman's duties, including decision-making and program-leadership for the team.

98. Mr. Seaman was then offered a position to become the EV Truck Tophat CPE, leaving the EV Utilities Platform without a formal CPE.

99. From October 2022 to March 31, 2023, Mr. Seaman only appeared briefly during meetings supporting milestone declarations, for a total of about five hours.

100. Thus, from October 2022 through the end of March 2023, Ms. Rose continued to regularly operate in a stand-in CPE capacity, with little to no oversight at all, meaning that in addition to performing her role as EV Utilities Platform Program Manager, she continued to perform many of Mr. Seaman's previous duties, including decision-making and program-leadership for the team.

101. Under Ms. Rose's leadership, the team successfully met all key performance milestones for an entirely new, "whitespace" product,[5] which was timed to be Ford's lead electric vehicle launch.

102. Some of these milestones were even delivered ahead of schedule.

103. Ms. Rose's accomplishments were recognized in her joint positive 2022 year-end performance review with Mr. Kamal.

104. During their performance review meeting, Ms. Katherine Ralston, Ms. Rose's Chief Program Manager, told Mr. Kamal that he was perceived as contributing substantially less to the successful product delivery and was less capable than Ms. Rose.

105. Mr. Seaman was in the room during this performance review and concurred with Ms. Ralston.

---

[5] Ford uses the term "whitespace" to describe a product developed without an established vehicle line or predecessor from which to build. Unlike programs based on existing vehicles, such as the Explorer or Expedition, a whitespace program requires the development of a new platform, technologies, processes, and solutions without the benefit of an established framework. Such programs therefore involve greater complexity and uncertainty, including evolving requirements, new technologies, and increased coordination across competing internal interests. The program led by Ms. Rose involved Ford's first ground-up electric-vehicle platform and incorporated technology that was new to Ford and, in some instances, to the industry.

106. Although Ms. Rose received significantly more positive feedback than Mr. Kamal regarding her work performance, both Ms. Rose and Mr. Kamal received the same performance rating because of their JobShare arrangement.

107. That year, Ford gave Ms. Rose a larger stock award than Mr. Kamal, reflecting her more substantial contributions, capabilities, and performance.

***Ms. Rose Is Diagnosed with ADHD and GAD and Notifies Ford of Her Disabilities***

108. In August 2022, within the first week of being promoted to the LL5 level, Ms. Rose began chairing CPE "Hard Rocks" forums approximately weekly, where employees presented difficult program issues requiring assistance from program leadership.

109. When Ms. Rose chaired the forums, she was the only program leader hearing the issues and responsible for providing the applicable feedback.

110. During one presentation, in October 2022, Ms. Rose struggled to sustain her attention and, when the presenter reached the end and asked Ms. Rose what he should do, Ms. Rose realized that she had missed too much of the presentation to meaningfully respond.

111. The experience was an inflection point for Ms. Rose—she recognized that the quick thinking and instinctive problem-solving on which she had long relied could no longer fully compensate for her difficulty sustaining attention as the complexity and demands of her leadership responsibilities increased.

112. This realization, together with a family history of ADHD and her recognition of similar difficulties throughout her own life, prompted Ms. Rose to undergo an evaluation for ADHD.

113. In November 2022, Ms. Rose was diagnosed with ADHD and GAD and began receiving professional treatment, including medication.

114. According to Life@Ford,[6] the process to request disability accommodations is as follows:

> Generally, an applicant or employee with a disability should tell the employer that he/she needs an accommodation to do the job. An employee or applicant may use the Disability or Pregnancy Accommodation Request and Resolution Form, which can be found in the Related Attachments section at the bottom of this article.

115. Two days after being diagnosed, Ms. Rose disclosed her disability both to Mr. Kamal and Mr. Seaman.

116. Ms. Rose was scheduled to lead an important meeting, so she asked Mr. Seaman and Mr. Kamal to find a way to interject if "something terrible happen[ed]," because she had just begun taking medication for her ADHD symptoms and she was concerned that she might experience an adverse reaction to the medication while presenting.

117. Ms. Rose performed well at the meeting.

---

[6] Life@Ford is Ford's internal global employee portal providing access to Human Resources (HR) policies, processes, programs, and employee services.

118. In fact, during the meeting, Mr. Seaman texted Ms. Rose, "You don't need me here. You've got this." Mr. Seaman then left the meeting.

***Under Mr. Katinas, Ms. Rose Experiences Discrimination for the First Time at Ford***

119. On or about March 1, 2023, less than a year after joining Mr. Seaman's team, Mr. Dana Katinas replaced Mr. Seaman as Ms. Rose's CPE.

120. By this time, Ms. Rose had worked at Ford since 2002, largely in male-dominated environments.

121. Most of Ms. Rose's managers, supervisors, peers, and direct reports had been men, and she was accustomed to being the only woman in the room.

122. Over the years, Ms. Rose had learned to navigate the bawdy jokes and irreverent banter, along with initial open dismissiveness of her capabilities that sometimes accompanied that environment, while earning the respect of her male colleagues through the quality of her work and leadership.

123. Ms. Rose did not regard every crude joke, disagreement, or difficult interaction with a male colleague as discriminatory.

124. On or about March 1, 2023, when meeting with Mr. Katinas, Ms. Rose disclosed her ADHD diagnosis, along with the accommodations Ford provided her via the JobShare partnership with Mr. Kamal.

125. Mr. Katinas seemed receptive and even disclosed that his own daughter had a disability.

126. Beginning in approximately mid-March 2023, Ms. Rose and Mr. Kamal told Mr. Katinas that their four-person team was approaching burn-out following months of 60-hour weeks with no overtime pay.

127. Ms. Rose and Kamal's team had an approved headcount of six employees but was operating with only four.

128. Therefore, they sought authorization to fill the two already-budgeted positions.

129. Throughout the spring of 2023, both Mr. Kamal and Ms. Rose repeatedly raised the staffing shortage issue with Mr. Katinas.

130. Although Mr. Katinas acted receptive to their concerns, the two vacant positions remained unfilled.

131. By summer of 2023, the team had been working sixty-hour weeks for nearly eight months straight, and Ms. Rose and Mr. Kamal again met with Mr. Katinas to urge him to fully staff their team.

132. Rather than address the staffing shortage, Mr. Katinas told Ms. Rose to "be careful."

133. Mr. Katinas did not direct the warning, or any comparable admonishment, toward Mr. Kamal, Ms. Rose's male, nondisabled JobShare partner, even though Mr. Kamal was present, held the same position as Ms. Rose, and was making the same staffing request.

134. Ms. Rose understood Mr. Katinas's warning as a threat that continuing to press him for additional staffing could jeopardize her employment.

135. During Ms. Rose and Mr. Kamal's weekly meetings with Mr. Katinas from late summer 2023 to early January 2024, Ms. Rose would discuss topics related to her work on Ford's Career Development Advisory Team 4 (CDAT4).[7]

136. A CDAT representative represents multiple people leaders on multiple programs, advocating for and assisting in the development of all their respective direct reports collectively.

137. An employee must be asked to join CDAT at each level; they are not guaranteed to continue serving as a CDAT representative upon their promotion to the next management level.

138. In 2019, Mr. Seaman had asked Ms. Rose to join the PDC5, as he felt the current representative was doing an inadequate job developing and advocating for the Bronco team's people and he valued Ms. Rose's strong people development skills.

139. In 2023, Ms. Ralston had invited Ms. to join the CDAT4.

140. Once asked to take on such a role, Ford considered the employee committed to that role. The employee was obligated to advocate for and develop all the people under their leadership.

141. Ms. Rose shared her work on CDAT4 with Mr. Katinas to convey the added value of her participation not just to Ford, but specifically to their team.

---

[7] As detailed in Note 4, *supra*, Personnel Development Committees (PDCs) were renamed Career Advancement Development Teams (CDATs) in 2020.

142. This added value included the ability to better generally advocate for their team members and Model e employees, as well as to obtain improved insight into other capable employees for future potential resource requirements.

143. However, when Ms. Rose would speak about her CDAT4 work, Mr. Katinas would roll his eyes and start talking over Ms. Rose.

144. Mr. Katinas did this increasingly over the course of their weekly meetings until, in December 2022, he said he saw no value in Ms. Rose supporting the CDAT4 committee.

145. Mr. Kamal also served on the CDAT4 with Ms. Rose.

146. However, when Mr. Kamal would discuss CDAT4 work, most often simply rephrasing exactly what Ms. Rose had shared about her work, Mr. Katinas would not roll his eyes or talk over Mr. Kamal.

147. Instead, Mr. Katinas would nod his head and say things like, “Okay,” or “I see your point.”

***<u>Ms. Rose’s Performance Reaches New Levels of Excellence</u>***

148. From August 1, 2022, to March 31, 2023, Ms. Rose and Mr. Kamal successfully delivered platform program objectives with minimal intervention or guidance, while simultaneously taking on and delivering additional workstreams for the “Tophat”[8] program team.

---

[8] “Tophat” refers to the upperbody, or aesthetic, of a vehicle. The underbody is then referred to ask the platform. Theoretically, these are two completely distinct programs, but in practice, there is overlap between the two programs.

149. Ms. Rose and Mr. Kamal's August 2023 mid-year performance review noted that they exceeded expectations for delivery objectives and met expectations for leadership behaviors.

150. In December 2023, Ms. Rose and Mr. Kamal received a corporate award for being the only team in Model EV organization to deliver their milestones on time and with quality.

151. At the end of 2023 and into the first half of 2024, Ms. Rose and Mr. Kamal were repeatedly selected to formally interview for promotions to LL4 positions at Ford, despite having been at the LL5 level for less than eighteen months.

152. At Ford, employees generally remained at a pay grade for at least two years before being selected to interview for a promotion to the next level.

153. Ms. Rose and Mr. Kamal were nevertheless selected to compete for LL4 positions against candidates who had accrued substantially more time at their pay grade.

154. These opportunities were highly competitive.

155. Upon information and belief, Ford closed at least one of these postings early because it had attracted so many applicants.

156. Upon information and belief, Ford selected only four to five candidates to interview for each role.

---

Ms. Rose had taken over responsibility and delivered technical feasibility for a substantial portion of the tophat content (components), including, but not limited to, mating parts with the underbody.

157. In December 2023, Ms. Rose and Mr. Kamal formally interviewed for two LL4 promotions: an Integrated Services Program Management Office Lead under Mr. Alex Purdy and a Hardware Integration Manager position in Engineering under Mr. Todd Sokolowski.

158. They were not selected for these positions for reasons unrelated to any deficiency in their performance or qualifications.

159. A recruiter later told Ms. Rose that they were the leading internal candidates, but there was tremendous pressure to hire an external candidate.

160. During this same period, senior Ford leaders continued to express interest in advancing Ms. Rose.

161. Ms. Rose had conversations with several chiefs and directors about future promotional opportunities, including a conversation with Ms. Amy Garby, Director of Technology Platform Program Management, regarding opportunities for Ms. Rose to advance within that organization.

162. Ms. Garby was mentoring Ms. Rose.

163. Ms. Garby and Ms. Rose had multiple discussions regarding potentially promoting Ms. Rose into the Technology Platform Program if Ms. Garby could secure the headcount.

***Ms. Rose's Medication Changes, Causing Severe Negative Side Effects***

164. By November 2023, it was becoming clear to Ms. Rose and her doctor that the initial benefits of her ADHD medication were wearing off, leaving her unable to focus on her meetings later in the day.

165. At Ms. Rose's level, vice presidents scheduled meetings as late as 7:00 p.m., so she needed to continue to operate at a high level in the evenings.

166. On the advice of her doctor, Ms. Rose agreed to adjust her medications.

167. Ms. Rose's insurance company required her to try and fail a thirty-day trial of the new medication pursuant to its step-therapy requirements before it would authorize coverage for an alternative medication.

168. Since business at Ford was slowing down for the holiday season, Ms. Rose thought it would be the perfect time to adjust her medication.

169. Ms. Rose started her new ADHD medicine two days before Thanksgiving.

170. Ms. Rose knew something was wrong almost immediately, as she slept for nearly sixteen hours that day and could barely get out of bed to host her annual Thanksgiving gathering.

171. Ms. Rose experienced significant exhaustion, confusion, and memory loss during the entire thirty-day trial.

172. In late December 2023, once the mandated thirty-day trial period was over, Ms. Rose's doctor immediately switched her back to her original ADHD medication, assuming it would re-regulate Ms. Rose as it had before.

173. Unfortunately, it did not, and although Ms. Rose was functioning better than she had on the second medication, by early January 2024, she was still experiencing increased cognitive, memory, and attention deficits.

***After Ms. Rose Discloses Her Disability-Related Needs, Mr. Katinas's Harassment Escalates***

174. In early January 2024, Ms. Rose informed Mr. Katinas about the recent disruption to her ADHD medication, that it had significantly affected her cognitive functioning, and that, although she had resumed taking her original medication, she had not yet returned to her prior baseline.

175. Ms. Rose specifically explained the symptoms she was experiencing, including extreme fatigue, inability to regulate her emotions, paranoia, and binge eating.

176. Ms. Rose also told Mr. Katinas that she had notified Mr. Kamal of these changes in medication and symptoms, that Mr. Kamal was supportive, and that she and Mr. Kamal would ensure they continued to deliver their workstream responsibilities but would likely need to shift some of their JobShare responsibilities to provide Ms. Rose with necessary accommodations.

177. Mr. Katinas agreed to the change in Ms. Rose's accommodations but offered no additional support or discussion.

178. On January 30, 2024, Ms. Rose and Mr. Kamal met with Mr. Katinas to discuss their performance review.

179. Their direct supervisor, Ms. Ralston, also attended this meeting.

180. Mr. Katinas informed Ms. Rose and Mr. Kamal that they received an "inconsistent" rating[9] on their 2023 year-end performance review.

181. This was despite their documented accomplishments and positive work performance throughout 2023, and despite receiving an "exceeds expectations" rating in their August 2023 performance review.

182. The January 2024 performance review did not provide any explanation for the change from the "exceeds expectations" rating from August 2023.

183. During the meeting, Mr. Katinas provided no information to explain why Ms. Rose and Mr. Kamal's delivery objectives rating had been significantly downgraded.

184. Mr. Katinas' feedback was contradictory and did not align with standard Ford performance expectations.

185. For example, Mr. Katinas told Ms. Rose and Mr. Kamal they weren't "proactive" and said they should have taken over tasks for a different team without that team's request or permission.

186. However, it would have been inappropriate and potentially considered insubordination had Ms. Rose and Mr. Kamal taken on tasks for another program manager's project without invitation.

[9] "Inconsistent," in Ford-speak, means below expectations.

187. Mr. Katinas also criticized Ms. Rose and Mr. Kamal because a vehicle component had failed during testing.

188. This critique was inappropriate because vehicle component failures are common during testing.

189. In fact, the purpose of vehicle component testing is to identify any product failures for correction prior to the product going to market, to avoid any potential product recalls.

190. Mr. Katinas told Ms. Rose and Mr. Kamal that they had not delivered the correct platform design quality.

191. This feedback made no sense, as Ms. Linda Zhang, EV Utilities Program Director, Model e, had repeatedly confirmed quality at each milestone Ms. Rose and Mr. Kamal had delivered.

192. When Ms. Rose asked for clarification, Mr. Katinas refused to respond.

193. Mr. Katinas stated Ms. Rose and Mr. Kamal should have anticipated several additional issues that prevented a major Tophat milestone declaration, and that these issues didn't show up until late-stage testing.

194. Ms. Rose explained the additional issues were owned, identified, and addressed by the Tophat program team in accordance with Ford's standard product development process intended to surface such issues.

195. Mr. Katinas claimed Ms. Rose failed to "insert" herself enough on the Tophat Program's program approval workstream.

196. Ms. Rose expressed confusion at this statement, pointing out to Mr. Katinas that he had specifically told her to "stand down."

197. Mr. Katinas raised his voice at Ms. Rose, saying, "I did not."

198. Ms. Rose opened her laptop to produce instant messages verifying that Mr. Katinas had told her to stand down.

199. Mr. Katinas then shouted at Ms. Rose, "Moving on!"

200. Mr. Katinas's shouting exacerbated Ms. Rose's anxiety, causing her increased disability-related symptoms, including migraines, vertigo, and insomnia.

201. Mr. Katinas expressed hostility at Ms. Rose for using paid time off (PTO) to accommodate her disabilities.

202. Mr. Katinas told Ms. Rose she should not have used it at the end of the year.

203. Ms. Rose had specifically chosen that time to perform the medication trial to cause the least disruption to her work at Ford.

204. Mr. Katinas claimed he had been "very accommodating on absences with limited transparency."

205. Mr. Katinas's shouting exacerbated Ms. Rose's anxiety, causing her to experience tinnitus, severe perspiration, stomachache, panic, and lightheadedness during the meeting.

206. At one point, trying not to pass out, Ms. Rose stood up and stepped back towards the door.

207. At that point, Mr. Katinas shouted, "Are you getting emotional and just leaving?"

208. Ms. Ralston texted Ms. Rose later in the afternoon asking if Ms. Rose was okay.

209. Ms. Rose spoke with Ms. Ralston on the phone later that night.

210. Ms. Ralston told Ms. Rose she did not agree with Mr. Katinas's behavior or approach during the meeting.

211. Ms. Ralston stated she was caught off guard by Mr. Katinas's behavior and approach and the items on which he focused.

212. When Ms. Rose said Ms. Ralston appeared "equal parts horrified and confused," Ms. Ralston agreed.

213. Ms. Ralston encouraged Ms. Rose to submit a rebuttal to the performance review.[10]

214. That night, Ms. Rose experienced a severe cortisol rebound, became numb, and started dissociating.

215. Ms. Rose was terrified of Mr. Katinas, his behavior toward her, and effect that behavior was having on her mental health and career.

216. In the days following the January 30 performance review meeting, Ms. Rose began experiencing medication-resistant migraines and binge eating and she developed an overwhelming fear of going to work.

---

[10] For months, Ms. Rose debated whether to submit a rebuttal, fearing that doing so would further anger Mr. Katinas and provoke additional retaliation. Ultimately, on May 23, 2024, Ms. Rose submitted the rebuttal.

217. In February 2024, Ms. Rose's medical team recommended she limit her interactions with both Mr. Katinas and Ms. Zhang, Ms. Rose's Director and the person ultimately responsible for approving the performance reviews, until they were able to stabilize Ms. Rose emotionally and psychologically.

218. Ms. Rose immediately shared this limitation with Mr. Kamal.

219. Ms. Rose emphasized her medical team recommended only that she *limit* her interactions, understanding it would be impossible and inappropriate to completely avoid Mr. Katinas and Ms. Zhang, as they were her supervisors.

220. Ms. Rose did not share these limitations with anyone in management, as she feared retaliation.

221. On or around February 1, 2024, Mr. Kamal began modifying his JobShare responsibilities so that he became the sole direct contact for their team with Mr. Katinas.

222. Mr. Kamal would re-schedule their standing meetings with Mr. Katinas, often at the last minute after Ms. Rose confirmed her intention to attend, to times he knew Ms. Rose had direct conflicts.

223. Ms. Rose never asked Mr. Kamal to become the sole direct contact, and in fact had explicitly said her position required some interaction with Mr. Katinas, as her supervisor.

224. Ms. Rose repeatedly asked Mr. Kamal to keep the meetings with Mr. Katinas at their previously scheduled times, but he refused to do so.

225. Considering their longtime friendship and partnership, Ms. Rose tried to view Mr. Kamal's change in behavior as a misguided attempt to look out for her.

226. In approximately late January or early February 2024, shortly after the performance review meeting, Mr. Seaman told Ms. Rose he learned Mr. Katinas had removed her from the Key Talent track in a CDAT3 meeting.

227. Mr. Seaman said he did not know exactly when the removal occurred because he had only just rejoined the CDAT3, but Ms. Rose had still been on the Key Talent track when he had left.

***<u>Mr. Katinas Begins Excluding Ms. Rose from Her Workstreams</u>***

228. On or around February 1, 2024, Mr. Katinas began changing meetings related to the program modification workstream—a platform program for which Ms. Rose was responsible—to "private" in the calendaring system.

229. The private designation on the meetings excluded Ms. Rose and her team.

230. These meetings were intended to discuss repurposing the underbody/platform design after the Tophat program had failed to develop a feasible design for it to date.

231. To date, Ms. Rose and her team had always been involved in these meetings as she had developed the platform design being discussed.

232. When Ms. Rose asked Mr. Katinas why he was excluding her team from meetings, he said the program modification was still in the investigative phase, so only a small group was included in the meetings.

233. Mr. Katinas told Ms. Rose and Mr. Kamal they would be informed when they could be told what the new design assumptions, modifications, and platform content would be.

234. However, despite the program modification being an underbody program for which Ms. Rose and Mr. Kamal were responsible, the Tophat program manager, who was Mr. Rose and Mr. Kamal's counterpart, was included in these meetings.

235. Upon information and belief, only Ms. Rose, Mr. Kamal, and their team were excluded from these meetings.

***<u>Despite Being Excluded from Her Workstream, Ms. Rose Remains Productive</u>***

236. To maintain productivity while excluded from these meetings, Ms. Rose focused on other areas of her work, including her roles as a People Leader and member of CDAT4, of which she had been a member since early 2023.

237. Ms. Rose had been a People Leader since July 1, 2015, when she had been promoted to LL6 and assigned two people to supervise, except for one brief period from November 2021 to July 2022 where she did not have direct reports.

238. People Leader is a Ford designation for management ranks, meaning the individual has direct reports, as compared to other managers who do not.

239. As with CDAT4, as a People Leader, Ford considered Ms. Rose committed to the role, and she was obligated to advocate for and develop all the people under her leadership.

240. Thus, as a part of her CDAT4 duties during this period, Ms. Rose transformed a generic Vehicle Programs-wide mentorship program of seventy members into a bespoke program that was tailored to serve each individual member's specific professional best interests.

241. This expansion was so well received that the Program Planning organization within Ford joined the mentorship program and Ms. Rose individually matched approximately 200 more mentors and mentees.

242. As a People Leader, Ms. Rose mentored four direct reports, assisting in planning their development and looking for opportunities to connect them with other mentors for potential professional advancement.

243. During this time, Ms. Rose also maintained productivity in other ways, including:

   a. Completing an Organization & Talent Review, including succession and development plans for the EV Utilities Platform program;

   b. Supporting the protype build process within the EV Utilities Platform, including addressing issue escalation and developing testing and risk mitigation plans;

   c. Leading program resolution of computer aided engineering feasibility issues; and

d. Establishing and leading an internal Model e CDAT, in coordination with Ms. Ralston, to ensure appropriate Model e representation at the various CDAT committee levels.

244. From February 2024 to mid-April 2024, in meetings with Ms. Rose and Mr. Kamal, Mr. Katinas continued to tell them that they would not be permitted to be involved in the program modification workstream until he and Ms. Zhang decided to "cascade"[11] the status of the progress on the workstream.

245. During Spring 2024, Ms. Rose continued to ask Mr. Katinas during team meetings when she and Mr. Kamal were going to start working on the vehicle modification program that they continued to be excluded from.

246. Ms. Rose knew her performance on this program modification workstream would be evaluated as a part of her performance review because Ms. Zhang had identified the workstream as a primary objective, which Mr. Katinas then cascaded to Ms. Rose and Mr. Kamal. Accordingly, Ms. Rose needed to begin working on the program modification as soon as possible.

247. Despite Ms. Rose and her team having intimate knowledge of the product being repurposed, the ongoing exclusion from the primary workstream had created uncertainty about whether sufficient work would remain to secure all of Ms. Rose's employees' positions.

[11] To "cascade" means to roll out to all cross-functional partners.

248. To protect their continued employment, Ms. Rose negotiated the transfers of two of her four employees to other positions within Ford.

249. Mr. Katinas opposed the transfers, preferring to keep the employees available "just in case" the work proceeded, which put the employees at great risk of losing their employment entirely.

250. Despite the lack of guaranteed sufficient work, Mr. Katinas continued to state Ms. Rose and Mr. Kamal would not be permitted to be involved until he and Ms. Zhang decided to cascade the status of the progress and refused to give Ms. Rose any other information regarding this workstream, despite this workstream being a primary responsibility of Ms. Rose's job role.

251. During that same February to mid-April time frame, Mr. Kamal told Ms. Rose that Mr. Katinas maintained the position that Mr. Kamal and Ms. Rose would continue to be excluded until he cascaded the workstream's progress status in his weekly one-on-one discussions with Mr. Katinas as well.

252. Ms. Rose's assigned duties included responsibility for reconfiguring the vehicle platform—the same portion of the vehicle being discussed for repurposing at these meetings.

253. This work accounted for at least seventy five percent of Ms. Rose's planned annual workload and constituted the core function of her position.

254. In effect, Mr. Katinas prevented Ms. Rose from being able to perform her assigned duties by refusing to include her in meetings or discuss the program modification workstream with her.

255. Mr. Katinas and Ms. Zhang continued to exclude Ms. Rose and Mr. Kamal from these meetings until approximately April 17, 2024.

256. On or around April 23, 2024, Ms. Rose was diagnosed with severe anxiety, which required psychiatric care.

***Mr. Katinas Schedules an Out-of-Process Performance Review of Only Ms. Rose***

257. On April 24, 2024, Mr. Katinas scheduled an out-of-process performance review meeting with Ms. Rose to be held on April 30, 2024.

258. His accompanying email read, "Pls bring YTD Objective update / progress to date, highlighting your specific contributions Jan–Apr. Thx."

259. During January through April, Mr. Katinas had kept Ms. Rose from performing her key job functions by excluding her from relevant meetings and failing to provide her with necessary information from the meetings.

260. When Ms. Rose asked Ms. Zhang, Mr. Katinas' supervisor, why this out-of-process performance review meeting was taking place, Ms. Zhang said it was a "new process" for all employees.

261. However, upon information and belief, no other employees within Ms. Rose's workstreams received an out-of-process performance review.

262. Mr. Kamal was not given an out-of-process performance review.

263. In fact, when Mr. Rose noticed that Mr. Kamal was not scheduled for the review and added him to the calendar invite, Mr. Katinas removed him.

264. Mr. Katinas also modified the meeting notice so that Ms. Rose could not forward it to Mr. Kamal or otherwise add Mr. Kamal as an invitee.

265. Mr. Katinas prohibited Mr. Kamal from attending the meeting even after Ms. Rose reminded Mr. Katinas that Mr. Kamal served as an accommodation for her ADHD, keeping track of their performance achievements and operating as a memory prompt for Ms. Rose to effectively recall and recount their performance.

266. Mr. Kamal's prohibition from the meeting made no sense because, due to their JobShare arrangement, the two had always completed all performance reviews and been evaluated jointly and had attended all performance review meetings together.

***Mr. Kamal Abruptly and Unexpectedly Ends His JobShare Arrangement with Ms. Rose Before the Out-of-Process Review Meeting***

267. Later in the day on April 24, 2024, Mr. Kamal emailed Ms. Rose asking to end their JobShare arrangement, writing, "I've also had meetings with multiple of my mentors who are pushing me to make a decision on where I see myself quickly, mainly from a job security standpoint. They may know something which I don't."

268. This made no sense to Ms. Rose, so she asked Mr. Kamal to meet with her the following morning via videoconference.

269. During the meeting, Mr. Kamal told Ms. Rose he had been told Ford would likely terminate his employment if he remained as Ms. Rose's JobShare partner.

270. Mr. Kamal told Ms. Rose that he understood her employment to be "safe," but that his continued participation as her JobShare partner placed his employment at risk.

271. Mr. Kamal told Ms. Rose that his mentors had advised him to protect himself by ending their JobShare partnership.

272. Upon information and belief, someone at Ford had told Mr. Kamal that his proximity to Ms. Rose was harming his career, because she was considered a liability.

***<u>Ford Forces Ms. Rose to Attend the Out-of-Process Review Meeting Without Accommodations</u>***

273. On April 26, 2024, Ms. Rose emailed Ms. Ralston her concerns about attending the out of performance review alone, writing:

> I am uncomfortable meeting alone with my CPE, as I feel I have been actively targeted by him for some time. Also, as I've noted, due to my disability, my memory recall - in particular, in stressful situations, is inconsistent at best. My CPE is well aware of my disability and has never expressed concern with how [Mr. Kamal] and I compensate for this.

274. Ms. Ralston responded she supported Mr. Kamal attending the meeting "if [Mr. Kamal] is aligned. If not, I would let HR know you are not comfortable with attending alone for all the reasons you stated."

275. Later that day, via email, Ms. Rose asked Mr. Kamal to attend the out-of-process performance review meeting with her.

276. On April 27, 2024, Mr. Kamal responded that, because Mr. Katinas had un-invited him twice from the meeting, he would not attend unless Mr. Katinas reinvited him.

277. On or around April 29, 2024, Ms. Rose contacted Ms. Erin Pantano of Employee Relations, to request help accessing accommodations for the out-of-process performance review meeting.

278. Ms. Rose told Ms. Pantano that her disabilities caused her challenges with memory recall and repetitive tasks, especially in highly stressful environments.

279. Ms. Rose told Ms. Patano that Mr. Seaman had approved her JobShare arrangement with Mr. Kamal, under which Mr. Kamal performed repetitive and clerical tasks and assisted Ms. Rose with memory recall.

280. Ms. Rose also noted that when Mr. Katinas took over as CPE in March 2023, Mr. Seaman told her he had explained to Mr. Katinas the nature of Ms. Rose and Mr. Kamal's JobShare agreement and how it accommodated Ms. Rose's executive functioning deficits.

281. Ms. Rose also told Ms. Pantano that she had communicated to Mr. Katinas the need to temporarily update her JobShare accommodations due to a medication reaction in January 2024.

282. Ms. Rose also noted that she had clarified in writing to Mr. Katinas that she would not be able to recall specifics without Mr. Kamal, as part of his role was to assist her with memory recall.

283. Ms. Pantano responded that because Ms. Rose's accommodations weren't in writing, they weren't approved by Ford.

284. Ms. Rose said she did not understand this, because her understanding of disability accommodation law was that accommodations did not have to be in writing.

285. Ms. Pantano recommended that Ms. Rose formalize her accommodation request in writing and said she would send Ms. Rose a specific form she could use.

286. Ms. Rose asked Ms. Pantano for permission to record the out-of-process performance review meeting to facilitate memory recall as a reasonable accommodation.

287. Ms. Pantano denied Ms. Rose's request to record the meeting with no rationale.

288. Ms. Pantano told Ms. Rose that Ms. Taleen Newlin, HR Representative, would attend the meeting.

289. Upon information and belief, Ms. Newlin had no training or knowledge in how to serve as a JobShare accommodation partner to Ms. Rose or assist her with memory recall.

290. Ms. Pantano provided no information to Ms. Rose about how Ms. Newlin's presence at the meeting would meet Ms. Rose's disability accommodation needs.

291. Ms. Rose also noted she was experiencing severe anxiety due to Mr. Katinas' hostile conduct towards her in recent meetings.

292. Ms. Patano did not provide Ms. Rose with any support, assistance, or resources to address her needs or her anxiety.

293. Due to the unexpected out-of-process performance review, the abrupt request to end the JobShare arrangement, Ford's refusal to allow Mr. Kamal to attend the out-of-process performance review as Ms. Rose's accommodation, and Ford's failure to agree to a reasonable alternative accommodation, Ms. Rose began experiencing severe mental health symptoms, including panic attacks and insomnia.

***Mr. Katinas Gives Ms. Rose False, Discriminatory Performance Feedback***

294. On April 30, 2024, Ms. Rose met with Mr. Katinas and Ms. Ralston for the out-of-process performance review meeting.

295. Ms. Newlin did not attend the meeting, nor did Ford provide any explanation for her absence.

296. Ms. Ralston attended solely as an observer, stating she had been invited on very short notice.

297. Per Mr. Katinas's request on April 24, 2024, Ms. Rose started the meeting by presenting a PowerPoint that she had created outlining her progress toward her objectives to date, which included the well-received cross-functional alternative initiatives and contributions she had achieved while unable to work on her primary job assignment, as outlined *supra*.

298. Ms. Rose took notes during the meeting, explaining she wanted to ensure she captured everything properly.

299. Since Ms. Rose did not have Mr. Kamal as her memory prompt and she was not permitted to record the meeting, her mentors had encouraged her to document everything Mr. Katinas said.

300. Each time Ms. Rose began writing, Mr. Katinas raised his voice, sighed, talked faster, and shifted in his seat, appearing to express irritation at her use of taking notes to accommodate her disability needs.

301. When Ms. Rose repeated that her intention was to ensure that she did not miss anything to better meet Mr. Katinas's expectations, Mr. Katinas demanded that she stop.

302. Mr. Katinas admonished Ms. Rose for not being more "visible," accusing her of failing to attend program modification meetings since February 2024.

303. As described *supra*, until the previous week, Mr. Katinas had been excluding Ms. Rose from program modification meetings since February 2024.

304. Ms. Rose had been to every program modification meeting that she had been invited to during the period in question—one.

305. Mr. Katinas then accused Ms. Rose of missing their meetings with Mr. Kamal.

306. Ms. Rose feared triggering Mr. Katinas' anger, so to defuse the situation and move on, she simply said the meetings had been moved and did not tell him that Mr. Kamal had been excluding her from those meetings, too.

307. Mr. Katinas told Ms. Rose to just keep paying attention to her calendar.

308. Ms. Rose understood Mr. Katinas's comment as a criticism directed at her ADHD and its impact on her attention.

309. During this discussion, Mr. Katinas' tone of voice escalated in volume.

310. Mr. Katinas told Ms. Rose was she was using too much PTO.

311. Ms. Rose responded that Mr. Katinas knew she had been sick and reminded him that, despite her time off, she was still meeting all her deadlines.

312. Ms. Rose also noted she was not even close to exhausting her yearly PTO, and that she was using her PTO in accordance with Ford policy.

313. Mr. Katinas said Ms. Rose needed to "communicate better" and that he "needed a better line of sight" when she was absent.

314. When Ms. Rose asked for clarification about what "better line of sight" meant, Mr. Katinas refused to explain.

315. Ms. Rose reminded Mr. Katinas that whenever she was absent, per Ford policy, she arranged for a Single Point of Contact (SPOC)[12] to cover for her and communicated the name of the SPOC to him.

316. Mr. Katinas just kept repeating he needed "better communication" and a "better line of sight" without any further explanation of how Ms. Rose should provide that.

317. Mr. Katinas's repeated criticism of Ms. Rose's use of PTO made her feel as though he was punishing her for being sick, even though she was entitled to the time under Ford's standard leave policies.

318. Mr. Katinas then accused Ms. Rose of failing to "do" his calendar.

319. When Mr. Katinas first assumed Mr. Seaman's role, Ms. Rose had voluntarily assisted him by highlighting meetings that, based on her greater familiarity with the organization, she believed were strategically important for him to attend in support of the team.

320. Managing Mr. Katinas's calendar was not among Ms. Rose's job responsibilities. Rather, Ms. Rose had undertaken the task as a courtesy while Mr. Katinas became familiar with the organization.

321. As an LL4 employee, Mr. Katinas was not entitled to his own administrative assistant.

[12] At Ford, within each organization, a leader designates a subordinate to serve as their SPOC to facilitate the efficient flow of information both up and down the chain of command.

322. Ms. Rose was not Mr. Katinas' administrative assistant.

323. When Ms. Rose became ill and went on leave in December 2023, she no longer had the capacity to continue performing this additional task on top of her own responsibilities.

324. Fearing that her job was at risk, Ms. Rose agreed to resume managing Mr. Katinas's calendar.

325. Mr. Katinas expected Ms. Rose, a woman in a leadership role, to perform a clerical task outside her job responsibilities—and criticized her when she stopped doing so as a courtesy—while imposing no comparable expectation on Mr. Kamal or, upon information and belief, any male employee.

326. Mr. Katinas then told Ms. Rose she was trending toward an "inconsistent" both categories for her mid-year performance review, expected to be delivered in August 2024.

327. Mr. Katinas did not explain why Ms. Rose was trending toward an "inconsistent" rating in both categories.

328. A "inconsistent" rating did not reflect Ms. Rose's work performance.

329. When Ms. Rose asked how she could improve, Mr. Katinas repeatedly said, "At your level, you should be comfortable with ambiguity."

330. After the meeting, Ms. Ralston privately commended Ms. Rose.

331. Ms. Ralston told Ms. Rose she was receptive, inquisitive, professional, and really tried to understand Mr. Katinas's perspective.

332. Ms. Ralston told Ms. Rose that she had been very impressed with Ms. Rose's initiative and how she conducted herself during the meeting.

***<u>Ms. Rose Commits Herself to Impressing Mr. Katinas</u>***

333. Ms. Rose left the meeting feeling confused and devalued, as she had always worked hard to achieve high levels of performance at work, and she did not know how to improve her work to achieve a higher than "inconsistent" rating from Mr. Katinas.

334. As a result, Ms. Rose scheduled "touchpoint" meetings with Mr. Katinas for late May and late June 2024.

335. The purpose of the touchpoint meetings was for Ms. Rose to seek feedback from Mr. Katinas regarding his expectations, the quality of her work and progress moving toward his expectations, and what she could do to raise her performance rating.

336. Ms. Rose wanted to ensure she was meeting or exceeding expectations with her work, as she always had before.

337. At both touchpoint meetings, Ms. Rose led the discussion and provided detailed documentation demonstrating the quality of her work.

338. During both meetings, Mr. Katinas told Ms. Rose she was meeting expectations without exception, and specifically stated Ms. Rose was "trending up."

339. Mr. Katinas did not give Ms. Rose any areas for improvement in either meeting.

340. In fact, in both meetings, Mr. Katinas told Ms. Rose she was doing excellent work.

341. In both meetings, Mr. Katinas told Ms. Rose that she was doing exactly what he had hoped for when he had given her the out-of-process performance review.

342. In both meetings, Mr. Katinas responded with "no" when Ms. Rose asked if there was anything else she should do differently moving forward.

343. At the beginning of June 2024, Ms. Ralston retired and Ms. Rose's direct-line reporting transitioned to Ms. Ralston's Director, Mr. Craig Kelley.

344. Beginning at that time, Ms. Rose began regularly sharing her documentation and the feedback she received from Mr. Katinas with both Mr. Kelley and her HR representative, Ms. Newlin, via email.

345. Ms. Rose did this to document her continued efforts to fulfill her responsibilities and meet her supervisors' and Ford's performance expectations.

346. Neither Mr. Kelley nor Mr. Newlin ever responded to these emails.

***<u>As Ms. Rose Improves, Mr. Kamal Stagnates</u>***

347. Ford policy required Mr. Kamal and Ms. Rose to continue their JobShare agreement  until one of them was moved to a new role.

348. After Mr. Kamal told Ms. Rose in his April 24, 2024 email that he no longer wanted to be her JobShare partner, neither had secured a new role, so they continued as JobShare partners.

349. Their relationship had become tense—Mr. Kamal avoided most interactions with Ms. Rose and sometimes snapped at her in front of their team.

350. Ms. Rose was surprised by Mr. Kamal's sudden change in behavior, but out of respect for their years-long friendship, gave him space.

351. Mr. Kamal also limited his direct contributions to their team's work and spent most of his time in the office searching for other jobs within Ford.

352. Mr. Kamal began directing strategic-level issues, which were supposed to be in Ms. Rose's purview, to team subordinates.

353. During this period, despite Mr. Kamal's interference, Ms. Rose still actively pursued and delivered as much of the team's work herself as possible, in accordance with her defined job responsibilities.

354. When issues were escalated to Ms. Rose or she independently identified matters requiring further attention, Mr. Kamal would sometimes attempt to delegate the matter to one of Ms. Rose's direct reports or close it before Ms. Rose believed it had been adequately addressed.

355. When Ms. Rose learned this had occurred, she would redirect the matter so that she could ensure it was appropriately resolved.

356. Ms. Rose's accomplishments during this time included:

    a. Providing detailed CPE briefings on key program content investigations;

    b. Interrogating and mitigating program timing disconnects;

c. Serving as program lead for computer-aided engineering design feasibility,

d. Identifying and driving $600,000.00 total and $10.00 per part cost avoidance; and

e. Taking the initiative to seek out alignment with an Engineering Chief and Director, allowing her to establish a regularly scheduled forum for the cross-functional team to escalate vehicle software issues to her for resolution.

357. In approximately late May or early June 2024, Mr. Katinas told one of Ms. Rose's subordinates, Mr. Alex Toy, that Mr. Kamal had accomplished no significant work on the team and was instead devoting his time to pursuing a new role.

***<u>Mr. Katinas Gives Ms. Rose a False, Discriminatory Mid-Year Performance Review</u>***

358. In September 2024, despite the positive feedback that Mr. Katinas had given Ms. Rose in the May and June touchpoint meetings, Mr. Katinas and Ms. Zhang rated Ms. Rose a score of one or "inconsistent" in both major categories of her mid-year performance review: performance and behavior.[13]

[13] Ford rated its employees in two major categories: "WHAT" assessing performance and "HOW" assessing behavior. The WHAT has four subcategories: (1) people, (2) profitability and cost, (3) quality and programs, and (4) efficiency. The HOW has six sub-categories: (1) deliver it, (2) own it, (3) do only what matters, (4) bias for action, (5) seek to understand, and (6) solve together. Supervisors ranked employees in each subcategory using a one (inconsistent) to three (exceeding expectations) scale. The subcategory scores were then averaged to get the final score in each major category.

359. On September 9, 2024, Ms. Rose met with Mr. Katinas and Mr. Kelley for her mid-year performance review meeting.

360. During that meeting, Mr. Katinas and Mr. Kelley provided Ms. Rose with specific subcategory rankings that made it mathematically impossible for her to have received an overall score of one.

361. For example, in two out of the four subcategories comprising the performance rating, Ms. Rose received a three and a two.

362. Therefore, even if Ms. Rose had received a one and a one in the remaining two subcategories, her overall score for the performance category would have been a 1.75.

363. Ford had a policy that performance review scores of 0.67 or higher must be rounded up.

364. Therefore, if Ms. Rose's subcategory rankings had been calculated accurately, Ms. Rose should have received at least a two, for "meets expectations," in the performance category.

365. Mr. Katinas then read aloud the supporting text in Ms. Rose's performance review.

366. It was almost exclusively positive: Ms. Rose "responded well to joint check-in sessions," "led the CAE [Platform Program Modification] timing assessment to support downstream TPS delivery," "took the initiative to start [a vehicle

software] specific hard rocks when it was clear the team was struggling," and "continued her strong people advocacy focus with CDAT."

367. The only negative feedback was that Ms. Rose did not know "how and where to contribute consistently" from January to April 2024.

368. During that period, Mr. Katinas had excluded Ms. Rose from her primary workstream meetings.

369. Further, despite Ms. Rose and Mr. Kamal still being bound by their JobShare agreement, their history of receiving the same performance ratings regardless of individual contributions, and Mr. Katinas' previous remarks regarding Mr. Kamal's failure to accomplish significant work, Mr. Kamal received individual performance scores that were higher than Ms. Rose's.

370. Upon information and belief, Mr. Kamal received scores of one and two in the two main categories of his performance review.

371. Upon information and belief, given Mr. Katinas' negative comments about Mr. Kamal's performance, he had not earned the higher score.

***Ms. Rose Accepts a New Role to Salvage Her Professional Reputation and Mental Health***

372. Mr. Kelley learned that Vice President Doug Field was seeking a highly capable program manager for a recently created Corporate Task Force (CTF), which had been experiencing program-management difficulties.

373. The CTF was created in approximately June 2024 to set up a dealer software support hotline, intended to address a systemic lack of technical support for dealership technicians to avert an unnecessary warranty spend of up to $2 billion.

374. As the Vice President generally responsible for architectural software development and delivery, Mr. Field oversaw the CTF's progress.

375. After concerns arose during the CTF's initial attempts to address systemic software issues during its first few weeks, Mr. Field determined that the CTF needed a "professional" program manager.

376. Mr. Kelley recommended Ms. Rose for the position to Ms. Zhang, as she was Ms. Rose's program director.

377. Based on Mr. Kelley's recommendation and her understanding that Mr. Field wanted this position filled quickly, Ms. Zhang asked Ms. Rose if she was interested in joining the CTF and assuming responsibility for its program management.

378. Ms. Rose confirmed her interest.

379. Ms. Zhang then confirmed Ms. Rose's interest and ability to join the CTF as its Program Manager to Mr. Ken Ely, an LL2 employee who owned[14] the CTF,

---

[14] "Owned" means serving as the executive champion for an initiative. The initiative is housed within that executive's organization, and the executive serves as its public face, receives credit for its work, and provides direction and guidance on significant issues, but does not manage its day-to-day operations.

and Ms. Yvonne Kinnie, an LL3 employee who led the CTF's day-to-day operations.

380. Ms. Kinnie affirmed Ms. Rose's designation as the CTF's Program Manager and Ms. Rose joined the CTF on July 1, 2024.

381. From the beginning, Ms. Rose communicated openly with her new management and team members about her disabilities and her accommodation needs, including the detrimental effects to her health and well-being during her time in Model e Vehicle Programs.

382. From the beginning, Mr. Ely, Ms. Kinnie, and the CTF's cross-functional teams gave Ms. Rose overwhelmingly positive feedback.

383. On or around July 25, 2024, Ms. Kinnie told Ms. Rose she was "very agile," and was able to get the CTF "back on track on time and with quality."

384. Ms. Kinnie also told Ms. Rose she had well-developed soft skills, meaning she knew when to push her team and when to give them a break.

385. On or around August 30, 2026, Mr. Ely said Ms. Rose had stepped in and managed the CTF seamlessly.

386. Before Ms. Rose joined the CTF, it had a reputation for failing to make sufficient headway in its goals and objectives.

387. Within weeks of joining the CTF, Ms. Rose led a challenging effort, which ultimately delivered the launch of a significant warranty-cost avoidance dealer support hotline.

388. Ms. Rose's efforts allowed the CTF to deliver the service ahead of schedule and ultimately avert the projected $2 billion annual unwarranted warranty spend.

389. On or around December 9, 2024, at a company-wide "all hands" meeting, Ford's CEO, Mr. Jim Farley, publicly praised Ms. Rose's team's efforts and results on the CTF.

390. On or around December 9, 2024, Mr. Ely gave Ms. Rose a Certificate of Recognition for pulling a key module support launch ahead on the CTF.

391. Mr. Ely had also given the CTF an additional recognition award in July 2024.

392. Ms. Rose was named on both certificates in recognition of her individual contributions to the CTF's work.

393. After joining the CTF, Ms. Rose experienced a marked improvement in the symptoms that had worsened during her time under Mr. Katinas's supervision. She began sleeping better, her appetite improved, her dermatillomania improved, she experienced fewer migraines, her vertigo resolved, and she no longer experienced symptoms of panic.

394. Ms. Rose's symptoms improved as she transitioned from a work environment in which she had experienced hostility, yelling, criticism, and uncertainty, to one in which she felt psychologically safe, supported, and able to perform her work without fear of confrontation or mistreatment.

395. The change reduced the workplace stress that had exacerbated Ms. Rose's disability-related symptoms and improved her overall functioning and well-being.

396. Ms. Rose experienced the difference so profoundly that she told the entire CTF team how safe she felt working with them.

397. Ms. Rose's medical providers attributed these improvements to the significant reduction in anxiety she was experiencing due to being on a team that did not create obstacles to performing her work and did not unfairly assess her work performance.

***Ford Hires a Less-Qualified Man Instead of Promoting Ms. Rose***

398. While serving in the temporary Program Manager position role on the CTF from July 1 to November 1, 2024, Ms. Rose pursued permanent roles at Ford.

399. Aside from finding roles that better aligned with her career goal to transition into software engineering, Ms. Rose hoped to maintain the improvement to her disability-related symptoms and mental health.

400. On the CTF, Ms. Rose had built a strong rapport with Mr. Ely, who regularly sought her input on reorganizing Service Engineering and Operations (SEO) organization—the nearly 1,000-person organization he oversaw within Ford; involved her in significant work for SEO; and treated her as a trusted collaborator.

401. During this period, Mr. Ely repeatedly told Ms. Rose he intended to promote her from an LL5 to the LL4 position within SEO.

402. In or around August 2024, Mr. Ely told Ms. Rose that he intended to create an LL4 position within SEO for her.

403. Mr. Ely asked Ms. Rose to submit a proposal to create the LL4 role and its responsibilities.

404. Ms. Rose submitted a plan for a "Chief, SEO Business Strategy & Program Management Office (LL4)" role, in which she would serve as Mr. Ely's "Right Hand" and "Thought-Partner." In this role, she would expand upon the work that she was already doing in SEO by bringing in three LL5 managers that would report to her.

405. Approximately one month later, a new Vice President, Mr. Daniel Justo, assumed leadership of SEO.

406. Mr. Justo's leadership of the SEO was announced during a reorganization workshop and took both Ms. Rose and Mr. Ely by surprise.

407. Mr. Ely told Ms. Rose not to worry and that this change would not affect her promotion.

408. Nevertheless, upon information and belief, after assuming his role as Vice President, Mr. Justo pressured Mr. Ely to offer the LL4 position that Ms. Rose had created to Mr. Justo's friend, Mr. Kleber Fernandes, who would be transferring from Ford South America.

409. Upon information and belief, Mr. Fernandes had no experience with program management or business offices.

410. Mr. Ely offered the position to Mr. Fernandes, and he accepted.

411. This left Mr. Ely without an LL4 position to offer Ms. Rose.

***Mr. Ely Exploits Ms. Rose's Disability-Related Concerns to Induce Her to Accept a Position in SEO***

412. In or around September and October 2024, Ms. Rose participated in a series of interviews for an LL5 role in the Integrated Services department to establish a Program Management Office and build out a program management department.

413. On or around November 1, 2024, Ms. Rose received a formal offer for the Integrated Services role.

414. Worried about losing an employee that he had come to depend on, Mr. Ely and Ms. Stacy Balzer, SEO's Director of Technical Support Operations, moved quickly to create a position within their organization for Ms. Rose.

415. Within a week, Mr. Ely and Ms. Balzer obtained headcount to create an LL5 position for Ms. Rose.

416. In countering Integrated Services' offer, Mr. Ely assured Ms. Rose that she could stay in her current role and that there would be room for upward mobility.

417. In urging Ms. Rose to accept the lateral position he was offering, Mr. Ely told her that her disabilities and disability-related "limitations" would likely hinder

her ability to advance at Ford generally, and on the Integrated Services team specifically.

418. Mr. Ely also told Ms. Rose that other department leaders, such as the one in Integrated Services where she had been offered a new position, would not be as tolerant of her disability as he had been.

419. Mr. Ely prefaced his comments by saying, “HR is not in the conversation.”

420. Ms. Rose understood Mr. Ely’s statement to mean that he recognized the impropriety of what he was about to say.

421. Thus, after determining that Ms. Rose was ready for promotion to an LL4 position—disabilities and all—Mr. Ely told Ms. Rose her disabilities would impede her ability to succeed professionally in other roles to manipulate her into remaining with SEO.

422. This was the first time Ms. Rose ever recalled someone referring to her disability, or anything about her intellect or capabilities, as “limitations.”

423. As a result, Mr. Ely’s statements triggered severe anxiety symptoms in Ms. Rose and caused her to fear that her disabilities would jeopardize her future at Ford if she accepted the Integrated Services position.

424. As a result, on or around November 6, 2024, Ms. Rose told Mr. Ely she would decline the Integrated Services offer and accept Mr. Ely’s lateral offer.

425. Ms. Rose made her acceptance of Mr. Ely's offer contingent on her leading a specified, comprehensive software-focused workstream and receiving the title of "Technical Program Manager, Software Diagnostics and Repair."

426. Mr. Ely accepted Ms. Rose's conditions and promised that her new position would encompass three specific workstreams: (1) continued leadership of the Hotline workstream she had been performing through the CTF; (2) continued work with Mr. Ken Dorony on one of Ford's Corporate Warranty workstreams; and (3) the Software End-to-End Future Diagnostic State workstream.

427. Mr. Ely also said he understood Ms. Rose's desire to transition from traditional program management to software was a key factor in her decision to accept his offer.

428. On November 7, 2024, Ms. Rose confirmed the details of the agreement with her new manager, Ms. Balzer, including her designated workstreams and job title.

429. Ms. Balzer confirmed Ms. Rose's title would be "Technical Program Manager, Software Diagnostics and Repair."

***<u>Mr. Ely Immediately Reneges on His Offer to Ms. Rose</u>***

430. Only a few weeks after Ms. Rose accepted the Technical Program Manager role with SEO, Mr. Ely announced that SEO would be reorganizing.

431. Under the reorganization, Mr. Ely required Ms. Rose to report to a new manager, who was not slated to oversee any of her workstreams.

432. The reorganization also significantly changed Ms. Rose's agreed-upon responsibilities and title.

433. Instead of the "Technical Program Manager, Software" title, Mr. Ely gave Ms. Rose the title of simply, "Program Manager."

434. Ms. Rose had specifically negotiated for a software-focused title and responsibilities because she held a degree in software engineering, wanted to transition her career into software program management, and wanted her title to reflect that specialized work.

435. Mr. Ely knew that the "Technical Program Manager, Software" title was an important condition of Ms. Rose's agreement to remain in SEO.

436. The Program Manager role instead would return Ms. Rose to the traditional program management work that she had already performed at Ford and was trying to move away from.

437. Additionally, the reorganization required Ms. Rose to serve as the sole program manager of the entire SEO organization, consisting of nearly 1,000 individuals.

438. Typically, for an organization of that size, this work would be done by a team of approximately two dozen people, since the standard Program Management Office (PMO) to business office ratio at Ford is two to four percent of the organization's total headcount.

439. While Ms. Rose herself had considered traditional program management work as a part of her proposed LL4 position to Mr. Ely, that role would have meant

developing a PMO with a team of four people and ultimately building up to a team of approximately two dozen people to implement the PMO.

440. Mr. Ely was now asking Ms. Rose to singularly perform that higher-level work while remaining at an LL5, without the corresponding promotion, increased compensation, appropriate staffing, or necessary authority to be successful in the role.

441. Mr. Ely also unilaterally changed Ms. Rose's agreed-upon workstreams.

442. Rather than continuing Ms. Rose's Hotline work through the CTF, working with Mr. Dorony on one Corporate Warranty workstream and performing Software End-to-End Future Diagnostic State work, Mr. Ely assigned Ms. Rose responsibility for all Corporate Warranty workstreams.

443. The reassignment both displaced the software-focused work Ms. Rose had specifically negotiated for and dramatically expanded her workload.

444. Instead of managing a single Corporate Warranty workstream with Mr. Dorony, Ms. Rose would be expected to oversee dozens of Corporate Warranty workstreams—an avalanche of work that could not reasonably be performed by a single employee.

445. On or around November 22, 2024, Ms. Rose met with Mr. Ely and reminded him that she had accepted the role in SEO because he had agreed to give her the specific job title and responsibilities she had requested.

446. Despite having agreed on Ms. Rose's title and responsibilities just two weeks prior, Mr. Ely claimed to have forgotten.

447. Mr. Ely agreed that Ms. Rose would retain the "Technical Program Manager, Software" title and continue with the work they had originally discussed.

448. That same day Ms. Balzer, called Ms. Rose to confirm these updates.

449. At no time did Ms. Rose refuse to perform any assigned work or job duties.

450. At no time did Mr. Ely or Ms. Balzer tell Ms. Rose that they considered her to comments to be inappropriate, unprofessional, or improper "pushback."

***Mr. Fernandes Becomes Ms. Rose's Boss***

451. Ms. Rose learned that, effective January 1, 2025, her new manager would be Mr. Fernandes.

452. Mr. Fernandes was Mr. Justo's friend, who Mr. Justo had recruited from South America to take the LL4 position that Mr. Ely had created for Ms. Rose.

453. Ms. Rose was confused by the reporting structure because her title and agreed-upon responsibilities aligned more naturally with Mr. Dorony's organization.

454. Nevertheless, at the time, the identity of Ms. Rose's direct manager did not materially affect her day-to-day work, as Mr. Ely had just reaffirmed her title and responsibilities, and she understood what her assignments were and what she was expected to accomplish.

455. Moreover, Ms. Rose's assignments were not discrete, short-term projects requiring new direction from a manager. They were long-term programs expected to continue for years, on which she was already actively working.

456. Therefore, Ms. Rose did not initially have concerns about Mr. Fernandes becoming her supervisor.

457. In December 2024, after the SEO reorganization was announced, but before taking over officially as her boss, Mr. Fernandes called Ms. Rose.

458. Mr. Fernandes introduced himself and expressed enthusiasm about joining SEO.

459. Mr. Fernandes asked Ms. Rose to tell him about herself and her role and said he was confused about why her title had changed.

460. Ms. Rose explained her professional background, her career goal of transitioning into software program management, and the circumstances surrounding the title and responsibilities she had negotiated with Mr. Ely.

461. Ms. Rose acknowledged that SEO had a significant need for additional program management support.

462. As she had told Mr. Ely in August 2024, Ms. Rose explained to Mr. Fernandes that adequately supporting an organization the size of SEO would require approximately two dozen employees, not a single program manager.

463. Ms. Rose explained that she was already working approximately seventy hours per week to maintain the quality of her existing deliverables and could not absorb the work of an entire program management organization herself.

464. Mr. Fernandes agreed that Ms. Rose should not be working seventy-hour workweeks, telling her, "That's not good."

465. Mr. Fernandes assured Ms. Rose that, if additional headcount was necessary, he would do whatever he could to obtain it.

466. During the conversation, Ms. Rose also disclosed her disabilities to Mr. Fernandes and explained her disability-related needs and existing accommodations, including how those accommodations enabled her to perform her job successfully.

467. Mr. Fernandes responded positively to Ms. Rose's explanations and did not ask for additional clarification.

468. At no time did Mr. Fernandes indicate that he felt Ms. Rose had been resistant, inappropriate, or unwilling to perform her responsibilities.

469. Ms. Rose ended 2024 with continued positive feedback and no documented areas for improvement.

***<u>Within Weeks of Disclosing Her Disabilities to Mr. Fernandes, He and Ms. Balzer Falsely Claim Ms. Rose Has Performance Issues</u>***

470. On or about January 21, 2025, Ms. Rose met with Mr. Fernandes and Ms. Balzer, who had been supervising her for about three weeks.

471. During the meeting, Mr. Fernandes and Ms. Balzer told Ms. Rose that they wanted to make sure she had the "right kind of attitude moving forward" because they said they had "seen a little bit of pushback."

472. Ms. Rose had no idea what they were talking about and said that no one had expressed concerns or provided negative feedback since she began in her role almost seven months prior.

473. Ms. Rose asked if there were specific concerns or feedback about her work.

474. Ms. Balzer said there was nothing she could think of that Ms. Rose had done wrong.

475. Ms. Balzer said she thought Ms. Rose had supported her teams very well, describing Ms. Rose's work as "critical."

476. Mr. Fernandes repeatedly acknowledged that he did not yet understand Ms. Rose's work sufficiently to evaluate it.

477. Mr. Fernandes admitted Ms. Rose's work was confusing to him and acknowledged that he and Ms. Balzer did not have enough information to assess Ms. Rose's performance or potential.

478. Regardless, baselessly, Mr. Fernandes said he had no evidence of Ms. Rose's progress.

479. It soon became clear that Mr. Fernandes did not know what Ms. Rose's job was and apparently believed she was a program manager for the entire SEO.

480. During the meeting, Mr. Fernandes acknowledged that his prior understanding of her responsibilities was wrong and that there had been a miscommunication about what her role was.

481. Ms. Rose again tried to explain what her role was to help him understand.

482. Mr. Fernandes and Ms. Balzer then told Ms. Rose that her efforts to explain her role and responsibilities constituted "pushback" and "defensiveness."

483. Ms. Rose explained that she was confused, as she had talked with Mr. Fernandes at the end of December and explained what her role and workstreams were. She had told him he could not take on the work of an entire program management organization herself, and that he had told her during the call that she was already working too much.

484. Ms. Balzer claimed Ms. Rose's failure to assume responsibility for program management across SEO was a problem because that had been "expected" of her, even though it was not within her job description.

485. As Mr. Fernandes and Ms. Balzer continued to accuse Ms. Rose of failing to perform a role that she had clearly identified as not being hers, her anxiety increased, and she began having difficulty verbally expressing herself.

486. Ms. Rose told Mr. Fernandes and Ms. Balzer that she was afraid to answer their questions because she didn't want to be accused of being defensive.

487. Ms. Rose repeatedly assured Mr. Fernandes and Ms. Balzer that she was not refusing work but was simply trying to explain her job duties and role.

488. To deescalate the situation, Ms. Rose offered to take any assignment they gave her but cautioned that she was already working seventy hours per week.

489. By the end of the meeting, Mr. Fernandes and Ms. Balzer still did not appear to understand that the additional program management work Ms. Rose had purportedly "pushed back" against was not part of her job description.

490. Ms. Balzer and Mr. Fernandes and told Ms. Rose to provide a detailed weekly breakdown of her duties, after which they said they would then schedule a follow-up meeting.

491. Ms. Rose promptly provided the requested breakdown, but neither Mr. Fernandes nor Ms. Balzer ever provided any response or follow-up.

***Mr. Fernandes Begins Harassing Ms. Rose and Impeding Her Work, Leading Her to Suffer a Debilitating Anxiety Attack***

492. After Ms. Rose's January 21, 2025 meeting with Mr. Fernandes and Ms. Balzer, Mr. Ely began missing most of the standing meetings that Ms. Rose led, despite previously attending most of them.

493. Mr. Ely also stopped responding to Ms. Rose's instant messages, which they had previously used to communicate frequently.

494. Instead, Mr. Fernandes began attending meetings for workstreams that Ms. Rose supported.

495. Mr. Fernandes had never previously attended these meetings, did not own or lead the workstreams being discussed, and did not have sufficient knowledge of the work being performed.

496. Rather, the workstreams were owned and led by other Ford leaders at Mr. Fernandes's level, who—consistent with Ford's ordinary practice—oversaw the work performed within their respective workstreams.

497. It was extremely unusual and outside the scope of standard practice for Mr. Fernandes to attend meetings on workstreams he did not own, lead, or even understand.

498. Mr. Fernandes's attendance was so unusual that Ms. Rose's colleagues questioned why he was present.

499. Outside Mr. Fernandes's presence, colleagues joked to Ms. Rose, "Get control of your boss, Laura."

500. Upon information and belief, Mr. Fernandes did not attend meetings concerning any other workstreams in which he was not involved.

501. Although the quality of Ms. Rose's work never declined, Mr. Fernandes and Ms. Balzer's increased scrutiny and criticism caused her to begin questioning herself, undermined her sense of professional competence and self-worth, and increased her anxiety.

502. Following the January 21, 2025 meeting, during private videoconferences with Ms. Rose, Mr. Fernandes repeatedly raised his voice at her, became red-faced, and, on multiple occasions, shouted at her.

503. One such incident occurred the first week of February 2025, when Ms. Rose used PTO due to anxiety-related migraines.

504. Mr. Fernades told Ms. Rose that Ford had decided to cancel an upcoming director-level meeting at which he mistakenly believed Ms. Rose would be presenting.

505. In fact, Mr. Dorony was scheduled to present, as he owned the workstream.

506. Ms. Rose had only been responsible for preparing the presentation materials.

507. Mr. Fernandes told Ms. Rose that he, Mr. Ely, and Mr. Josh Halliburton, Executive Director of Quality, had decided to cancel the meeting to avoid wasting the directors' time due to Ms. Rose's poor performance and "surprising" lack of progress on the project.

508. The work Mr. Fernandes criticized, however, had already been reviewed and approved by Mr. Dorony and Mr. Ely prior to its submission to Mr. Halliburton.

509. Neither Mr. Dorony nor Mr. Ely had identified any lack of progress or poor performance in Ms. Rose's work.

510. To the contrary, Mr. Ely had approved the presentation for submission.

511. When Ms. Rose attempted to explain this approval process, Mr. Fernandes began yelling at her, “Why, Laura, why would you review the paper with Ken Ely?!”

512. However, this was the appropriate thing for Ms. Rose to do, as Mr. Ely would not have wanted to look unprepared in front of Mr. Halliburton with a presentation he had not approved.

513. Further, as Ms. Rose clarified to Mr. Fernandes, she had not personally reviewed the presentation with Mr. Ely; rather, Mr. Dorony, the owner of the workstream, an LL4 employee, and Mr. Fernandes’s peer, had reviewed it with Mr. Ely.

514. Mr. Fernandes then began yelling at Ms. Rose even more loudly, asking her, “Why would you let him?”

515. The meeting left Ms. Rose feeling confused, dejected, and afraid of Mr. Fernandes.

516. Mr. Dorony told Ms. Rose that he spoke with Mr. Fernandes immediately after Ms. Rose’s meeting with Mr. Fernandes.

517. Mr. Fernandes told Mr. Dorony that he had canceled the meeting because he assumed Ms. Rose would be unable to present the team’s progress.

518. Mr. Dorony said he took exception to Mr. Fernandes’s decision to cancel the meeting, telling him that Ms. Rose would not have done the presentation as Mr. Dorony owns the workstream.

519. At the time, Ms. Rose was already experiencing anxiety-related migraine headaches, vertigo, and stomach problems severe enough to require intermittent absences from work due to her disability symptoms being triggered by Mr. Fernandes' abuse.

520. Mr. Fernandes's escalating scrutiny, criticism, and aggressive treatment further exacerbated Ms. Rose's anxiety, which, in turn, increased the frequency and severity of her physical GAD symptoms, including debilitating migraine headaches and vertigo that became increasingly resistant to treatment.

521. Ms. Rose also began experiencing longer and longer stretches of insomnia, struggled to bathe and eat consistently, and rapidly lost thirty-five pounds in about six weeks.

522. On or around February 7, 2025, Ms. Balzer and Mr. Fernandes falsely accused Ms. Rose of making an inappropriate statement to a long-time vendor.

523. Mr. Fernandes and Ms. Balzer told Ms. Rose that she had been accused of telling a vendor that no one liked her, and that the vendor had reached out to them and told them that Ms. Rose's comments had made the vendor uncomfortable.

524. Ms. Rose had no recollection of saying this and explained that, because of her neurodivergence, this was not a statement she would make.

525. Additionally, Ms. Rose had worked with the vendor in question for years, greatly respected her, and would not have demeaned herself in front of her.

526. Nevertheless, Ms. Balzer and Mr. Fernandes concluded the discussion by admonishing Ms. Rose and advising her to maintain professionalism with all vendors.

527. The reprimand was particularly distressing and confusing to Ms. Rose because Mr. Fernandes was admonishing her about professionalism in front of Ms. Balzer while, in their private one-on-one meetings, he had repeatedly shouted at and berated Ms. Rose without provocation.

528. Ms. Rose did not understand how Mr. Fernandes could accuse her of unprofessionalism based on one inappropriate comment, whereas he regularly yelled at and berated her.

529. After this meeting, Ms. Rose's GAD and its associated physical and psychological symptoms became debilitating. She began experiencing severe migraine headaches, vertigo, stomach aches, dermatillomania, paranoia, confusion, mental fog, intrusive thoughts, and was unable to eat or sleep for forty-eight hours.

530. Although Ms. Rose had no recollection of making the statement attributed to her, the confidence with which Ms. Balzer and Mr. Fernandes made the accusation caused Ms. Rose to question whether her severe anxiety and deteriorating mental health was starting to negatively affect her memory and possibly causing her to dissociate.

531. Ms. Rose consulted her medical team, who advised her to take an immediate leave of absence due to her rapidly deteriorating mental and physical health.

532. On February 13, 2025, Ms. Rose began medical leave, taken under the Family Medical Leave Act (FMLA).

533. Shortly after Ms. Rose went on FMLA leave, the referenced vendor reached out to Ms. Rose, unsolicited, to ask why no one in the department was responding to the vendor.

534. The vendor did not know Ms. Rose had taken medical leave.

535. During the exchange, Ms. Rose apologized for the inappropriate statement she had made to the vendor.

536. The vendor was confused, had no idea what Ms. Rose was talking about, and vehemently denied initiating a complaint about Ms. Rose with either Ms. Balzer or Mr. Fernandes or having communicated anything to anyone that could be interpreted as a complaint about Ms. Rose.

537. In fact, the vendor confirmed that she had never communicated with Mr. Fernandes at all.

***Ms. Rose Seeks Disability Accommodations to Facilitate Her Return to Work***

538. Three weeks into Ms. Rose's FMLA leave, her mental and physical health stabilized enough for her medical team to contemplate her return to work.

539. On March 25, 2025, in accordance with Ford policy, Ms. Rose contacted PeopleFirst[15] and Sedgwick.[16]

540. PeopleFirst and Sedgwick gave Ms. Rose conflicting information, with Sedgwick advising Ms. Rose to return to work and negotiate her accommodations face-to-face with Mr. Fernandes and PeopleFirst advising it may be unwise to do so given Mr. Fernandes's hostile conduct toward her.

541. Sedgwick approved short-term disability coverage for Ms. Rose's first month of full-time leave.

542. However, Sedgwick denied Ms. Rose's second month of coverage, claiming the documentation Ms. Rose's provider submitted was insufficient.

543. Ms. Rose's psychiatric-mental health nurse practitioner (PMHNP) immediately faxed Sedgwick additional documentation supporting the medical necessity of Ms. Rose's continued full-time leave.

544. Facsimile was the only method Sedgwick provided for document submission.

545. Sedgwick repeatedly claimed it had not received Ms. Rose's provider's documentation.

546. On Tuesday, April 8, 2025, after repeated attempts, Sedgwick finally responded to Ms. Rose's PMHNP, allowing the provider to submit the documentation.

---

[15] PeopleFirst is Ford's centralized HR function, through which it administers employee HR processes and records.

[16] Sedgwick is Ford's third-party administrator for employee disability and leave matters, which participates in Ford's reasonable-accommodation process by receiving and reviewing medical documentation concerning disability-related limitations and requested workplace accommodations and communicating that information to Ford for consideration.

547. At the same time, Ms. Rose's PMHNP provided Sedgwick with a return-to-work assessment identifying the reasonable accommodations Ms. Rose would require to safely return to work.

548. The reasonable accommodations Ms. Rose was requesting, at the recommendation of her medical providers, included:

    a. Continued remote work;

    b. Modified schedule with extended breaks and associated reasonable workload; and

    c. A change in management style/communication to include:

        i. Refraining from exhibiting aggression;

        ii. Using written communication rather than verbal as much as possible;

        iii. Limiting non-essential interactions; and

        iv. Recording meetings.

549. The accommodations were requested only temporarily, for a period of two months, to accommodate Ms. Rose's disabilities as she transitioned back to full-time work after her medical leave.

550. At the conclusion of that period, Ms. Rose and her medical providers would then reassess her disability symptoms to identify what, if any, continuing accommodations were necessary.

551. As of Friday, April 11, 2025, Sedgwick had not yet processed Ms. Rose's accommodation requests.

552. Nevertheless, Sedgewick advised Ms. Rose to return to work on Monday, April 14, 2025, even if her accommodations had not been approved.

553. Later that day, Ms. Rose contacted PeopleFirst to confirm Sedgwick's instructions to return to work on Monday, April 14 without the accommodations her medical provider had requested.

554. PeopleFirst noted that Mr. Fernandes had not approved the restrictions.

555. Initially, like Sedgwick, PeopleFirst instructed Ms. Rose to return to work on Monday without the restrictions, and "work it out directly with [her] supervisor."

556. Ms. Rose explained that Mr. Fernandes' harassment had directly caused the deterioration to her mental and physical health, prompting her need for medical leave.

557. Ms. Rose explained that she was concerned that, without the additional accommodations in place, interactions with Mr. Fernandes would exacerbate her disability symptoms again.

558. PeopleFirst then instructed Ms. Rose not to return to work until she received further direction from them.

***<u>Ford and Sedgwick Stonewall Ms. Rose's Efforts to Return to Work and Deny Her Accommodations Requests Without Engaging in the Interactive Process</u>***

559. On Sunday, April 13, 2025, having heard nothing from PeopleFirst and wanting to return to work as soon as possible, Ms. Rose submitted a copy of her requested reasonable accommodations and a detailed statement alleging discriminatory treatment and a hostile environment arising from Mr. Fernandes' conduct to Parth Thoria and Rebecca Lightfoot with Ford's local HR.[17]

560. Ms. Rose copied PeopleFirst and a Sedgwick employee named Donna B.

561. In the email, Ms. Rose explained that she needed a response from PeopleFirst so that she could return to work.

562. On Monday, April 14, 2025, Ms. Rhoda Jones from Ford local HR confirmed receipt of Ms. Rose's email, statement, and accommodations request, writing, "The first step in the accommodation request process is for our partner Sedgwick to review. Please forward the document from your health care provider to your claims examiner at Sedgwick. They will communicate with Ford relative to any next steps."

563. Ms. Rose responded:

> Thank you for reaching out, Rhoda.
>
> Sedgwick received the return-to-work restrictions from my doctor last week.

[17] Separate from PeopleFirst, Ford also employs internal HR professionals and HR Business Partners assigned to particular organizations and business functions. These HR personnel address substantive workplace matters, including employee relations, performance and management issues, workplace complaints, compliance, and discrimination concerns.

> I spoke with both Sedgwick and PeopleFirst today. PeopleFirst is awaiting the documentation from Sedgwick. However, Sedgwick indicated that they do not provide this documentation to Ford.
>
> I'm hoping that the PeopleFirst disability team and my Sedgwick examiner can swiftly work this out so that I can get the accommodations in place and return as soon as possible.

564. On Tuesday, April 15, 2025, Ms. Rose sent a follow-up email to Ford HR, Sedgwick, and PeopleFirst, requesting an update on the status of her return-to-work accommodations request.

565. On Wednesday, April 16, 2025, Donna B. told Ms. Rose that Sedgwick had sent modified paperwork to Ford's PeopleFirst team, seeking only the following accommodations for Ms. Rose: remote work and 4-hour workdays for a two-month period.

566. No one from Ford, PeopleFirst, or Sedgwick contacted Ms. Rose or her medical provider to discuss why removing the other accommodations was necessary or what alternative accommodations Ford could offer Ms. Rose before denying them.

567. Ms. Rose called Ms. Mariana Tamez Vazquez, a PeopleFirst representative, to confirm that PeopleFirst had received Sedgwick's paperwork.

568. Ms. Vazquez confirmed receipt and told Ms. Rose that PeopleFirst was discussing the requests and seeking approval from Mr. Fernandes.

569. Ms. Vazquez then directed Ms. Rose back to her local Ford HR representative, Ms. Jones, regarding both her requested accommodations and the HR statement she had submitted concerning Mr. Fernandes's conduct.

570. Later that day, on Wednesday, April 16, 2025, Mr. Dorony told Ms. Rose that within the first month of her medical leave, Mr. Fernandes had said she "would not be returning to Ford."

571. Mr. Dorony said he took Mr. Fernandes' response to mean that Ms. Rose had "had enough and just quit."

572. Ms. Rose told Mr. Dorony that she had not quit and was doing everything she could to return to work.

***<u>Ford Refuses to Engage in or Allow Ms. Rose Access to the Interactive Process and Places Her on Involuntary Leave</u>***

573. On Wednesday, April 16, 2025, after trying to return to work for almost a month, Ms. Rose saw on Mr. Fernandes' calendar that he had a meeting with Ms. Jones scheduled for that morning.

574. Hoping that this meant she would be returning to work, Ms. Rose requested a meeting with Ms. Jones for Thursday, April 17, 2025, at 9:00 a.m. to discuss her accommodations and statement to HR.

575. Ms. Jones declined the meeting request.

576. On Tuesday, April 22, 2025, Donna B. told Ms. Rose that Ford had placed her on extended leave, effectively denying her accommodation requests without engaging in the interactive process.

577. Donna B. read Ms. Rose an email she had received from PeopleFirst the day before, on Monday, April 21, 2025.

578. Per that email, Ford was placing Ms. Rose on "No Work Available" status through June 13, 2025, or until she no longer had restrictions requiring disability accommodations.

579. Donna B. could not tell Ms. Rose if "No Work Available" meant in all of Ford or just in Ms. Rose's specific workstreams or department.

580. Ms. Rose asked about engaging in the interactive process under the ADA.

581. Donna B. said she had no information or knowledge about the process.

582. Ms. Rose asked if anyone else had engaged in the interactive process with Ford before.

583. Donna B. said she had only seen accommodation requests approved or rejected without any negotiation or discussion.

584. Donna B. also told Ms. Rose that, because she had been placed on extended leave, she would be placed on long-term disability, which would drop her pay to 60% of her salary beginning on May 28, 2025.

585. Remarkably, Sedgwick calls itself "the industry's most trusted accommodations partner."[18]

586. Sedgwick's website says it "simplif[ies] the accommodations process to keep you compliant and help your employees get the support they need to stay productive at work."[19]

587. Its website boasts:

> When an employee requests a job accommodation, you need a partner who knows the process inside and out to help you stay compliant. With decades of Americans with Disabilities Act (ADA) expertise, we develop tailored, best-practice programs to help your employees get the reasonable accommodations they need to return to or keep thriving at work.[20]

588. The website explicitly references the interactive process:

> Navigating the accommodations process can be complex, but we make it easy by guiding you and your employees every step of the way. Our team handles every step in the interactive process, from capturing the initial request and confirming the level of impairment to determining the best accommodation and helping implement it. Throughout it all, we use our Omni tools to communicate with the employee, ensuring they have the right information, understand their responsibilities and stay engaged. We also explore options for employees to return or stay at work when possible.[21]

---

[18] *Accommodations*, SEDGWICK, https://www.sedgwick.com/benefits-administration/accommodations/ (last visited Oct. 4, 2026).
[19] *Id.*
[20] *Id.*
[21] *Id.*

589. Later that day, Ms. Luba from PeopleFirst called Ms. Rose and told her to reach out to Mr. Fernandes directly to try to negotiate return-to-work accommodations.

590. Ms. Rose reiterated her concerns about trying to negotiate her accommodations with Mr. Fernandes, telling Ms. Luba, that, as Mr. Fernandes's conduct had caused her to need disability leave. Ms. Rose told Luba she would be reaching out to her local HR representative at Ford to ensure a respectful and psychologically safe process.

591. Ms. Luba did not provide Ms. Rose with any alternative options or any information about engaging in the interactive process.

592. Ms. Rose asked Ms. Luba for a copy of Ford's interactive process policy.

593. Ms. Luba said she did not know of any such policy and advised Ms. Rose to request it from her local HR representative.

594. Shortly after this call, Ms. Rose also submitted requests to both Sedgwick and PeopleFirst for all documentation and records related to her current disability leave.

595. On Thursday, April 24, 2025, Ms. Rose sent Ms. Jones a meeting request for the following Monday, writing:

> Though it's my understanding that Ford is expected to take the lead on the next steps in the accommodation interactive process, I am growing concerned as several weeks have elapsed since I've communicated my intention to return to work to both Ford and Sedgwick.

> I would like to discuss Ford's process and timing for the next steps to ensure that we're moving forward with timeliness and good faith toward reasonable accommodations.

596. Because Ms. Jones was out of the office, Ms. Rose copied her manager, Ms. Heather Kostka, on the email. Ms. Kostka responded that she would provide Ms. Rose with the requested documentation.

597. On the morning of April 28, 2025, Ms. Jones declined Ms. Rose's meeting invitation, writing, "Hi Laura – I am unable to meet this morning."

598. Ms. Rose responded:

> Thanks, Rhoda. I will move it to this afternoon. What time works best for you? Also, in your absence, Heather indicated that she would help me obtain the documentation that I requested on Thursday. However, I haven't seen it come through. It would be so helpful if one of you could arrange sending it. Thank you! Laura

599. Ms. Jones ignored Ms. Rose's request to reschedule the meeting, writing, "Good morning, Laura - The work restrictions submitted cannot be accommodated at this time. My understanding is that you have been placed back on leave until June 13th. Do you have a different understanding?"

600. Significantly, June 13, 2025—the date through which Ford stated Ms. Rose would remain on leave—was also the date on which Ms. Rose's temporary return-to-work restrictions were scheduled to expire.

601. Thus, rather than meeting with Ms. Rose to determine whether reasonable accommodations would permit her to work while her temporary restrictions remained in effect, Ford chose to ban her from work for the entire duration of the restriction period.

602. Ms. Rose emailed Ms. Kostka and Ms. Jones:

> Per my meeting notice, I would like to proceed promptly with the interactive process – today, given the considerable delay – to develop and align on reasonable accommodations so that I may return to work this week. Over the course of nearly a month, I've initiated daily attempts with multiple parties (within Ford and Sedgwick) to reiterate my intention to return to work and to engage in the ADA-required collaborative process without success or acknowledgment.
>
> During this time, I've lost several weeks' opportunity to continue a healthy recovery, as devised by my medical team, and have experienced some health deterioration due to the extreme duress caused by this delay and lack of engagement / communication.
>
> PeopleFirst reached out to me last week to indicate that I should initiate the interactive process. I am presuming because no one at Ford had done so.
>
> I indicated my intention to accomplish this with you, my local HR rep; and they confirmed that I should proceed. I am seeking your help to resolve this swiftly.

603. Ms. Jones responded that she would reach out to PeopleFirst to "learn more," and asking if Ms. Rose had received the letter regarding her placement on "No Work Available" status.

604. Ms. Rose responded:

> Yes, I received the letter, which states, "There is no work available for this employee within the above-listed restrictions." It does not reference a return-to-work date.
>
> This statement from Ford is, presumably, an impetus for me to formally request engagement in the interactive process to discuss, develop and align on reasonable accommodations that do not impose undue hardship on the company.
>
> As I've requested several times as respectfully, clearly, and directly as possible, it is my intention to engage in the ADA interactive process with the purpose of returning to work without further delay.
>
> Further, I am requesting to do so today, as I have been subjected to considerable delay in the process so far.
> Please confirm that you are declining to engage in the interactive process or please provide a time today that works for you when we can meet for this collaborative process.

605. Ms. Jones responded without addressing Ms. Rose's request to engage in the interactive process, writing: "Laura, Your doctor has not released you to return to work fulltime which is what the business needs at this time. As a result, you have been returned to leave of absence status effective 4/14/25. Your pay will continue under the terms of the Company's disability plan."

606. Ms. Jones did not provide Ms. Rose with a copy of Ford's interactive process policy.

607. Instead, Ms. Jones sent Laura a link to an article, writing: "Laura, The policy is located on Life@Ford. The link below will take you to it. https://www.lifeatford.com/en-us/article/KA-06935."

608. Ms. Rose read the linked article and responded:

> This link is to the disability accommodations process but does not specify how Ford conducts the interactive process. However, please note the paragraph cited from this policy.
>
> "Reasonable Accommodation
> Reasonable accommodation to allow a qualified individual with a disability to perform the essential functions of a job generally means making modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed. Generally, an applicant or employee with a disability should tell the employer that he/she needs an accommodation to do the job. An employee or applicant may use the Disability or Pregnancy Accommodation Request and Resolution Form, which can be found in the Related Attachments section at the bottom of this article. An employer is not obligated to provide an accommodation if the employer is not aware of the need. The employer also is not obligated to make an accommodation if it would result in undue hardship or adversely affects the rights of others. Lastly, the employer is not obligated to provide the specific accommodation requested, but may provide an alternative which better suits business necessity. It is important to enter into an interactive process with the employee to best determine a reasonable accommodation. Engaging in the interactive process does not mean the employer is bound to ultimately offer an accommodation."
>
> I am requesting that Ford follow its documented process and engage with me to determine a reasonable accommodation.
>
> Further, I am again requesting the rationale that substantiates that the disability leave return-to-work accommodations cause Ford an undue hardship. Laura Rose

609. Ms. Kostka responded:

> I was in an All Hands meeting during the time you scheduled and was not able to answer any phone calls. Rhoda and I are working with our People Matters Team and Sedgwick. Our role as HR Business Partners is limited in regards to supporting leaves and accommodations but we are aligning with our partners to ensure your questions are being routed properly and we can help you get the answers you are looking for.

610. This contradicted with PeopleFirst's description of HR's role in the accommodation process and left Ms. Rose without access to the interactive process.

611. On Tuesday, April 29, 2025, Ms. Rose responded:

> Please advise if we will be meeting today to move forward with resolution on the matter of my accommodations.
>
> Also, please send me the contact for the People Matters representative who is leading the review of the letter delineating the concerning treatment I've endured resulting in the considerable deterioration of my health.
>
> I would like to expedite a discussion with them, preferably today. Thank you.

612. Ms. Kostka never responded.

613. Ms. Jones responded to Ms. Rose's email but failed to provide availability for a meeting or contact information for a People Matters representative, writing:

> Based on your People Leader's assessment, the work restrictions provided by your doctor prevent you from performing the essential functions of your job, specifically the 4-hour workday restriction. This means that from a

> disability standpoint, you are not yet sufficiently recovered to return to your position.
>
> The term "No Work Available" is an internal designation used when an employee is on leave because their restrictions cannot be accommodated. It does not change your leave status; you remain on disability leave.
>
> When your doctor releases you to return to work full duty, we will work with you on any workplace accommodations presented at that time. In the meantime, please continue working with Sedgwick on your disability claim.
>
> Lastly, any follow ups concerning the letter you submitted will be addressed by People Matters after you return to work full duty.
>
> I hope this additional information is helpful.

614. Ms. Rose responded, requesting a copy of the essential functions of her job that Ms. Jones had referenced.

615. Ms. Jones did not respond, and Ms. Kostka instead responded on her behalf, writing that HR could not provide Ms. Rose with any more information and had been directed to advise Ms. Rose to work with Sedgwick for all matters related to her medical leave.

616. Ms. Rose then reached out to Sedgwick with the same request for a copy of the essential job functions referenced in Ms. Jones' email.

617. Sedgwick responded that they had no knowledge of any such documentation.

618. For almost a month, Ms. Rose had communicated almost daily with Ford HR, PeopleFirst, and Sedgwick to try to return to work, only to be repeatedly redirected from one to another, each claiming someone else was responsible.

619. Due to this Kafkaesque process and Ford's refusal to engage in the interactive process, Ms. Rose's health continued to deteriorate, which she shared in her emails to Ms. Kostka and Ms. Jones.

620. Ms. Rose's stress-induced migraines returned for the first time after ceasing late February 2025.

621. Ms. Rose also began feeling dizzy, having stomach aches, and feeling increased anxiety.

***While Ford Claims There Is "No Work Available" for Ms. Rose, Its Managers Say They Need Her Back, Even Part-Time***

622. On Tuesday, April 22, 2025, Ms. Rose spoke with Mr. Dorony about her efforts to return to work.

623. Although organizationally Ms. Rose did not report directly to Mr. Dorony, Mr. Dorony was the manager who owned the majority of the workstreams that Ms. Rose supported.

624. During their conversation, Mr. Dorony confirmed he wanted Ms. Rose to return to work as soon as possible.

625. Mr. Dorony told Ms. Rose she was a valuable member of the team as an experienced performance manager.

626. Mr. Dorony said the current people covering Ms. Rose's workstreams were either overloaded or lacked the capabilities to fully deliver on her work.

627. Mr. Dorony also said any number of work hours would be helpful from Ms. Rose, even part-time.

628. Ms. Rose asked if Mr. Dorony would support her reporting directly to him moving forward rather than Mr. Fernandes.

629. Mr. Dorony agreed he would.

630. Mr. Dorony told Ms. Rose that, if she returned, she could go into his building for on-site attendance, rather than Mr. Fernades's building.

631. On April 30, 2025, Ms. Rose spoke with Mr. Mike Kan, another Ford manager overseeing some of the workstreams to which she had been assigned.

632. Mr. Kan told Ms. Rose Ford had hired another LL5 employee to handle Ms. Rose's work while she was out on leave.

633. Mr. Kan told Ms. Rose that Ford had planned to take some of these workstreams away from her prior to her going on leave.

634. Notably, this was the same work that Mr. Ely had previously used to induce Ms. Rose to decline the Integrated Services job offer and remain within SEO.

635. Removing Ms. Rose from these workstreams reduced her essential job functions by approximately twenty hours.

636. Ford's decision to remove these workstreams from Ms. Rose also undermined its position that she could not perform the essential functions of her position on a reduced schedule.

637. With those responsibilities reassigned, Ms. Rose's return to work would have been significantly more manageable and in line with the accommodations she and her medical provider had requested.

638. Thus, Ford had a readily available path to return Ms. Rose to work on a reduced schedule, away from Mr. Fernandes.

639. In late April 2025, Ms. Rose began receiving documents responsive to her records requests from Sedgwick.

640. Per those documents, Mr. Fernandes rejected Ms. Rose's requested accommodations, writing, "Our aligned recommendation is that she should only return to work in her current role when she is fully able to perform the function full time."

***Ms. Rose's Continued Herculean Efforts to Return to Work***

641. On or around May 2, 2025, in a continued effort to return to work, Ms. Rose asked to meet with Mr. Eric Hinrichsen, Program Manager for People with Disabilities within the Diversity Equity Inclusion (DEI) organization, who had assisted Ms. Rose in documenting potential accommodations for her disabilities the previous year.

642. Mr. Hinrichsen worked under the supervision of Mr. Ernest Adams, Chief DEI Officer.

643. Mr. Adams and his team had taken a proactive approach in building relationships with Ford's employee resource groups, including "Ford Empowering Diverse Abilities," which brought together employees with disabilities and neurodivergent employees across Ford.

644. Ms. Rose was an active member of the group and, at the time, its highest-ranking visible member who openly identified as having a disability.

645. As a result, Ms. Rose was not merely known within her immediate organization as an employee with disabilities; she was a visible example within Ford of a neurodivergent employee who had advanced into the upper levels of the company.

646. Ms. Rose had previously met with Mr. Hinrichsen on October 24, 2024, to share her concerns about asking for accommodations in the roles she was interviewing for, due to fears of facing the same discrimination and harassment she had suffered under Mr. Katinas.

647. Mr. Hinrichsen had advised Ms. Rose to begin brainstorming a list of potential accommodations and encouraged her to make a formal report.

648. Ms. Rose met with Mr. Hinrichsen for a second time on May 2, 2025.

649. Prior to this meeting, Ms. Rose had developed the idea of proposing another JobShare arrangement to accommodate her disabilities, using Ford's Reasonable Accommodation Request Form to outline her JobShare proposal.

650. Per Ford's disability policy, employees may use the Form to make accommodation requests, but it is not required.

651. Ms. Rose brought her JobShare proposal to her meeting with Mr. Hinrechsen, explained its purpose as an accommodation request, and asked Mr. Hinrechsen to provide guidance on the proposal to increase its chances of being approved.

652. Mr. Hinrichsen was supportive of Ms. Rose, made minimal edits to her proposal, and told her it was a great idea.

653. Later that day, Ms. Rose emailed Ms. Jones, Ms. Kostka, and Mr. Fernandes, again reiterating her request that Ford engage in the interactive process with her regarding her requested accommodations and return to work, attaching the Reasonable Accommodation Request Form that she had finalized with Mr. Hinrichsen.

654. The form proposed a JobShare as a reasonable accommodation that would allow Ms. Rose to work part-time while providing full-time coverage of her essential job functions.

655. Ms. Rose again requested a meeting with them the following Monday, May 5, 2025.

656. On Monday, May 5, 2025, Ms. Jones responded to Ms. Rose's May 2 email, proposing an alternative meeting time for that Friday, May 9, noting Ms. Kostka and Mr. Fernandes would not attend.

657. Ms. Rose responded, requesting that the meeting be scheduled earlier, given that her FMLA leave was close to being exhausted and she had already been attempting to engage Ford in the interactive process for over a month.

658. On May 7, 2025, Ms. Jones and Ms. Pantano met with Ms. Rose.

659. Ms. Pantano said Ford's response to Ms. Rose's requests, including taking over a month to schedule an interactive process meeting, was common practice in terms of how it treated individuals transitioning from full to partial disability status.

660. Ms. Pantano also claimed that there had been some sort of "mix-up" related to what had been initially sent to Mr. Fernandes, which may have caused some delay in Ford's response.

661. Ms. Rose said she was continuing to work with her medical team to assess her disability needs and identify appropriate accommodations, but that return-to-work accommodations of some sort would be necessary.

662. Ms. Rose emphasized this was why she had only requested the accommodations for two months—she and her medical team would then reassess and modify the accommodations request as needed as she transitioned back to full-time work.

663. Ms. Rose identified a highly qualified Ford employee who was willing to serve as her JobShare partner and was immediately able to begin working at fifty percent capacity.

664. The employee was a former candidate in Ford's Product Development Leadership Program, a selective, multi-year leadership development rotation.

665. The employee's willingness to enter a JobShare partnership with Ms. Rose also reflected the professional confidence Ms. Rose continued to command among her highly regarded peers.

666. Ms. Jones and Ms. Pantano said they would follow up with Mr. Fernandes to confirm that the JobShare proposal could be implemented.

667. Ms. Rose confirmed she was open to discussing any additional details necessary to facilitate the proposed arrangement.

668. Ms. Rose said she was willing to ask her medical provider to modify her recommendation that she perform remote work to comply with Ford's expectation of one in-office day per week.

669. Ms. Rose reiterated her request for a copy of her essential job functions.

670. Neither Ms. Pantano nor Ms. Jones provided Ms. Rose with her essential job functions.

671. Ms. Jones and Ms. Pantano scheduled a follow up meeting with Ms. Rose for Monday, May 12, 2025, so they could discuss the proposed JobShare arrangement with Mr. Fernandes.

672. On Monday, May 12, 2025, Ms. Jones emailed Ms. Rose rescheduling the follow-up meeting to that Friday, May 16.

673. Ms. Jones wrote that she and Ms. Pantano were unable to meet with department leadership to discuss Ms. Rose's proposal until Thursday, May 15, 2025.

674. In response, Ms. Rose expressed her concerns with the ongoing delays and asked that the meeting be rescheduled for sooner if possible, noting that Ms. Pantano's calendar indicated she would be out of the office on Friday, May 16, 2025.

675. Ms. Jones refused to meet earlier, writing that she would meet with Ms. Rose on Friday, May 16, 2025, without Ms. Pantano.

676. On Friday, May 16, 2025, Ms. Jones canceled the meeting.

***Ford Replaces Ms. Rose with a Younger, Nondisabled Employee***

677. On Sunday, May 4, 2025, Ms. Rose learned that one of her colleagues, Ms. Eniso Ngwenya, had been recruited to join Mr. Fernandes' team, effective immediately.

678. Ms. Ngwenya told Ms. Rose that Mr. Fernandes had told her she was being brought onto the team to perform work that was "completely" different from Ms. Rose's.

679. The responsibilities Ms. Ngwenya described to Ms. Rose, however, substantially overlapped with the work Ms. Rose had been performing immediately before going on leave.

680. Specifically, Ms. Ngwenya said she would be responsible for the end-to-end process and would serve as the primary interface with the same engineering chief who had served as Ms. Rose's counterpart before her leave.

681. When Ms. Ngwenya asked Ms. Rose what her responsibilities had been, Ms. Rose described the same end-to-end process Ms. Ngwenya had just described.

682. Ms. Ngwenya initially told Ms. Rose that she was not involved in the Dealer Software Support Hotline (DSSH) workstream, one of the workstreams Ms. Rose had been performing before Ford placed her on leave.

683. However, Ms. Rose subsequently saw a meeting notice from Ms. Mary Nieckarz, an LL6 employee who also reported to Mr. Fernandes, introducing Ms. Ngwenya to team members and expressly stating that Ms. Ngwenya would be engaging on DSSH.

684. Ms. Ngwenya also told Ms. Rose she was beginning the role on a part-time basis.

685. Ford was therefore permitting Ms. Ngwenya to perform responsibilities previously performed by Ms. Rose on a part-time basis while claiming Ms. Rose could not return to work because her essential job functions required full-time capacity.

686. Ms. Ngwenya is not disabled and is younger than Ms. Rose.

687. Over the following weeks, Ms. Rose's colleagues' calendars confirmed that Ms. Ngwenya was assuming additional responsibilities previously assigned to Ms. Rose, including workstreams Mr. Ely had promised Ms. Rose as part of the negotiations to keep her within SEO.

688. Meeting notices indicated that Ms. Ngwenya had been assigned to two of Ms. Rose's three workstreams.

689. Upon information and belief, Ms. Ngwenya performed those two job functions in a part-time capacity through fall 2025.

690. During the same period, Ms. Rose's team members and workstream owners repeatedly told her that her return to work would be welcome in any capacity as there were multiple key elements not being addressed in her absence.

691. On Wednesday, May 21, 2025, Ms. Rose again spoke with Mr. Dorony.

692. Mr. Dorony confirmed that Ms. Ngwenya had taken over many of Ms. Rose's job functions within the past few weeks.

693. Initially, Mr. Dorony claimed Ms. Ngwenya's work was different from Ms. Rose's.

694. However, when Ms. Rose asked Mr. Dorony to describe Ms. Ngwenya's work, Mr. Dorony described the end-to-end warranty process.

695. Ms. Rose then pointed out this was exactly what she had been working on, and that Ms. Ngwenya's current work was simply the next stage of Ms. Rose's responsibilities.

696. Thus, while Ford continued to keep Ms. Rose on leave because it claimed her essential job functions required full-time capacity, it was permitting a younger, non-disabled employee to perform many of those same job functions on a part-time basis.

***Ms. Rose Files a Civil Rights Complaint Against Ford***

697. Ms. Jones proposed rescheduling the meeting with Ms. Rose to Wednesday, May 21, 2025, almost two months after Ms. Rose had initially contacted Ford about returning to work.

698. Ms. Jones claimed Mr. Fernandes needed time to identify work assignments that aligned with Ms. Rose's disability restrictions.

699. Ford thus continued to place control over Ms. Rose's return to work in the hands of the very manager whose conduct had precipitated her medical leave and whose manner of interacting with her was itself the subject of her requested accommodations.

700. On Monday, May 19, 2025, Ms. Rose responded that she was confused about what new work assignments Mr. Fernandes would need to identify, given the limited, temporary nature of her requested accommodations and the fact that her

proposed JobShare arrangement would ensure her prior responsibilities were completely fulfilled with capacity for additional work.

701. Ms. Rose also noted her concerns with Ford's recruitment of Ms. Ngwenya as her replacement after she began attempting to return to work.

702. Ms. Rose wrote that Ms. Ngwenya had been recruited in a part-time capacity despite Ford's repeated insistence to Ms. Rose that the essential job functions for the work Ms. Ngwenya was performing required full-time capacity.

703. Ms. Rose requested a response to her JobShare proposal, noting that she and her partner were ready to implement that proposal immediately or, alternatively, she was prepared to return to work immediately on a temporary part-time basis with reasonable accommodations with a rapid transition to full-time, as she had previously offered.

704. On May 21, 2025, Ms. Jones emailed Ms. Rose again canceling and rescheduling the meeting, proposing a new date of Friday, May 23.

705. Ms. Rose agreed, noting that it would require her to move a medical appointment, which she was willing to do, and expressing her concern over Ford's repeated cancellations within just a few hours of the scheduled meetings.

706. In response, Ms. Jones revoked the May 23 meeting offer, directing Ms. Rose to keep her medical appointment and writing that she would work with Ms. Rose's availability.

707. Ms. Jones did not offer a new date for the meeting.

708. On May 22, 2025, Ms. Rose filed a complaint with the Michigan Department of Civil Rights (MDCR), alleging failure to accommodate, disability discrimination, and retaliation against Ford.

709. The same day, Ms. Rose notified Ms. Jones that she had filed the MDCR complaint, writing:

> Based on my ongoing concerns and HR/Ford's repeated delays in convening meetings and finalizing my return-to-work accommodations, I have filed a complaint with the Michigan Department of Civil Rights. I would still like to continue our meetings to resolve my concerns collaboratively and allow me to return to work as soon as possible. Please let me know when you are available to meet and if you have any questions.

710. That same day, Mr. Fernandes, Ms. Kostka, Mr. Ely, and Ms. Melissa White, Employee Relations/People Matters Manager, signed Ms. Rose's termination paperwork.

711. Ms. Bindu Blatchley, Employee Relations/People Matters Director, signed the termination paperwork on May 23, 2025, the day after Ms. Rose gave Ford notice that she filed the MDCR complaint.

***<u>Ms. Rose Continues to Cooperate with Ford's HR Machine</u>***

712. On May 30, 2025, Sedgwick notified Ms. Rose that her salary had decreased to 60% and that she was now on "unpaid leave."

713. Being on unpaid leave meant that, in addition to losing 40% of her salary, Ms. Rose also lost some insurance coverage and benefits.

714. On June 3, 2025, Ms. Rose submitted updated paperwork to Sedgwick, requesting an extension of her leave until an agreement was reached on reasonable return-to-work accommodations.

715. Ms. Rose also gave her medical provider documentation to complete to support her continued need for return-to-work accommodations.

716. Ms. Rose's medical provider returned the completed forms to Ms. Rose that same day, indicating the same accommodations were still necessary for Ms. Rose's return to work, and listing July 14, 2025 as the end date for the temporary restrictions.

717. Ms. Rose immediately submitted the updated paperwork to Sedgwick.

718. On June 5, 2025, Ms. Rose filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging sex and age discrimination against Ford.

719. Despite filing MDCR and EEOC complaints, Ms. Rose genuinely believed that once the appropriate people within Ford understood what had occurred, Ford would address the situation and help her return to work with reasonable accommodations.

720. Thus, Ms. Rose continued to engage with Ford's HR partners in good faith.

721. On Thursday, June 12, 2025, Ms. Rose reached out to Donna B. at Sedgwick to ask about the status of her accommodations.

722. In response, Donna B. directed Ms. Rose back to Ford:

Laura R. - 8 days ago 6/4/2025 2:26 PM

Hi, Donna. I received 2 notices for 2 separate days regarding documentation received but I can?t view either one in the portal. Is there a link for me to see them and to understa nd if there is follow-up required? Thanks, Laura

Sedgwick - 8 days ago 6/4/2025 3:01 PM

Good afternoon, I show you were sent a text that we received your medical paperwork. Those would not show on the portal. Your restrictions were sent to Ford for approval. As soon as we get the determination your claim will be updated and you be notified either by email or phone.

Laura R. - 7 hours ago 6/12/2025 8:39 AM

Good morning, Donna. I am checking on the return-to-work documentation that my provider submitted June 3. Can you confirm that the requested accommodations are agreed with Ford and what date I am able to return to work? Thank you!

Sedgwick - 6 hours ago 6/12/2025 9:18 AM

Good morning, The restriction request was sent to Ford. We are waiting on the reply.

Laura R. - 5 hours ago 6/12/2025 10:20 AM

Ok, thank you. Since my provider has told me that I need the accommodations in place to return-to-work and my leave ends this weekend, what should I plan to do if we do not have agreement with Ford before Friday, June 13, end of day?

Sedgwick - 3 hours ago 6/12/2025 12:17 PM

Good afternoon, You can reach out to your supervisor for direction.

723. Ms. Rose then emailed Ms. Jones, Ms. Pantano, and Sedgwick:

> Per Sedgwick, please advise what Ford is directing me to do (see my communication with Sedgwick).
>
> Since my provider has told me that I need the accommodations in place to return-to-work (as noted in all prior documentation and in our May 7, 2025, discussion) and my leave ends this weekend, what should I plan to do if we do not have agreement before Friday, June 13, end of day?
>
> To help expedite matters, my provider has indicated that the same return-to-work accommodations that we discussed in our May 7, 2025, meeting were re-submitted on June 3, 2025.
>
> I've attached the notes from the meeting that I sent to all the same day.
>
> As noted below, I am awaiting a response on availability to finalize agreement on the discussed accommodations.

724. On Friday, June 13, 2025, Ms. Jones responded:

> Hello Laura – Kleber [Fernandes] has replied to the email received from Sedgwick indicating being unable to accommodate the restrictions noted. You should continue to communicate with Sedgwick on your claim. Regards, Rhoda.

725. By this point, it had become clear to Ms. Rose that Ford and Sedgwick were doing nothing but forcing her to run endlessly on a bureaucratic Möbius strip:

    a. Ford HR repeatedly directed Ms. Rose to direct her communications to Sedgwick;

    b. Sedgwick would only confirm Ms. Rose's disability leave status and direct her to contact her local HR regarding her accommodation requests; and

    c. Ms. Rose's local HR would tell her that Mr. Fernandes had denied her accommodations requests and redirect her back to Sedgwick.

726. On June 14, 2025, Ford received notice of Ms. Rose's EEOC complaint.

727. On June 19, 2025, Ford notified Ms. Rose that she would remain on "No Work Available" status through July 14, 2025.

728. Once again, July 14, 2025—the date on which Ms. Rose's temporary return-to-work restrictions were scheduled to expire per the updated paperwork Ms. Rose's provider submitted on June 3—was also the date through which Ford stated Ms. Rose would remain on leave.

729. On June 24, 2024, Ms. Rose contacted Ms. Jones and Ms. Pantano, following up on her request that Ford engage in the interactive process with her.

730. Ms. Rose noted that regardless of the date of her return to work, given the nature of her disabilities, she would require accommodations to do so, and Ford's insistence on her being able to work full-time prior to returning would prevent her from ever being able to work.

731. In other words, Ford's failure to engage in the interactive process was itself creating a situation in which Ms. Rose—a person who could and wanted to return to work—would be forced to remain permanently and fully disabled.

732. Ms. Rose also noted that, given the temporary nature of her requested accommodations, had Ford approved them or otherwise timely engaged in the interactive process following her initial request for specific accommodations on April 8, 2025, *she would already have been back to work full-time.*

***<u>Ford Uses the Farce of an Interactive Process Meeting to Terminate Ms. Rose</u>***

733. On June 30, 2025, Ms. Jones finally responded to Ms. Rose's request to engage in the interactive process, copying Ms. Pantano and agreeing to meet on Wednesday, July 2, 2025.

734. When Ms. Rose arrived at the meeting on July 2, 2025, only Ms. Jones was present.

735. Ms. Jones said Mr. Fernandes would be joining to discuss Ms. Rose's role, leading Ms. Rose to believe she would finally be allowed to return to work.

736. When Ms. Jones told Ms. Rose of Mr. Fernandes's anticipated attendance, Ms. Rose experienced a brief panic attack.

737. This would be Ms. Rose’s first time seeing Mr. Fernandes since taking leave, and she was frightened to have a conversation with him without any accommodations.

738. Ms. Rose made a quick excuse to Ms. Jones to pause her audio and video for a few minutes, then ran to the bathroom in case she was going to be physically sick.

739. Ms. Rose was sweating profusely down her neck and spine, with her heart pounding heavily and feeling as if it was doing so inside her head.

740. Ms. Rose did some breathing exercises to calm herself down and then returned to the camera.

741. When she returned, Mr. Fernandes had joined the meeting.

742. Mr. Fernandes told Ms. Rose she was being terminated for poor performance and then immediately left the meeting.

743. Ms. Jones told Ms. Rose her termination was effective immediately.

744. According to the termination form Ms. Rose received, she was being terminated for inconsistent performance and behavior, including not meeting performance expectations for her level and role and “becoming defensive” when provided direction or asked about the status of work assignments.

745. The termination form also accused Ms. Rose of blaming leadership and others for her performance shortcomings.

746. As detailed *supra*, during her time at Ford, Ms. Rose received almost exclusively positive feedback, numerous professional accolades, and no substantive feedback regarding areas for improvement, and she consistently delivered a quality work product on or ahead of schedule.

747. Ms. Rose exhausted her administrative remedies and timely filed this action within 90 days of receipt of her right to sue letter.

**COUNT I**
**Disability Discrimination**
**Americans with Disabilities Act**
**42 U.S.C. § 12101 *et seq*.**
**(Against Defendant Ford)**

748. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

749. Title I of the Americans with Disabilities Act (ADA) prohibits employers from discriminating against employees on the basis of disability.

750. Ford is a covered entity and an employer within the meaning of the ADA.

751. Ms. Rose is a qualified individual with a disability within the meaning of the ADA because she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, and/or was regarded as having such an impairment.

752. Ms. Rose was qualified to perform the essential functions of her position with reasonable accommodation.

753. Ms. Rose met, and many times exceeded, her employer's legitimate job performance expectations.

754. Ford knew of Ms. Rose's disability and her disability-related limitations.

755. Ford, through its managers, supervisors, and agents, subjected Ms. Rose to adverse employment actions, including:

a. Giving her unfavorable performance reviews that did not accurately reflect her work performance;
b. Placing her on involuntary extended leave;
c. Excluding her from her primary workstreams and thereby denying her the ability to perform her required job responsibilities;
d. Unfairly denying her promotion opportunities;
e. Replacing her with a nondisabled individual;
f. Permitting a nondisabled individual to work part-time in her former role while denying her the opportunity to do so;
g. Refusing to engage in the interactive process with her;
h. Reducing her pay; and
i. Terminating her employment

756. Ford subjected Ms. Rose to the foregoing adverse employment actions because of her disabilities and would not have taken those actions but for her disabilities.

757. Similarly situated employees without disabilities were treated more favorably than Ms. Rose.

758. As a direct and proximate cause of Defendant's acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT II**
**Hostile Work Environment**
**Americans with Disabilities Act**
**42 U.S.C. § 12101 *et seq*.**
**(Against Defendant Ford)**

759. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

760. The ADA prohibits subjecting a qualified individual with a disability to a hostile work environment because of her disability.

761. Ms. Rose is a qualified individual with a disability within the meaning of the ADA.

762. Ford, through its managers, supervisors, and agents, subjected Ms. Rose to unwelcome harassment because of her disability by:

a. Making derogatory statements to her about her disabilities and her related accommodations needs;

b. Shouting at and berating her;

c. Giving her baseless negative performance feedback and reviews;

d. Placing her on involuntary extended leave;

e. Replacing her with a nondisabled individual;

f. Permitting a nondisabled individual to work part-time in her role while denying her the ability to do so; and

g. Excluding her from her primary workstreams.

763. The harassment was so severe or pervasive that, under the totality of the circumstances, it unreasonably interfered with Ms. Rose's employment and created an intimidating, hostile, or offensive work environment.

764. A reasonable person in Ms. Rose's position would have perceived the work environment as hostile or offensive, and Plaintiff subjectively perceived it as such.

765. Ford knew or should have known of the harassment because Ms. Rose reported the hostile treatment to management, HR, and Ford's Disability Specialist.

766. Despite receiving these reports, Ford failed to investigate, intervene, or otherwise take prompt and appropriate corrective action.

767. As a direct and proximate cause of Defendant's acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT III**
**Failure to Accommodate**
**Americans with Disabilities Act**
**42 U.S.C. § 12101 *et seq.***
**(Against Defendant Ford)**

768. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

769. The ADA requires employers to make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability.

770. The ADA requires employers to work with qualified individuals with disabilities to identify reasonable accommodations that will provide the individual with an equal employment opportunity and will not cause an undue hardship on the operation of the business.

771. According to the ADA's governing regulations: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3).

772. Ms. Rose is a qualified individual with a disability who could perform the essential functions of her position with reasonable accommodation.

773. Ford knew of Ms. Rose's disability.

774. Ms. Rose timely notified Ford in writing of her disability-related need for reasonable accommodations. Ms. Rose's requested accommodations included JobShare, continued remote work, a modified schedule with extended breaks, a reasonable workload, and modified communications.

775. Ms. Rose's requested accommodations would have enabled her to perform the functions of her position, were reasonable, and would not have imposed an undue hardship on Ford.

776. Ford nevertheless failed to accommodate Ms. Rose's known disabilities. Mr. Katinas barred Mr. Kamal—Ms. Rose's ADHD memory-prompt accommodation—from Ms. Rose's out-of-process performance review, even though he was aware that Ms. Rose used Mr. Kamal as a disability-related accommodation.

777. Mr. Fernandes rejected Ms. Rose's requests for reasonable accommodations and insisted that Ms. Rose "only return to work . . . when she is fully able to perform the function full time," thereby conditioning Ms. Rose's return to work on her ability to perform without the modified schedule and other accommodations she had requested. Mr. Fernandes further failed to meaningfully engage with Ms. Rose concerning accommodations that would permit her to perform her position with her disability-related limitations.

778. Ford failed to provide Ms. Rose with reasonable accommodations or to engage in the interactive process in good faith.

779. Ms. Rose repeatedly sought accommodations through Ford's designated accommodation process, including through HR, PeopleFirst, and Sedgwick, but Ford failed to meaningfully evaluate her requests or work with her to identify an effective accommodation. Instead, Ford required Ms. Rose to return full time and without restrictions and placed her on "No Work Available" status and extended leave.

780. Ford's contention that Ms. Rose could return only when capable of working full time was further undermined by Ford's subsequent use of Ms. Ngwenya on a part-time basis to perform Ms. Rose's role, demonstrating that full-time performance was not necessary to the position and that a modified work arrangement was available.

781. As a direct and proximate cause of Defendant's acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT IV**
**Retaliation**
**Americans with Disabilities Act**
**42 U.S.C. § 12203(a)**
**(Against Defendant Ford)**

782. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

783. Title V of the ADA prohibits retaliation against an individual who has opposed an act made unlawful by the ADA or who has requested a reasonable accommodation.

784. Ms. Rose engaged in protected activity by repeatedly requesting reasonable accommodations, opposing disability discrimination, and filing a complaint with MDCR.

785. Ford knew of Ms. Rose's protected activity because she repeatedly communicated her requests for reasonable accommodations and complaints of disability discrimination directly to Ford management and HR, and Ford had

previously granted Ms. Rose disability-related accommodations. Plaintiff also notified Ford of her MDCR complaint on May 23, 2025, and Ford was notified of her EEOC charge on July 14, 2025.

786. Ford retaliated against Ms. Rose by:

a. Failing to approve the accommodations she needed to do her job;

b. Refusing to engage in the interactive process with her;

c. Placing her on "No Work Available" status and extended leave;

d. Reducing her pay; and

e. Terminating her employment.

787. Ford's adverse action escalated as Ms. Rose continued to assert her rights under the ADA. As Ms. Rose repeatedly sought to maintain her existing accommodations and seek return-to-work accommodations, Ford progressively restricted her ability to work, placed her on "No Work Available" status and extended leave, reduced her pay, and signed paperwork authorizing her termination the day after she notified Ford of her MDCR complaint.

788. The escalating adverse treatment and close temporal proximity demonstrate a causal connection between Ms. Rose's protected activity and Ford's retaliatory conduct.

789. As a direct and proximate cause of Defendant's conduct, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT V**
**Sex Discrimination**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2 *et seq*.**
**(Against Defendant Ford)**

790. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

791. Ford is an employer within the meaning of Title VII.

792. Title VII prohibits an employer from discriminating against an employee on the basis of sex.

793. Ms. Rose is an employee within the meaning of Title VII and is a member of a protected class based on her sex.

794. Ms. Rose was qualified for her position. She successfully performed the responsibilities of her position, consistently delivered on her assigned work, and received positive feedback regarding her performance.

795. Ms. Rose suffered adverse employment actions, including heightened and disparate performance scrutiny, negative performance documentation, and ultimately the termination of her employment.

796. Ms. Rose was treated less favorably than a similarly situated employee outside her protected class. Ms. Rose and Mr. Kamal, a male employee, remained JobShare partners through July 2024, occupied the same role, shared responsibility for the same work, and were subject to the same performance expectations.

797. Despite their substantially similar positions and responsibilities, Ford subjected Ms. Rose, but not Mr. Kamal, to an out-of-process performance review in April 2024. Although Ms. Rose and Mr. Kamal had historically completed their performance reviews together, Mr. Katinas repeatedly denied Ms. Rose's requests that Mr. Kamal participate in the review.

798. Ford thereafter subjected Ms. Rose, but not Mr. Kamal, to additional 30- and 60-day follow-up reviews and ultimately issued Ms. Rose a formal negative performance review.

799. Ford treated Ms. Rose less favorably despite evidence that Ms. Rose was performing at least as well as, and in material respects better than, Mr. Kamal. Ms. Rose continued to receive positive feedback concerning her work, while Mr. Katinas and other Ford employees expressed concerns that Mr. Kamal was not contributing equally to their assigned projects and was not performing all his responsibilities.

800. This disparity was consistent with their prior performance history. In 2023, although Ms. Rose and Mr. Kamal received the same annual performance rating, their manager expressly informed Mr. Kamal that his contributions and capabilities were significantly below Ms. Rose's.

801. Nevertheless, when Ford departed from the JobShare partners' established performance-review process in 2024, Ford singled out Ms. Rose, the female JobShare partner, for heightened scrutiny, separate reviews, repeated follow-up

reviews, and negative performance documentation, while Mr. Kamal, her male JobShare partner, was not subjected to comparable treatment.

802. Ford subsequently relied upon Ms. Rose's purported negative performance as a basis for terminating her employment.

803. Ford's asserted performance-based justification is inconsistent with Ms. Rose's documented performance, the positive feedback she continued to receive, Ford's contemporaneous concerns regarding Mr. Kamal's comparatively weaker performance, and Ford's materially more favorable treatment of Mr. Kamal.

804. Ms. Rose's sex was a motivating factor in Ford's disparate treatment of Ms. Rose and the adverse employment actions taken against her, in violation of Title VII.

805. As a direct and proximate cause of Defendant's acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

## COUNT VI
**Retaliation**
**Title VII of the Civil Rights Act**
**42 U.S.C. § 2000e-3(a)**
**(Against Defendant Ford)**

806. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

807. Title VII prohibits retaliation against an employee who has opposed a practice made unlawful by Title VII or who has made a charge.

808. Ms. Rose engaged in protected activity by filing a charge of sex discrimination with the EEOC on June 5, 2025.

809. Ford received notice of Plaintiff's EEOC charge shortly after its filing and knew of Ms. Rose's protected activity before terminating her.

810. On July 2, 2025, less than one month after learning Ms. Rose filed an EEOC charge against it, Ford terminated Ms. Rose's employment.

811. Ford terminated Ms. Rose because she engaged in protected activity, and Ford would not have terminated Plaintiff but for her protected activity.

812. There is a causal connection between Ms. Rose's protected activity and the adverse employment action.

813. As a direct and proximate cause of Defendant's acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

## COUNT VII
**Age Discrimination**
**Age Discrimination in Employment Act**
**29 U.S.C. § 621 *et seq*.**
**(Against Defendant Ford)**

814. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

815. The Age Discrimination in Employment Act (ADEA) prohibits discrimination against an employee on the basis of age.

816. Ford is an employer within the meaning of the ADEA.

817. Ms. Rose is an employee within the meaning of, and protected by, the ADEA. Ms. Rose was over forty years old at all times relevant to her claims.

818. Ms. Rose was qualified for her position and met Ford's legitimate performance expectations.

819. Ford discriminated against Ms. Rose based on her age by treating her less favorably than a younger employee and terminating her employment and replacing her with a significantly younger individual.

820. As a direct and proximate cause of Defendant's acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT VIII**
**Retaliation**
**Age Discrimination in Employment Act**
**29 U.S.C. § 621 *et seq*.**
**(Against Defendant Ford)**

821. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

822. The ADEA prohibits retaliation against an employee who has opposed a practice made unlawful by the ADEA or who has made a charge under the ADEA.

823. Ms. Rose engaged in protected activity by filing a charge of age discrimination with the EEOC on June 5, 2025.

824. Ford received notice of Ms. Rose's EEOC charge on July 14, 2025, and knew of Ms. Rose's protected activity before terminating her.

825. On July 2, 2025, less than one month after learning Ms. Rose had filed an EEOC charge against it, Ford terminated Ms. Rose's employment.

826. Ford terminated Ms. Rose because she engaged in protected activity, and Ford would not have terminated Plaintiff but for her protected activity.

827. As a direct and proximate cause of Defendant's conduct, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT IX**
**FMLA Interference**
**Family and Medical Leave Act**
**29 U.S.C. § 2615(a)(1)**
**(Against Defendants Ford and Fernandes)**

828. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

829. The Family Medical Leave Act (FMLA) makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the Act.

830. Ford is a covered employer within the meaning of FMLA.

831. At all relevant times, Mr. Fernandes acted directly or indirectly in Ford's interest with respect to Ms. Rose and exercised authority and control over Ms. Rose's return to work and reinstatement following FMLA leave. Mr. Fernandes therefore constituted an employer within the meaning of the FMLA.

832. At all relevant times, Ms. Rose was an eligible employee within the meaning of FMLA, having been employed by Ford for at least twelve months and for at least 1,250 hours of service during the twelve-month period preceding her leave.

833. FMLA entitles an eligible employee to up to twelve workweeks of leave during any twelve-month period because of a serious health condition that makes the employee unable to perform the functions of her position.

834. Plaintiff suffered from a serious health condition that rendered her unable to perform the functions of her position.

835. Plaintiff gave Defendants notice of her need for FMLA leave and took FMLA leave beginning on February 13, 2025.

836. Plaintiff was entitled to exercise her rights under FMLA, including the right to reinstatement to her position or an equivalent position upon her return from FMLA leave.

837. Defendants interfered with Ms. Rose's exercise of her FMLA rights by, among other things, obstructing and delaying her return to work, refusing to timely process her reinstatement, placing her on involuntary "No Work Available" and extended leave, reassigning her job duties to another employee, and terminating her employment rather than restoring her to her position or an equivalent position.

838. Mr. Fernandes personally participated in the interference with Plaintiff's FMLA rights, including by obstructing Ms. Rose's return to work and

participating in the decisions concerning Ms. Rose's reinstatement and termination.

839. Ms. Rose was prejudiced by Defendants' interference with her FMLA rights because, had Defendants restored her to her position or an equivalent position as required by FMLA, Ms. Rose would have returned to work and continued receiving the wages and employment benefits she instead lost because of Defendants' interference.

840. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT X**
**Retaliation**
**Family and Medical Leave Act**
**29 U.S.C. § 2615(a)(2)**
**(Against Defendants Ford**
**and Fernandes)**

841. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

842. The FMLA makes it unlawful for an employer to discharge or in any other manner retaliate against an employee for exercising or attempting to exercise rights protected by the Act.

843. Ms. Rose engaged in protected activity by requesting and taking FMLA leave.

844. Defendants knew that Ms. Rose had engaged in protected activity under FMLA.

845. After Ms. Rose exercised her FMLA rights, Defendants subjected her to adverse employment actions, including reducing her pay, placing her on unpaid leave, and terminating her employment.

846. The circumstances support a causal connection between Ms. Rose's exercise of her FMLA rights and Defendants' adverse actions. Ms. Rose began FMLA leave on February 13, 2025. Approximately one month into Ms. Rose's leave, Mr. Fernandes stated that Ms. Rose was not coming back. Thereafter, Defendants reduced Ms. Rose's pay, placed her on unpaid leave, and ultimately terminated her employment. Mr. Fernandes's statement, together with the temporal proximity and escalating adverse treatment following Ms. Rose's exercise of her FMLA rights, supports an inference that Defendants retaliated against Plaintiff for exercising those rights.

847. As a direct and proximate cause of Defendants' conduct, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

## COUNT XI
**Disability Discrimination**
**Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1101 *et seq*.**
**(Against Defendants Ford, Balzer,**
**Ely, Fernandes, and Katinas)**

848. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

849. Ford is an employer within the meaning of the Persons with Disabilities Civil Rights Act (PDCRA).

850. At all relevant times, Ms. Balzer, Mr. Ely, Mr. Fernandes, and Mr. Katinas acted as agents of Ford and possessed and exercised authority affecting the terms, conditions, and privileges of Ms. Rose's employment, including her performance evaluations, title, job responsibilities, work assignments, promotional opportunities, return to work, and continued employment.

851. Ms. Rose is an employee within the meaning of PDCRA.

852. PDCRA prohibits an employer from discriminating against an employee on the basis of disability.

853. Ms. Rose is a person with a disability within the meaning of PDCRA, and her disability was unrelated to her ability to perform the duties of her position, with or without reasonable accommodation.

854. Defendants knew of Ms. Rose's disability and disability-related limitations.

855. Defendants discriminated against Plaintiff because of her disability with respect to the terms, conditions, and privileges of her employment, including by issuing baseless unfavorable performance reviews, excluding her from her primary workstreams, denying her promotional opportunities, replacing her, and terminating her employment.

856. After learning of Ms. Rose's disability and disability-related limitations, Mr. Katinas subjected Ms. Rose to adverse treatment, including downgrading Ms.

Rose's previously positive performance evaluation and deliberately excluding Ms. Rose from the platform-reconfiguration workstream, which constituted approximately seventy-five percent of Ms. Rose's role. Mr. Katinas later acknowledged that he had deliberately excluded Plaintiff from that workstream for months.

857. Mr. Ely expressly told Ms. Rose that her disabilities would likely hinder her future promotional opportunities and warned Plaintiff that other leaders would not be as tolerant of her disability-related limitations. Mr. Ely thereafter gave Ms. Rose a lateral move rather than a promotion and altered Ms. Rose's previously agreed-upon title and work responsibilities.

858. After learning of Ms. Rose's disabilities and accommodation needs, Mr. Fernandes participated in abruptly raising purported performance concerns despite Ms. Rose having ended 2024 with positive feedback and no documented areas for improvement. Mr. Fernandes thereafter restricted Ms. Rose's ability to return to work, recruited a non-disabled employee to perform Ms. Rose's role on a part-time basis while maintaining that Ms. Rose was required to possess full-time capacity, and ultimately participated in and communicated Plaintiff's termination.

859. Ms. Balzer knew of Ms. Rose's disability and accommodation needs and exercised managerial authority over Plaintiff. Ms. Balzer had previously confirmed Ms. Rose's agreed-upon role and responsibilities and facilitated Ms.

Rose's transfer on those terms. Nevertheless, Ms. Balzer later joined Mr. Fernandes in abruptly raising purported performance concerns despite Ms. Rose's positive performance history and subsequently denied the parties' prior documented agreement concerning Ms. Rose's role and responsibilities.

860. Ms. Rose had successfully performed her job at Ford for years while receiving disability-related accommodations, earning positive performance reviews, and advancing in her career. Ms. Rose's disabilities did not become an impediment to her employment until Defendants assumed managerial authority over her and began treating her disability-related limitations and accommodations as obstacles to her continued advancement and employment. Thereafter, the individual Defendants expressly linked Ms. Rose's disabilities to her promotional prospects and ability to perform certain work, removed significant job responsibilities, subjected her to unfavorable and out-of-process performance criticism, restricted her ability to return to work, and replaced her with a non-disabled employee whom Ford permitted to perform the role on a part-time basis despite maintaining that Ms. Rose's disability-related limitations prevented her from performing the same role without full-time capacity.

861. Ms. Rose's history of successfully performing her job with accommodations, followed by the deterioration of her employment conditions after the individual Defendants began exercising authority over her, the individual Defendants' disability-specific derogatory statements, and the sequence of adverse

employment actions that followed support a causal nexus between Ms. Rose's disability and the challenged adverse employment actions and a reasonable inference that Defendants took those actions because of Ms. Rose's disability.

862. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**<u>COUNT XII</u>**
**Hostile Environment**
**Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1101 *et seq*.**
**(Against Defendants Ford, Fernandes, and Katinas)**

863. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

864. PDCRA prohibits subjecting an employee to a hostile work environment because of their disability.

865. After Ms. Rose disclosed her disabilities and disability-related needs to Defendants, she was subjected to repeated, unwelcome conduct and communications because of those disabilities and needs. Ford managers increasingly treated Ms. Rose's disability-related needs and requests for accommodation as professional deficiencies and impediments to her continued employment.

866. The disability-based hostility directed at Ms. Rose included repeated aggressive and demeaning communications concerning Ms. Rose's performance

and disability-related needs. Mr. Katinas shouted at and berated Plaintiff during her performance review and criticized Ms. Rose's use of a disability-related memory-assistance tool. Mr. Fernandes likewise subjected Ms. Rose to aggressive and hostile communications concerning her ability to work with disability-related needs and insisted that Ms. Rose could return only when capable of working full time.

867. The conduct was not an isolated workplace disagreement. Ms. Rose was repeatedly subjected to hostile treatment by managers after her disabilities and disability-related limitations became an issue in the workplace, while simultaneously facing escalating criticism of her performance and ability to continue working. The hostility accompanied the removal of significant work responsibilities, restrictions on Ms. Rose's return to work, and treatment of her disability-related limitations as an impediment to her continued employment.

868. Considering the totality of the circumstances, including the frequency and cumulative nature of the conduct, the involvement of multiple managers, its connection to Ms. Rose's disabilities and disability-related limitations, and its effect upon her ability to perform and continue her employment, the unwelcome disability-based conduct was sufficiently severe or pervasive to substantially interfere with Ms. Rose's employment and create an intimidating, hostile, and offensive work environment.

869. A reasonable person in Ms. Rose's position would have perceived the environment as hostile or offensive, and Ms. Rose did perceive the environment as hostile or offensive.

870. Defendants had actual or constructive notice of the hostile environment. The disability-based conduct was perpetrated by Ford managers and supervisory employees in their interactions with Ms. Rose and occurred in connection with Ford's performance-management, accommodation, work-assignment, and return-to-work processes.

871. Despite their knowledge of the hostile environment, Defendants failed to take prompt and adequate remedial action reasonably calculated to end it. Instead, the hostile treatment continued through Ford managers and supervisory employees and accompanied Ms. Rose's continuing efforts to obtain accommodations and return to work.

872. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT XIII**
**Failure to Accommodate**
**Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1101 *et seq*.**
**(Against Defendants Ford,**
**Katinas, Fernandes, and Sedgwick)**

873. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

874. Ms. Rose is a person with a disability within the meaning of PDCRA and was otherwise qualified to perform the duties of her position with reasonable accommodation.

875. PDCRA requires an employer to accommodate the known disabilities of an employee unless the employer demonstrates that the accommodation would impose an undue hardship.

876. Ms. Rose timely notified Ford in writing of her disability-related need for reasonable accommodations within 182 days after she knew or reasonably should have known that the accommodations were needed. Ms. Rose's requested accommodations included JobShare, continued remote work, a modified schedule with extended breaks, a reasonable workload, and modified communications.

877. The requested accommodations were reasonable and would not have imposed an undue hardship on Ford. Reasonable accommodations were available that would have enabled Ms. Rose to perform the duties of her position. Ms. Rose had successfully performed her position remotely, Ford had previously discussed and approved JobShare as an accommodation, and Ms. Rose sought modifications that would permit her to continue performing her work with her disability-related limitations. Defendants nevertheless failed to accommodate Ms. Rose's known disabilities.

878. After Ms. Rose told Mr. Katinas she was having a negative reaction to her medication, he subjected her—and no one else—to an out-of-process performance review where he gave her a baseless negative performance rating. He barred Mr. Kamal—Ms. Rose's memory-prompt accommodation—from Ms. Rose's out-of-process performance review, even after being reminded that Ms. Rose used Mr. Kamal as a disability-related accommodation.

879. Ford denied Ms. Rose's request for an alternative memory-prompt accommodation.

880. When Ms. Rose ultimately created her own memory-prompt accommodation by taking notes of the meeting, Mr. Katinas became hostile and aggressive towards her.

881. Mr. Fernandes rejected Ms. Rose's requests for reasonable accommodations and insisted that Ms. Rose only return to work when she was fully able to work full time, thereby conditioning Ms. Rose's return to work on her ability to perform without the modified schedule and other accommodations she had requested. Mr. Fernandes further failed to meaningfully engage with Ms. Rose concerning accommodations that would permit her to perform her position with her disability-related limitations.

882. Sedgwick provided Ms. Rose with inaccurate and conflicting guidance concerning her return to work, provided information inconsistent with that provided by Ford and PeopleFirst concerning Sedgwick's role and

responsibilities in the accommodation process, and failed to provide consistent guidance concerning the steps Ms. Rose was required to take to obtain resolution of her accommodations and return to work, making it impossible for Ms. Rose to access accommodations and the interactive process or return to work.

883. Ford's position that Ms. Rose could return only when capable of working full time was contradicted by its assignment of Ms. Ngwenya to perform Ms. Rose's role on a part-time basis, demonstrating that full-time performance was not necessary to the position and that a modified work arrangement was available.

884. As a direct and proximate cause of Defendants' conduct, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT XIV**
**Retaliation**
**Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1602(a)**
**(Against Defendants Ford,**
**Ely, and Fernandes)**

885. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

886. PDCRA prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing."

887. Ms. Rose engaged in protected activity by requesting disability accommodations, opposing Ford's treatment of her disability-related needs, and filing a complaint with MDCR.

888. On May 22, 2025, Ms. Rose filed an MDCR complaint alleging disability discrimination and notified Ford of the filing that same day. Also on May 22, Mr. Fernandes, Mr. Ely, Ms. Kostka, and Ms. White approved Ms. Rose's termination.

889. On May 23, 2025, Ms. Blatchley provided the final required approval for Ms. Rose's termination.

890. Mr. Fernandes, Mr. Ely, and Ms. Kostka were aware of Ms. Rose's disability-related requests and complaints and had been directly involved in the underlying events.

891. Ford terminated Ms. Rose on July 2, 2025, approximately six weeks after learning that Ms. Rose had filed an MDCR complaint alleging disability discrimination against it.

892. The timing of Ford's termination process, together with the participation of managers directly involved in Ms. Rose's disability-related requests and complaints, supports an inference that Plaintiff's protected activity was a significant factor in her termination.

893. Ms. Rose's protected activity was a significant factor in Defendants' decision to terminate her employment.

894. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**<u>COUNT XV</u>**
**Sex Discrimination**
**Elliott-Larsen Civil Rights Act**
**M.C.L. 37.2202 *et seq*.**
**(Against Defendants Ford and Katinas)**

895. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

896. ELCRA prohibits an employer or its agent from discriminating against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of sex.

897. Ford is an employer, and Mr. Katinas acted as Ford's agent, within the meaning of ELCRA.

898. Ms. Rose is an employee within the meaning of ELCRA and is a member of a protected class based on her sex.

899. Ms. Rose was qualified for her position. She successfully performed the responsibilities of her position, consistently delivered on her assigned work, and received positive feedback regarding her performance.

900. Ms. Rose met, and many times exceeded, Defendants' legitimate job performance expectations.

901. Ms. Rose suffered adverse employment actions, including heightened and disparate performance scrutiny, negative performance documentation, and ultimately the termination of her employment.

902. Defendants treated Ms. Rose less favorably than a similarly situated employee outside her protected class. Ms. Rose and Mr. Kamal, a male employee, remained JobShare partners through July 2024, occupied the same role, shared responsibility for the same work, and were subject to the same performance expectations.

903. Despite their substantially similar positions and responsibilities, Defendants subjected Ms. Rose, but not Mr. Kamal, to an out-of-process performance review in April 2024. Although Ms. Rose and Mr. Kamal had historically completed their performance reviews together, Mr. Katinas repeatedly denied Ms. Rose's requests that Mr. Kamal participate in the review.

904. Defendants thereafter subjected Ms. Rose, but not Mr. Kamal, to additional 30- and 60-day follow-up reviews and ultimately issued Ms. Rose a formal negative performance review.

905. Defendants treated Ms. Rose less favorably despite evidence that Ms. Rose was performing at least as well as, and in material respects better than, Mr. Kamal. Ms. Rose continued to receive positive feedback concerning her work, while Mr. Katinas and other Ford employees expressed concerns that Mr. Kamal

was not contributing equally to their assigned projects and was not performing all of his responsibilities.

906. This disparity was consistent with Ms. Rose and Mr. Kamal's prior performance history. In 2023, although they received the same annual performance rating, their manager expressly informed Mr. Kamal that his contributions and capabilities were significantly below Ms. Rose's.

907. Nevertheless, when Defendants departed from the JobShare partners' established performance-review process in 2024, Defendants singled out Ms. Rose, the female JobShare partner, for heightened scrutiny, separate reviews, repeated follow-up reviews, and negative performance documentation, while Mr. Kamal, her male JobShare partner, was not subjected to comparable treatment.

908. Defendants subsequently relied upon Ms. Rose's purported negative performance as a basis for terminating her employment.

909. Defendants' asserted performance-based justification is inconsistent with Ms. Rose's documented performance, the positive feedback she continued to receive, Defendants' contemporaneous concerns regarding Mr. Kamal's comparatively weaker performance, and Defendants' materially more favorable treatment of Mr. Kamal.

910. Ms. Rose's sex was a motivating factor in Defendants' disparate treatment of her and the adverse employment actions taken against her.

911. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT XVI**
**Age Discrimination**
**Elliott-Larsen Civil Rights Act**
**M.C.L. 37.2202 *et seq*.**
**(Against Defendants Ford, Fernandes, and Ely)**

912. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

913. Ford is an employer and Mr. Fernandes and Mr. Ely acted as Ford's agents within the meaning of ELCRA.

914. ELCRA prohibits an employer or its agent from discriminating against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of age.

915. Ms. Rose is an employee within the meaning of ELCRA and is a member of a protected class based on her age.

916. Defendants discriminated against Plaintiff based on her age by treating her less favorably than younger employees and terminating her employment to replace her with a substantially younger individual.

917. Ms. Rose's age was a motivating factor in Defendants' disparate treatment of her and the adverse employment actions taken against her.

918. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**COUNT XVII**
**Retaliation**
**Elliott-Larsen Civil Rights Act**
**M.C.L. 37.2202 *et seq*.**
**(Against Defendants Ford and Fernandes)**

919. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

920. Ford is an employer and Mr. Fernandes acted as Ford's agent within the meaning of ELCRA.

921. ELCRA prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing."

922. Ms. Rose engaged in protected activity by opposing discrimination, filing a complaint with MDCR, and filing a charge with the EEOC.

923. Defendants retaliated against Plaintiff by terminating her employment after receiving notice that she had filed complaints of discrimination against Ford.

924. There is a causal connection between Ms. Rose's protected activity and Defendants' adverse employment actions.

925. As a direct and proximate cause of Defendants' acts and omissions, Plaintiff has suffered damages as detailed in the Damages section of this Complaint.

**COUNT XVIII**
**Breach of Contract**
**(Against Defendant Ford)**

926. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

927. Although employment in Michigan for an indefinite term is presumed to be at will, specific and definite promises concerning the terms and conditions of employment may give rise to enforceable contractual obligations.

928. Ford, through its authorized agents, including Mr. Ely and Ms. Balzer, made specific and definite promises to Ms. Rose, including that, in exchange for Ms. Rose declining an outside offer and remaining within Mr. Ely's organization, Ms. Rose would receive and retain the title of Technical Program Manager, and would lead three specified, defined workstreams in which she was already engaged.

929. Ms. Rose accepted these promises and provided consideration, including by declining the competing offer from Integrated Services and continuing her employment on the agreed terms.

930. Ford and Ms. Rose thereby formed an enforceable agreement concerning the terms of Ms. Rose's employment, which was subsequently confirmed by Ford's agents, including Mr. Ely and Ms. Balzer.

931. Ford breached the agreement by unilaterally changing Ms. Rose's agreed-upon job responsibilities without her knowledge or consent, reprimanding her for failing to perform responsibilities that were not part of the agreed-upon role, and ultimately reassigning the defined workstreams it had promised Ms. Rose to another employee while Ms. Rose was on leave, some of which was involuntarily and forced upon her by Ford.

932. As a direct and proximate result of Defendant's breach, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**<u>COUNT XIX</u>**
**Negligent Performance of a Voluntary Undertaking (Against Defendants Ford and Sedgwick)**

933. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

934. Under Michigan law, a party that voluntarily undertakes to render services or perform an act assumes a common-law duty to exercise reasonable care in performing that undertaking. *Fultz v. Union-Com. Assocs.*, 683 N.W.2d 587, 591 (Mich. 2004); *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 561 (Mich. 2011).

935. Separate and apart from any obligation imposed by the ADA, PWDCRA, or FMLA, Ford voluntarily established, controlled, and administered a defined accommodation and return-to-work process through its Human Resources

personnel, PeopleFirst, and Sedgwick. Ford expressly advised Ms. Rose that Sedgwick's review of her requested accommodations was the first step in Ford's accommodation process and repeatedly directed her to pursue her accommodation and return to work through that process.

936. Ford's voluntary undertaking included the administration and coordination of that process, separate from any substantive determination as to whether Ms. Rose was entitled to a particular accommodation under federal or state law.

937. Having voluntarily undertaken to administer and coordinate that process, Ford owed Ms. Rose a common-law duty to exercise reasonable care in its performance.

938. Ford breached that duty by negligently administering the process it undertook, including by providing Ms. Rose with conflicting instructions; failing to reasonably coordinate among Ford personnel, PeopleFirst, and Sedgwick; failing to timely transmit and process Ms. Rose's medical restrictions and accommodation documentation; repeatedly canceling and rescheduling meetings necessary to resolve Ms. Rose's requests; and directing Ms. Rose through a circular referral process that left her accommodation and return-to-work status unresolved for months.

939. Ms. Rose reasonably and detrimentally relied upon Ford's undertaking by following the process Ford directed her to use, submitting the requested documentation, continuing to communicate with the entities and personnel Ford

designated to administer the process, and awaiting Ford's direction regarding her return to work.

940. Ford's negligent performance increased the risk of harm to Ms. Rose and unnecessarily prolonged the resolution of her accommodation and return-to-work status. Had Ford exercised reasonable care in administering the process it undertook, Ms. Rose could have timely returned to work with temporary accommodations rather than remaining in an unresolved employment status that resulted in reduced pay, unpaid leave, loss of benefits, and ultimately the loss of her employment.

941. Separate and apart from determining or paying disability benefits for Ford employees, Sedgwick undertook to provide services concerning Ms. Rose's accommodation and return-to-work process. Among other things, Sedgwick communicated directly with Ms. Rose concerning how she should request accommodations and her return-to-work, advised Ms. Rose on her return to work, reviewed and processed Ms. Rose's accommodation submissions, separated her medical restrictions and requested accommodations into distinct requests before forwarding them to Ford, and communicated with Ford concerning Ms. Rose's restrictions and requested accommodations.

942. Ford expressly advised Ms. Rose that Sedgwick's review of her requested accommodations was the first step in Ford's accommodation process and

repeatedly directed her to communicate with Sedgwick concerning her medical leave and return to work.

943. Consistent with that role, Sedgwick communicated directly with Ms. Rose concerning how to pursue her return to work and requested accommodations, processed and transmitted her accommodation submissions to Ford, and provided Ms. Rose with guidance and instructions concerning that process.

944. Donna B., acting on behalf of Sedgwick and within the scope of her employment, participated in Sedgwick's undertaking by providing Ms. Rose with guidance and instructions concerning her accommodation and return to work.

945. Having undertaken to provide these services, Sedgwick owed Ms. Rose a duty to exercise reasonable care in performing the undertaking.

946. Ms. Rose reasonably and detrimentally relied upon Sedgwick's undertaking and guidance concerning the accommodation and return-to-work process, including by continuing to communicate and work with Sedgwick concerning her accommodations and return to work and submitting an updated accommodation request based upon Sedgwick's advice.

947. Sedgwick breached its duty of reasonable care in performing the undertaking by providing inaccurate and conflicting guidance concerning Ms. Rose's return to work, providing information inconsistent with that provided by Ford and PeopleFirst concerning Sedgwick's role and responsibilities in the accommodation process, and failing to provide consistent guidance concerning

the steps Ms. Rose was required to take to obtain resolution of her accommodations and return to work.

948. Sedgwick's negligent performance of its undertaking and Ms. Rose's reasonable reliance thereon caused or contributed to delays and confusion in Ms. Rose's accommodation and return-to-work process and prolonged the period during which her requested accommodations and return to work remained unresolved.

949. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

950. Ms. Rose's damages under this Count arise from Defendants' negligent performance of their voluntary undertakings and Ms. Rose's resulting economic and professional losses and do not depend upon proof of a physical or psychological personal injury to Ms. Rose compensable under the Worker's Disability Compensation Act (WDCA).

**COUNT XX**
**Intentional Infliction of Emotional Distress**
**(Against Defendants Ford and Fernandes)**

951. Ms. Rose realleges and incorporates by reference the allegations contained in the previous paragraphs.

952. Under Michigan law, intentional infliction of emotional distress requires extreme and outrageous conduct, intent, causation, and severe emotional distress.

Where the claim arises from an employment relationship subject to the Worker's Disability Compensation Act (WDCA), a plaintiff must establish the specific intent to injure required by M.C.L. 418.131(1). *Travis v. Dreis & Krump Mfg. Co.*, 551 N.W.2d 132, 138 (Mich. 1996).

953. Considering Mr. Fernandes's position of authority over Ms. Rose, the nature and sustained course of his conduct, and his knowledge of Ms. Rose's particular susceptibility to emotional and physical distress, his conduct was extreme and outrageous and exceeded all bounds of decency tolerated in a civilized society.

954. Mr. Fernandes knew of Ms. Rose's disabilities, disability-related limitations, and particular susceptibility to emotional and physical distress. He further knew that his hostile and aggressive manner of communicating with Ms. Rose was contributing to her deteriorating condition. Indeed, Ms. Rose specifically requested modified communications as a disability accommodation, including that Mr. Fernandes refrain from yelling at her.

955. By February 7, 2025, Ms. Rose's deteriorating condition was apparent. She had been missing work, and during a meeting that day, she was specifically asked whether she was "okay." Mr. Fernandes therefore knew, or at minimum was confronted with circumstances demonstrating, that Ms. Rose was experiencing significant distress.

956. Despite that knowledge, Mr. Fernandes deliberately continued and escalated his hostile treatment of Ms. Rose. His sustained course of hostile conduct, his

statement during Ms. Rose's medical leave that she "was not returning," and his subsequent interference with her return to work support the inference that Mr. Fernandes specifically intended to cause Ms. Rose emotional injury as a means of making her continued employment intolerable and driving her from the workplace.

957. Mr. Fernandes was a supervisory and managerial employee of Ford who exercised substantial authority over Ms. Rose's work, accommodations, return to work, and continued employment. A corporate employer's intent may be established through a supervisory or managerial employee possessing the requisite state of mind. *Travis*, 551 N.W.2d at 138–39. Accordingly, Mr. Fernandes's specific intent to injure Ms. Rose is attributable to Ford for purposes of M.C.L. 418.131(1).

958. As a direct and proximate cause of Defendants' acts and omissions, Ms. Rose has suffered damages as detailed in the Damages section of this Complaint.

**DAMAGES**

959. Ms. Rose realleges and incorporates by reference previously pled paragraphs as if fully pled herein.

960. As a direct and proximate result of the above-described conduct, Ms. Rose suffered general, special, incidental, and consequential injury and damages, past, present, and future, above the jurisdictional threshold of this Court, an amount

that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a. Loss of income, employment benefits, and other economic damages;

b. Pain, suffering, and severe emotional distress;

c. Physical manifestations of emotional distress including migraines, memory loss, and dermatillomania;

d. Embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;

e. Loss of employment opportunities;

f. Damage to her professional reputation;

g. Anxiety;

h. Depression;

i. Hypervigilance;

j. Economic loss;

k. Medical and medical-related expenses;

l. Pharmaceutical expenses;

m. Loss of the ability to perform daily activities and obtain the full enjoyment of life;

n. Psychological treatment, therapy, and counseling and related expenses;

o. Loss of the ordinary pleasures of everyday life;

p. Loss of relationships;

q. Travel and travel-related expenses; and

r. All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C. For any appropriate statutory damages;

D. For costs of this suit;

E. For punitive damages, according to proof, as appropriate to the individual cause of action;

F. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G. For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

**DEMAND FOR JURY TRIAL**

Now comes Plaintiff, by and through her attorneys, ABDNOUR WEIKER LLP, and hereby demands a trial by jury.

DATED: October 5, 2026

Respectfully Submitted,
ABDNOUR WEIKER, LLP

*s/Elizabeth K. Abdnour*

Jacquelyn Kmetz (P83575)
Elizabeth K. Abdnour (P78209)
Ashley A. Dylenski (P88208)
325 E. Grand River Ave., Suite 250
East Lansing, MI 48823
(517) 994-1776
jacquelyn@education-rights.com
liz@education-rights.com
ashley@education-rights.com

*Attorneys for Plaintiff*

**PROOF OF SERVICE**

I certify that on October 5, 2026, I filed this document by use of this Court's ECF system, which will serve copies to the Clerk of Courts and all counsel of record.

Respectfully submitted,

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour